**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Venacio Aguasanta Arias, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DynCorp, *et al.* ) | |
| ) | |
| Defendants. ) | Case Number: 1:01CV01908 (RWR) |
| ) | |
| ) | Consolidated for Case Management |
| Nestor Emogenes Arroyo ) | and Discovery with |
| Quinteros, *et al.*, ) | *Quinteros*: 1:07CV01042 (RWR) |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DynCorp, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>**JOINT RULE 16.3 STATEMENT**</u>

This joint statement by the parties is being filed pursuant to the Court's October 22, 2007

Order for Initial Scheduling Conference issued in both the *Arias* and *Quinteros* cases, as well as

pursuant to D.D.C. Civ. R. 16.3 (hereafter "LCvR 16.3") and Fed. R. Civ. P. 26(f).

**A.**    <u>**Introduction**</u>

The initial conference of the parties, convened pursuant to LCvR 16.3 and Fed. R. Civ. P.

26(f) was held on October 30, 2007. This was a face to face meeting of all parties' counsel held

in Washington, D.C. Following that meeting, this joint report has been prepared to summarize

the parties' positions on the topics listed in LCvR 16.3(c) and to include a brief statement of the

case and the statutory basis for all causes of action and defenses, as directed in the Court's 10/22/07 Orders.

In addition, in accordance with LCvR 16.3(d), the parties are submitting alternative proposed scheduling orders with this report due to the significant differences between the parties about how discovery should be commenced and "phased" in these cases. Because this disagreement affects most of the topics addressed in this Joint Statement, the parties will first briefly summarize their alternative discovery phasing proposals here, and will address them in more detail in Section E below and in their separate proposed scheduling orders.

(1)    Summary of Plaintiffs' Proposal

Plaintiffs propose that this mass-tort action be managed for discovery and trial purposes in phases. Plaintiffs propose that class discovery commence in the *Arias* case with an established deadline to file Plaintiffs' class certification motion. Parallel to the class discovery, Plaintiffs propose that a group of trial Plaintiffs be selected for focused discovery and trial from the *Quinteros* case. Focused discovery will be limited to the first group of trial Plaintiffs while questionnaire responses and associated record gathering are being conducted into the remaining Plaintiffs on a rolling basis. Discovery from the Provincial Plaintiffs will be limited to initial disclosures. Upon completion of the first phase of individual Plaintiff trials, the Court and parties will discuss global resolution and schedule additional Plaintiff groups for trial as well as trial of the Provincial claims.

(2)    Summary of Defendants' Proposal

The defendants propose to commence "Phase 1" discovery at this time into three subject matters: (a) the Rule 23 requirements for the *Arias* class action claims (to be followed immediately by the *Arias* class certification proceeding); (b) the submission of verified fact statements (*i.e.*, "*Lone Pine*" submissions) by the 1660 individual *Quinteros* plaintiffs; (c) and

discovery relevant to the defendants' anticipated "government contractor defense," which will be addressed in a dispositive motion following this first phase of discovery.

**B.**    **Plaintiffs' Brief Statement of their Cases and the Statutory Basis for All Causes of Action**

The claims in this action arise from Defendants' conduct in connection with the implementation of their contracts with agencies of the United States and Columbian governments to exterminate, by the use of fumigants sprayed from airplanes and helicopters plantations of cocaine and./or heroin poppies in large tracts of the Columbian rainforest.  During the course of implementing these contracts, Defendants also sprayed large sections of Esmeraldas, Carchi, and Succumbios provinces in Ecuador, across the border from Columbia, and caused severe physical and mental damages to Plaintiffs and their children.  Furthermore, as a direct and proximate result of the cross-border spraying, the Provinces of Succumbios, Carchi, and Esmeraldas have suffered damage to their natural resources and have expended, and will be required to expend in the future, funds to remediate the situation and to address their citizens' health, security, and property.  Plaintiffs have been subjected to serious and systematic damage to their persons and their property in violation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, international laws, treaties, conventions, resolutions, and the common laws of the United States, the District of Columbia, the Commonwealth of Virginia, the State of Texas, the State of Delaware, and/or the country of Ecuador.

**C.**    **Defendants' Brief Statement of the Cases and their Defenses with Statutory Basis Therefor**

In these cases, the plaintiffs seek to hold defendants liable for their support of aerial drug eradication operations conducted pursuant to the specific terms of contracts with the U.S. Department of State as part of a joint United States-Colombia foreign policy initiative known as "Plan Colombia."  Plaintiffs' contention that these aerial eradication operations have resulted in

damage to human health, to livestock and legal crops, and to the environment in Ecuador has been repeatedly considered and rejected by the U.S. government and the Republic of Colombia.

The defendants' Answers filed in both *Arias* and *Quinteros* deny that the defendants (collectively "DynCorp International") either intentionally or negligently caused herbicides to be sprayed or to drift over the Colombian border into Ecuador. Moreover, even if DynCorp International were found responsible for herbicide spraying or drifting into Ecuador (which is denied), the defendants also deny that the herbicide at issue (glyphosate combined with a surfactant to make it better stick to the illegal coca and poppy plants) can or does cause any significant injury to human beings or to farm animals. In annual submissions made to the U.S. Congress in connection with appropriations for "Plan Colombia," the safety of the herbicide has been consistently certified by the U.S. Department of State and the U.S. Environmental Protection Agency. Numerous other scientific studies by the Organization of American States and by the U.S. Department of Agriculture have confirmed the absence of any significant injury to human beings or to farm animals from exposure to the herbicide used in Plan Colombia. Still other studies have concluded that the amount of "drift" from the aerial eradication operations is minimal.

In order to prevail in their claims against DynCorp International, plaintiffs will first have to establish that they were in fact exposed to a toxic substance *as a result of* the actions of the defendants, for which defendants should be held responsible. But defendants' actions have all been taken pursuant to the specific direction and oversight of the U.S. and Colombian governments, and the plaintiffs' assertion of cross-border spraying of the herbicide in Ecuador is without factual basis.

Next, plaintiffs will have to establish based on scientifically reliable and relevant evidence that the glyphosate and surfactant mixture: (1) is capable of causing the bodily injuries alleged ("general causation"), and (2) in fact caused each individual plaintiff to suffer the bodily injuries and property damage that he/she alleges ("specific causation"). But glyphosate has never been shown in any controlled scientific trials or studies to result in any significant injury to humans or to farm animals. Nor is there any scientifically reliable and relevant evidence identifying a mechanism of action whereby exposure to glyphosate (with or without combining it with the surfactant) could or would cause such injuries.

As the Court requested, the defendants next identify the statutory bases for the defenses they have raised in their Answers:

The "government contractor" defense (Defense No. 1 in *Arias*; Defense No. 1 in *Quinteros*) and the "derivative sovereign immunity" defense (No. 2 in *Arias*; No. 2 in *Quinteros*) are both grounded in the exceptions to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), as well as in ample federal caselaw. These defenses bar plaintiffs' claims because every significant action undertaken by DynCorp International in connection with the aerial eradication work that is part of Plan Colombia is directed and supervised by the U.S. Department of State pursuant to its contracts with DynCorp International. The defendants also rely upon 28 U.S.C § 2680(j) and federal common law for their defense that they are engaged in "combatant activities" in the continuing U.S. war on drugs and terrorism (No. 20 in *Arias*; No. 20 in *Quinteros*).

The "political question" doctrine (No. 3 in *Arias*; No. 3 in *Quinteros*) raises the nonjusticiability of issues in this litigation, which arises from the separation of powers stated in the U.S. Constitution. The U.S. Constitution also forms the basis for the defenses stated against punitive damages (No. 17 and 18 in *Arias;* No 17 and 18 in *Quinteros*). The "act of state"

doctrine (No. 4 in *Arias*; No. 4 in *Quinteros*) is based on U.S. federal common law and is raised here because of the substantial involvement of the Republic of Colombia in the conduct described in the *Arias* and *Quinteros* complaints.  Indeed, the plaintiffs mistakenly assume that certain actions are undertaken by DynCorp International when such actions are actually performed by the Republic of Colombia.  Federal common law also forms the basis for the defense that the plaintiffs' assertion of state law tort claims is preempted by federal law (No. 8 in *Arias*; No. 8 in *Quinteros*).[1]

The defendants also have raised the defense that they may not be able to fairly and fully defend themselves based on claims of confidentiality or military or state secrets regarding the U.S. government documents that are pertinent to proving DynCorp International's lack of responsibility or culpability.  (No. 5 in *Arias*; No. 5 in *Quinteros*).  The military and state secrets privilege belongs to the government, of course, and not to DynCorp International, but its assertion raises both jurisdictional and evidentiary issues that are well recognized.

The defendants also maintain that plaintiffs have failed to state a claim under the Alien Tort Statute at 28 U.S.C. § 1350 (No. 6 in *Arias*; No. 6 in *Quinteros*), under the Torture Victims

---

[1] Both federal and state common law recognize many of the additional defenses identified in DynCorp International's Answers including:  lack of causation, both factual and scientific (No. 10, 11, and 12 in *Arias*; No. 10, 11, and 12 in *Quinteros*); the principles of indemnity, contribution and similar doctrines (No. 13 in *Arias*; No. 13 in *Quinteros*); proximate cause or contribution by the plaintiffs (No. 14 in *Arias*; No. 14 in *Quinteros*); the lack of duty by DynCorp International to any of the plaintiffs (No. 15 in *Arias*; No. 15 in *Quinteros*); the failure to mitigate damages (No. 16 in *Arias*; No. 16 in *Quinteros*); the failure to name indispensable parties (No. 19 in *Arias*; No. 19 in *Quinteros*); the alleged battery was not intentional (No. 22 in *Arias*; No. 21 in *Quinteros*); the alleged assault was not intentional (No. 23 in *Arias*); the alleged intentional infliction of emotional distress was neither intentional nor reckless (No. 24 in *Arias*; No. 22 in *Quinteros*); the alleged negligent infliction of emotional distress claims fail to satisfy necessary showings (No. 25 in *Arias*; No. 23 in *Quinteros*); the negligent hiring and supervision claims fail because defendants' conduct was lawful and proper (No. 27 in *Arias*; No. 25 in *Quinteros*); the conversion claims fail because plaintiffs have not lost control of their properties (No. 28 in *Arias*); the trespass claims fail because actions were not intentional (No. 29 in *Arias*; No. 26 in *Quinteros*); no basis for equitable or injunctive relief (No. 32 in *Arias*); and no responsibility or liability for the actions of the defendants' independent contractors (No. 33 in *Arias*; No. 28 in *Quinteros*).

Protection Act (No. 7 in *Arias*) (should the dismissal of this claim be raised on appeal), and/or under the various international laws, treaties, covenants, declarations or other international proclamations identified in both complaints (No. 6 in *Arias*; No. 7 in *Quinteros*).  These defenses are based on the provisions of these same international proclamations identified in the complaints and on 28 U.S.C. § 1350 itself because there can be no cause of action under that statute without independent violations of international law.

A specific statute of the District of Columbia, D.C. Code 16-2701 and 16-2702, is the basis for the defense that D.C. law does not support the *Arias* plaintiffs' wrongful death claim (No. 21 in *Arias*) and D.C.'s (and the other identified states') failure to explicitly recognize a claim for medical monitoring is the premise for the stated defense that such a claim may not be brought in these cases (No. 31 in *Arias*; No. 27 in *Quinteros*).  And finally, the lack of any supporting D.C. or other applicable state law is also the basis for the general defense No. 9 in *Arias* and No. 9 in *Quinteros,* and for the defense that the plaintiffs' negligence per se claims lack a statutory basis (No. 26 in *Arias*, No. 24 in *Quinteros*) and for the defense that the *Arias* plaintiffs' nuisance per se claims lack either a statutory or common law basis (No. 30 in *Arias*).

**D.     Topics Listed in LCvR 16.3(c)**

At the October 30th conference of all parties' counsel, the topics set forth in LCvR 16.3 and Fed. R. Civ. P. 26(f) were discussed and the following conclusions were reached.

(1)     Whether the case is likely to be disposed of by dispositive motion; and whether, if a dispositive motion has already been filed, the parties should recommend to the court that discovery or other matters should await a decision on the motion.

The defendants believe that the entire *Arias* and *Quinteros* cases are likely to be disposed of by a motion for summary judgment on the government contractor's defense (perhaps coupled with a separate motion to dismiss the remaining alleged violations of international law).  As a result, the defendants propose to commence Phase 1 discovery into government-contractor-

defense-related topics so that the defendants' anticipated motion(s) may be briefed and ruled on by the Court before other general discovery is commenced against the defendants. Defendants' recommendation on this subject is part of its larger proposal for phased discovery from both plaintiffs and defendants, which is addressed in more detail in Section E below.

In addition, the defendants believe that if any portion of the plaintiffs' claims remain after the Court's consideration of the defendants' government contractor's defense motion, such remaining claims are likely to be disposed of due to, *inter alia*, the lack of scientifically reliable and relevant evidence to support plaintiffs' claims under *Daubert v. Merrill Dow Pharms., Inc.* 509 U.S. 579 (1993) as well as a lack of colorable evidence to support the plaintiffs' factual allegations.

The plaintiffs respond that this case is unlikely to be resolved by dispositive motion. Therefore, the Plaintiffs do not believe that the Court should craft or stay discovery pending decision on DynCorp's proposed government contractor and international law summary judgment motions.

     (2)    <u>The date by which any other parties shall be joined or the pleadings amended, and whether some or all the factual and legal issues can be agreed upon or narrowed.</u>

The plaintiffs recommend that they be permitted to add new plaintiffs by appendix, notice of adoption, or another mechanism approved by the Court short of filing an entirely new complaint in the event that additional individual Plaintiffs wish to assert similar claims against DynCorp. The Court cannot preclude non-parties from pursuing an action against the defendants simply because this action is pending. The individual action is not a class action and cannot bind or limit the rights of non-litigants.

The defendants disagree and recommend instead that a firm cut-off date be set for joining plaintiffs and for amending pleadings, which defendants believe should be May 30, 2008.

The parties agree that there are no factual and/or legal issues in these cases that can be agreed upon or narrowed at this time. The parties have also agreed that the *Quinteros* plaintiffs will amend their complaint to correct the names of the defendants identified therein.

(3)     Whether the case should be assigned to a magistrate judge for all purposes, including trial.

The parties agree that the cases should *not* to be assigned to a Magistrate for all purposes. However, the plaintiffs request that this Court assign a magistrate to hear discovery motions.

The defendants do not wish to have a Magistrate rule on discovery disputes because of the extremely sensitive nature of many of the DynCorp International and government documents that are involved here as well as the politically sensitive nature of DynCorp International's activities that are part of Plan Colombia.

(4)     Whether there is a realistic possibility of settling the case.

Plaintiffs and defendants do not believe that settlement is possible at this stage of the litigation. Nonetheless, Plaintiffs do believe there will be numerous opportunities for global resolution of this matter and request that the Court take an active role in supervising and ordering settlement discussions when appropriate.

(5)     Whether the case could benefit from the Court's alternative dispute resolution (ADR) procedures (or some other form of ADR); what related steps should be taken to facilitate such ADR; and whether counsel have discussed ADR and their response to this provision with their clients.

The parties agree that these cases would not benefit from alternative dispute resolution procedures *at this time*. The plaintiffs' counsel state that, at the appropriate time, this case would benefit from ADR procedures involving a third-party private mediator. Plaintiffs also believe that the Court and the parties should re-visit use of the Court's ADR procedures as appropriate. The defendants do not rule out ADR at a future date but do not believe it will be fruitful until at least all of the dispositive motions have been ruled on by the Court.

The defendants' counsel state that they have discussed ADR and the defendants' position stated in this response with their clients' representatives, who concur that the case would not benefit from ADR at this time.

(6)     Whether the case can be resolved by summary judgment or motion to dismiss; dates for filing dispositive motions and/or cross-motions, oppositions, and replies; and proposed dates for a decision on the motions.

As noted in the response to Topic 2 above, the defendants believe that the cases can and will be resolved by summary judgment and/or motions to dismiss. However, defendants recognize that plaintiffs are entitled to some discovery on the government contractor defense to be set out in the defendants' anticipated dispositive motion on this subject. Accordingly, defendants propose that discovery be conducted on government-contractor-related subjects until August 29, 2008, with briefing to follow on the defendants' dispositive motion(s) within 60 days thereafter. This proposal is set out in more detail in Section E below and in the Defendants' Proposed Scheduling Order.

The plaintiffs anticipate filing one or more motions for summary judgment after completion of discovery. If successful, a damages trial will still be required on Plaintiffs' claims. Plaintiffs anticipate filing their motions such that they can be fully briefed and argued at or before the pretrial conference.

(7)     Whether the parties should stipulate to dispense with the initial disclosures required by Rule 26(a)(1), F.R.Civ.P., and if not, what if any changes should be made in the scope, form or timing on those disclosures.

The parties have agreed that Initial Disclosures will be made pursuant to Fed. R. Civ. P. 26(a)(1) within 60 days of the date of the Initial Scheduling Conference, now scheduled for November 27, 2007.

In addition to the agreed upon Rule 26(a)(1) disclosures, in conjunction with Plaintiffs' proposed scheduling order, set forth in Section E, *infra*, Plaintiffs will provide defendants with a chart identifying the following information for each individual Plaintiff: 1) name; 2) address; 3) exposure address (if different than current address); 4) date of birth; 5) sex; 6) claimed physical injuries (if any); 7) claimed property damage (if any); and 8) real property address and/or a list of damaged chattels for property damage Plaintiffs. Plaintiffs can provide this information in the form of a chart or an amended pleading to defendant concurrently with Plaintiffs' Rule 26 disclosures.

> (8)  The anticipated extent of discovery, how long discovery should take, what limits should be placed on discovery; whether a protective order is appropriate; and a date for the completion of all discovery, including answers to interrogatories, document production, requests for admissions, and depositions.

As noted above, the parties have differing views on the extent of and timing for discovery. These alternative views are set out in more detail in Section E below.

The parties have agreed to recommend a Protective Order to the Court and will do so at a later time after exploring whether they can reach agreement about its terms.

The parties have agreed to follow the 7-hour limit on depositions until/unless this proves to be too short due to the need for translation services at all or most of the depositions of the plaintiffs and others in Ecuador. The parties have not yet reached other agreements relative to appropriate limits on discovery, but plan to continue to discuss this among themselves.

Pursuant to Fed. R. Civ. P. 26(f)(3), the parties have agreed to discuss and negotiate a document production protocol that will address, *inter alia*, the disclosure and discovery of electronically stored information including the form in which it will be produced.

Pursuant to Fed. R. Civ. P. 26(f)(4), the parties have also agreed to discuss and negotiate a "claw-back" procedure for the assertion of claims of privilege or work-product protection following the production of documents in discovery.

The parties are hopeful that the foregoing matters in this response to Topic 8 will be resolved by consent, and they will seek the Court's assistance only if consent is not reached.

      (9)    <u>Whether the requirement of exchange of expert witness reports and information pursuant to Rule 26(a)(2), F.R.Civ.P., should be modified, and whether and when depositions of experts should occur.</u>

The parties have agreed to follow the procedures and requirements relative to expert witness reports and depositions of experts as set out in Fed. R. Civ. P. 26(a)(2) unless and until they later resolve to seek modifications thereto, which they shall strive to do on a joint basis.

     (10)    <u>In class actions, appropriate procedures for dealing with Rule 23 proceedings, including the need for discovery and the timing thereof, dates for filing a Rule 23 motion, and opposition and reply, and for oral argument and/or an evidentiary hearing on the motion and a proposed date for decision.</u>

With respect to the *Arias* class action claims, the *Arias* plaintiffs recommend that class discovery in the *Arias* case proceed in parallel with the questionnaire process, trial group selection, and focused discovery in the *Quinteros* case. Plaintiffs propose that discovery necessary to file a motion for class certification can be completed by spring, 2008, with Plaintiffs' motion to follow immediately thereafter. Plaintiffs propose that briefing on Plaintiffs' motion for class certification be per L. Cv. R. 7.

The defendants propose instead that the class certification issues be addressed in the *first* phase of discovery from the putative class representatives in *Arias*, to commence immediately following the Initial Scheduling Conference on November 27, 2007, and to continue through June 30, 2008, with an interim deadline of March 31, 2008, for the collection of complete medical records from the class representative plaintiffs. Thereafter, defendants propose to brief

the *Arias* motion for certification within 45 days of the completion of class-related discovery or the filing of the certification motion, whichever occurs last. *See* Paragraph 3 of the Defendants' Proposed Scheduling Order.

    (11)    <u>Whether the trial and/or discovery should be bifurcated or managed in phases, and a specific proposal for such bifurcation.</u>

As noted earlier, the parties have a significant disagreement about what kind of "phasing" should be pursued to best facilitate case management. The plaintiffs prefer phasing through the use of "test plaintiffs" while the defendants prefer phasing based on the potential resolution of all or part of the litigation through dispositive motions, the motion for class certification, and the *Lone Pine* submissions. These alternative positions are set out in Section E below and in the separate proposed Orders filed together with this Joint Statement.

    (12)    <u>The date for the pretrial conference (understanding that a trial will take place 30 to 60 days thereafter).</u>

The plaintiffs believe that this case will be ready for a first phase trial in early 2009. Therefore, Plaintiffs propose that the Court set a trial date in January, 2009, with a pretrial conference set 30 days prior.

The defendants believe that it is premature to recommend dates for the pretrial conference.

    (13)    <u>Whether the Court should set a firm trial date at the first scheduling conference or should provide that a trial date will be set at the pretrial conference from 30 to 60 days after that conference.</u>

The plaintiffs believe that this case will be ready for a first phase trial in early 2009. The plaintiffs believe that the Court should set a firm trial date at this time.

The defendants believe that it is premature to set a firm trial date at this time and that a trial date should rather be set at the last pretrial conference to be held in these cases.

(14)    <u>Such other matters that the parties believe may be appropriate for inclusion in a scheduling order.</u>

The parties have set out their alternative proposals for phasing and scheduling in the following Section E and in their separate proposal scheduling orders.

**E.    <u>Proposed Scheduling Orders</u>**

As noted above, there are attached to this Joint Rule 16.3 Statement, a Plaintiffs' Proposed Scheduling Order and a Defendants' Proposed Scheduling Order.  The differing bases for these proposed orders are discussed in the following two subsections of this report.

**1.    <u>Plaintiffs' Proposed Discovery and Scheduling</u>**

**a.    Plaintiffs Oppose Defendants' Proposed "*Lone Pine*" Order**

Plaintiffs oppose DynCorp's proposed "*Lone Pine*" order and, instead, request that the Court implement an orderly mechanism to resolve this case through phased trials.  DynCorp has proposed that the Court impose a "*Lone Pine*" order with respect to the over 1,600 individual Plaintiffs.  A "*Lone Pine*" order is rarely used *pre-discovery* case management device named after an order in a New Jersey Superior Court case entitled *Lore v. Lone Pine Corp.*, 1986 WL 637507 (N.J.Super.Ct. 1986).  Plaintiffs are unaware of any Court within this judicial district entering a "*Lone Pine*" order[2].  There are no decisions of the Court of Appeals for the District of Columbia discussing a "*Lone Pine*" order.  DynCorp's requested "*Lone Pine*" order is foreign to this district and is an inappropriate case management vehicle in this case.

As part of its requested "*Lone Pine*" order, DynCorp wants Plaintiffs to submit verified information establishing, *inter alia*, exposure ("Provide the facts related to your exposure to the Plan Columbia herbicide"), medical causation expert opinion testimony ("report(s) of treating

---

[2] At the Rule 26 meeting with defense counsel that occurred on October 30, 2007, counsel for DynCorp was unable to identify any case in this district which had employed a "*Lone Pine*"

physicians or other medical attendants who support your claim of injury or illness and who opine to a reasonable degree of medical probability that it was caused by your exposure to the Plan Columbia herbicide"); and damages.  At the same time, DynCorp wants to preclude Plaintiffs from conducting discovery into, *inter alia*: 1) the precise composition of the herbicide sprayed in Ecuador (necessary to evaluate medical causation); 2) the amount and timing of DynCorp's spraying activities in Ecuador (necessary to establish exposure and dose); and 3) any information DynCorp may have about the adverse health effects of the herbicide it sprayed in Ecuador (DynCorp is the *only* party to this litigation which has access to the MSDS [Material Safety Data Sheets], manufacturer warnings, or other health information which DynCorp obtained when it purchased the herbicide).

Presumably, DynCorp envisions a process where the over 1,600 individual Plaintiffs submit what effectively amounts to verified interrogatory responses and Rule 26 expert witness reports on exposure, medical causation, and damages.  Thereafter, DynCorp wants this Court to review all 1,600 submissions to determine whether Plaintiffs have made a "*prima facie* showing," and to dismiss (before Plaintiffs can conduct *any* discovery into exposure or causation) Plaintiffs which DynCorp feels have failed to make an "adequate" showing.  DynCorp effectively wants this Court to hear a Rule 56 no-evidence motion for summary judgment *before* Plaintiffs are allowed to conduct *any* discovery.  This is manifestly unfair, as Plaintiffs have a right to conduct necessary discovery to obtain evidence to oppose a motion for summary judgment.  Fed. R. Civ. Proc., § 56(f).

This is a toxic tort case involving personal injury and property damage.  There is, for all practical purposes, one defendant (DynCorp and its subsidiaries).  There is one chemical cocktail

---

order.  Plaintiffs search of orders and opinions within this district similarly failed to discover the use of a "*Lone Pine*" order.

at issue (the "Plan Columbia herbicide" which is a mixture of a glyphosate-based herbicide, surfactants [such as POEA and COSMO FLUX], and other chemicals). All of the individual Plaintiffs allege to have been exposed to the Plan Columbia herbicide sprayed by DynCorp and to have suffered personal injury or property damage as a result.

This is not a situation where Plaintiffs are "suing over one hundred defendants for a range of injuries occurring over a span of up to forty years." *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Both Defendants and the Court are fully aware of Plaintiffs' core allegations. They have been exposed to unlawful cross-border spraying with the Plan Columbia herbicide and have been injured as a result.

DynCorp is on sufficient notice of the Plaintiffs claims to have answered both the individual Plaintiff/Provincial complaint as well as the Class complaint. Nonetheless, Plaintiffs are willing, and do propose, pursuant to Fed. R. Civ. Proc., §§ 12(e) and 16(c)(2), to provide the Court and DynCorp with a more definitive statement as to the precise injuries and damages alleged by the Plaintiffs. Specifically, the individual Plaintiffs will agree to provide the Court and DynCorp with a chart setting forth each Plaintiffs': 1) name; 2) address; 3) exposure address (if different than current address); 4) date of birth; 5) sex; 6) claimed physical injuries (if any); 7) claimed property damage (if any); and 8) real property address and/or a list of damaged chattels for property damage Plaintiffs. These facts are within Plaintiffs' counsels' possession, as a result of Plaintiffs' counsels' due diligence inquiries pursuant to Fed. R. Civ. Proc., § 11(b). Counsel is willing to provide this information to both the Court and DynCorp in short order[3].

This supplemental pleading should provide DynCorp and the Court with adequate information about Plaintiffs, Plaintiffs' claimed injuries, and Plaintiffs' theories of liabilities to

---

[3] What Plaintiffs are unwilling to do, at this time, is incur the expense and time to obtain over 1,600 verifications from Ecuador before commencing discovery.

evaluate and prepare its defense on the merits.  Furthermore, this information states sufficient

facts, and provides DynCorp sufficient notice, to place this case at issue to proceed with

discovery.  *See Bell Atlantic Corp. v. Twombly*, _____ U.S. _____, 127 S.Ct. 1955, 1966-1968

(2007) (discussing the "enormous expense of discovery" and that, despite this expense, a

Plaintiff is entitled to discovery once "a claim has been stated adequately" [anti-trust]).

The Court may appropriately control pre-trial discovery and law and motion practice in

this case without resorting to the draconian measures set forth in a New Jersey trial court order.

Nowhere in the Manual for Complex Litigation ("MCL"), Fourth Edition, Federal Judicial

Center, 2004, is a "*Lone Pine*" order discussed or suggested.

As for discovery into the individual Plaintiffs, questionnaires have been successfully used

in many Multi-District Litigation mass tort cases as well as a host of other mass tort cases.  MCL

4th § 22.83 ("In lieu of interrogatories, questionnaires directed to individual plaintiffs in

standard, agreed-on forms were used successfully in the breast implant and diet drug

litigations").  An orderly questionnaire process will provide DynCorp with verified factual

information about the individual Plaintiffs.  Although the process of obtaining all 1,600 plus

questionnaires can be quite lengthy, even a small percentage of responses can allow the parties

and the Court to engage in phased trials, "sampling," and phasing of intense, plaintiff-specific,

discovery.  *See* MCL 4th, § 22.81 (discussing "sampling").

As in most toxic tort cases, causation is not a fact within the provenance of the individual

Plaintiff, it is an expert witness issue.  *Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982).

As previously argued by counsel for DynCorp in a Petition for Writ of Certiorari to the Supreme

Court, it is "absolutely clear that expert testimony on issues of exposure and individual medical

causation is required for recovery in cases such as this one."  *Litton Systems, Inc. v. Carroll*,

1995 WL 17050077 (S. Ct. 1995).  The expertise required is generally *different* than the expertise needed to provide medical care to an injured individual.

"Generally, physicians focus on causal elements that can be addressed through medical treatment or through changes in lifestyle or diet; courts focus primarily on causal elements for which a litigant or other party might be held responsible. . . . Identification of those kinds of causes depends on information concerning quantification of risk in the workplace environment, as well as medical literature on causation, including the psychological, toxicological, and epidemiological literature."  *Reference Manual on Scientific Evidence*, Second Edition, Federal Judicial Center, p. 452 (2000).

It is simply improbable if not impossible that a physician in rural Ecuador would know: 1) the exact composition of the Plan Columbia herbicide; or 2) be an expert in toxicology such that he or she could "opine to a reasonable degree of medical probability that [Plaintiffs' injury or illness] was caused by [Plaintiffs'] exposure to the Plan Columbia herbicide," as requested in DynCorp's proposed "*Lone Pine*" order.  DynCorp's proposed "*Lone Pine*" order requires nothing short of expert witness testimony before Plaintiffs are allowed to conduct any discovery. This is unfair and unnecessary.  Fed R. Civ. Proc., § 26(a)(2) sets forth a mechanism governing expert discovery which provides great flexibility and has been successfully employed in dozens of massively complex cases.

There are some fundamental shortfalls to the arguments advanced by DynCorp to support its request for a "*Lone Pine*" order.  First, DynCorp has utterly failed to articulate any standard by which it wishes this Court to evaluate Plaintiffs' "*Lone Pine*" submissions.  Does DynCorp suggest that Plaintiffs' can overcome their "*Lone Pine*" burden by producing a "scintilla of evidence?"  Does DynCorp envision a trial by paper on the merits of Plaintiffs' claims as part of

the "*Lone Pine*" process.  (Defendant seems to so indicate by suggesting that this Court should weigh Plaintiffs' medical causation evidence against the State Department's conclusions on the safety of the Plan Columbia herbicide as reported to Congress.)  It is preposterous that DynCorp would suggest that this Court should sit in judgment and weigh evidence without allowing Plaintiffs to conduct *any* discovery into causation or exposure, something that would never be permissible on a summary judgment motion.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (Court may not make credibility determinations or weigh evidence on a motion for summary judgment).  Or, does DynCorp propose that Plaintiffs will overcome their "*Lone Pine*" burden by producing evidence to give rise to a genuine issue of material fact?  If so, despite DynCorp's statements to the contrary, it is requesting a motion for summary judgment. *See* Fed. R. Civ. Proc., § 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

DynCorp's failure to articulate what standard it wishes this Court to apply to Plaintiffs' "*Lone Pine*" submissions is telling of the impracticality of the proposal.  Even in complex litigation, Plaintiffs are entitled to their fundamental Constitutional rights to due process.  *In re: PPA Products Liability Litigation*, 460 F.3d 1217, 1250 (9th Cir. 2006)  ("In sum, although we grant additional deference to a district court administering a MDL proceeding, due process and fundamental fairness may not be sacrificed to provide assembly-line justice").  DynCorp is entitled to verified discovery responses from all Plaintiffs.  It will obtain these responses as Plaintiffs provide questionnaire responses as set forth in Plaintiffs' scheduling order.  At the same time, Plaintiffs are entitled to basic discovery before their cases are challenged by a stealth summary judgment motion labeled as a "*Lone Pine*" order.

Furthermore, DynCorp's proposal is, at its core, based upon a false legal standard. As set forth in Section C, *supra*, DynCorp apparently believes that there is a "significant injury"[4] element to an ATCA claim, or a basic tort claim. DynCorp speaks much of "significant injury to human beings." Even DynCorp will admit that the Plan Columbia herbicide is not inteded for use on populated areas (such as Plaintiffs' villages). Furthermore, even DynCorp must admit that there can be serious acute symptoms that result from exposure to the Plan Columbia herbicide. That DynCorp may view eye irritation, acute respiratory distress, or acute gastrointestinal distress as "insignificant" is irrelevant. Such injuries are real, and extremely "significant" to the Plaintiffs who suffered these harms, and are compensable damages that juries routinely are called upon to value.

The majority of the individual personal injury Plaintiffs have suffered long-term physical injuries, including chromosomal damage, as a result of being exposed to the Plan Columbia herbicide. As repeatedly stated by DynCorp, these injuries will be hotly contested by battling experts and broad-sweeping *Daubert* challenges. As set forth above, medical causation is ultimately an expert witness issue. The scientific debate over medical causation will not and cannot be resolved at the pre-discovery stage.

In DynCorp's discussion of Plaintiffs' property damage claims, it repeatedly fails to mention harm to Plaintiffs crops (while repeatedly discussing harm to Plaintiffs' farm animals). DynCorp has answered that the Plan Columbia herbicide is a broad-based herbicide which will kill not only coca and poppy plants, but legal crops as well. Apparently, DynCorp views the spraying and total destruction of Plaintiffs' crops as "insignificant." Although loss of a year's

---

[4] "Significant" to whom?

worth of maize, beans, and potatoes may be "insignificant" to DynCorp, a company with 2007 revenues of over $2 billion, it is the entire livelihood of some of the Plaintiffs in this action.

"*Lone Pine*" orders are rarely used management devices which have only obtained published approval in the Fifth Circuit. *See Acuna*, 200 F.3d at 340; *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 604, fn. 2 (5th Cir. 2006). "*Lone Pine*" orders are employed when Plaintiffs are suing *numerous* defendants or other unique factors make it impossible for the Court or the defendants to have sufficient information from the complaint to know what injuries are alleged to have been caused by exposure to each defendants' chemicals. The instant case is not a situation where Plaintiffs are suing hundreds of chemical manufacturers to whom Plaintiffs *may* have been exposed at one time or another for an injury that the Plaintiff attributed to each and every defendant manufacturer. This is, instead, a "classic example of a non-elastic mass tort, that is, the universe of potential claimants are either known or are capable of ascertainment and the event or course of conduct alleges to constitute the tort involved occurred over a known time period and is traceable to an indentified entity or entities." *In re: Chevron U.S.A., Inc.*, 109 F.3d 1016, 1018 (5th Cir. 1997). In such cases, phased trials are a preferred management technique.

### b.    Phased Trials and Phased Discovery Is More Appropriate

As an alternative to DynCorp's "*Lone Pine*" suggestion, Plaintiffs propose that this case be resolved by phased trials. Plaintiffs propose that small groups of Plaintiffs, twenty (20) individual Plaintiffs, be selected for focused discovery and then tried as a group.

The use of test cases is a well recognized case management technique which can provide substantial information that may assist in resolution of complex mass-tort actions. *See* MCL 4th, § 22.315. Cited favorably by the MCL is a DDT (a pesticide) case in Alabama where formal discovery was limited to 20 randomly selected Plaintiffs, with discovery into the remaining

thousands of Plaintiffs limited to questionnaire responses. Information obtained from the discovery, motion practice, and trial could be used to easily screen the remaining Plaintiffs based upon questionnaire responses. *Id.*, § 22.81 (discussing *Willhoite v. Olin Corp.*, CV-83-C-5021-NE (N.D. Ala. 1983)).

"Bellwether" selections are a statistically significant random sampling of the Plaintiff population designed to provide a representative cross-section of claimed injuries, exposures, and damages, such that rulings or trial results can be applied to all Plaintiffs. *See Chevron U.S.A.*, 109 F.3d at 1020. Although often recommended by judicial scholars, there are several inherent problems with the "bellwether" approach which can inadvertently increase the expense and complexity of this matter. The only management mechanism lost by abandoning the "bellwether" approach is that findings in the "bellwether" trial may not be applied to all Plaintiffs. *Id.* This is a small price to pay for the increased efficiency of an alternative trial group selection process. An alternative approach, which can provide substantial information to assist in global resolution of this matter, is to allow Plaintiffs to select the first group of trial Plaintiffs.

The fundamental problem with the "bellwether" approach was succinctly summarized by Mr. Twain, "There are three kinds of lies: lies, damned lies, and statistics." To select a true "bellwether" group, it must be demonstrated that the sample population is actually representative of the entire Plaintiff population. The Plaintiff population is not a normalized population. It is a distinctly unique population, consisting exclusively of injured individuals who have initiated a lawsuit. To properly sample this population would require either: 1) a Court appointed expert; or 2) a battle of the experts as Plaintiffs and DynCorp present their competing proposals for appropriate sampling. The expense and complexity of this preliminary step of simply selecting a

trial group is illustrated by the fact that at least two chapters in the *Reference Manual on Scientific Evidence* are devoted to the disciplines involved; "Reference Guide on Survey Research," and "Reference Guide on Statistics."

A Plaintiff-selected group of trial Plaintiffs can provide substantial information that will allow resolution of this matter. First, a Plaintiff-selected group allows DynCorp to rapidly assess its maximum potential exposure. Plaintiffs will, necessarily, select cases for the first trial group that, in Plaintiffs' opinion, have good exposure, good causation, and good damages. If DynCorp were to defense the "best" Plaintiff picks, that is quite telling of the value of the remainder of the case. At the same time, the verdicts on the Plaintiff picks represent a maximum exposure, allowing the Court and DynCorp to place a ceiling on potential liability.

Conversely, there is little doubt that DynCorp (if given the opportunity) can find a group of individuals within the Plaintiff population which have little damages or which it could defensed at trial. This provides little information to anyone. Even in mass tort actions involving clear liability (even conduct warranting exemplary damages), there will be one or more Plaintiffs that can be defense at trial. A perfect case in point is the Vioxx drug litigation. In that MDL case, and in the various state court Vioxx cases, there have been Plaintiff verdicts with punitive damages and defense verdicts. Not surprisingly, many of the defense verdicts have been on Plaintiffs that defendant Merck was allowed to select for trial.

Whether Plaintiffs pick 20 cases for focused discovery and trial, Plaintiffs pick 10 and DynCorp each pick 10 cases for focused discovery and trial, or the Court select a group of 20 "bellwether" Plaintiffs for focused discovery and trial, this is a much more manageable, efficient, and productive way to manage this matter than DynCorp's proposed "*Lone Pine*" order. All discovery, dispositive motions, and the first phase trial could be completed in the amount of time

it would take to obtain 1,600 verified "*Lone Pine*" submissions and have the Court review all of these submissions individually to determine if each Plaintiff has stated a "*prima facie* case."  A trial on a test group of Plaintiffs will also answer dispositive issues applicable to the entire Plaintiff population.  Therefore, Plaintiffs request that the Court reject DynCorp's proposed "*Lone Pine*" order and, instead, implement a process to select a small group of Plaintiffs to be tried first.

### 2.    Defendants' Proposed Discovery and Scheduling

The defendants believe that the most feasible approach to case management here is a "first phase" of discovery into the following three subject matters:

(a)    Discovery pertinent to the *Arias* class action claims and certification proceeding;

(b)    The submission of verified fact statements ("*Lone Pine*" submissions) by the 1660 individual *Quinteros* plaintiffs to identify each plaintiff's alleged exposure and resulting harm; and

(c)    Discovery pertinent to DynCorp International's anticipated reliance on the "government contractor" defense, which will seek dismissal of all plaintiffs' claims.

Defendants' proposed schedule will allow the Court to move expeditiously to address class certification issues, as required by the Federal Rules of Civil Procedure and this Court's local rules, while at the same time allowing limited discovery from the *Quinteros* individual plaintiffs necessary to identify those plaintiffs with *prima facie* claims, and allowing discovery from the defendants into a threshold issue that defendants believe will result in final disposition of all claims.  This phased approach will also avoid the inevitable confusion and inefficiencies that would follow from wholesale discovery on all issues at once in these related cases, which (in addition to alleging complex toxic tort claims through a putative foreign class and a separate mass action as well as claims brought on behalf of three foreign government entities) will also

give rise to a number of complicated discovery questions, including, *inter alia*, (1) how to secure discovery from foreign parties and non-party witnesses and (2) how to accommodate the U.S. State Department's review of all program documents sought from the defendants in discovery, as required under the terms of the defendants' government contracts at issue in these cases.[5]  In the event that any part of plaintiffs' claims survive following the Court's ruling on defendants' dispositive briefing following Phase 1 discovery, the parties can then proceed to more general discovery into fact and damage issues, expert witness discovery, and the inevitable *Daubert* motions.

Defendants' proposal is consistent with the practice of this and other federal courts to bifurcate discovery for better case management.  *See e.g.*, *Fitts v. Unum Life Ins. Co. of Am.*, No. 98-00617, 2006 WL 449299, at *2 (D.D.C. Feb. 23, 2006) ("the Court bifurcated discovery and created two phases to the case"); *Gluck v. Ansett Australia Ltd.,* 204 F.R.D. 217, 218 (D.D.C. 2001) (noting that the "scheduling order . . . bifurcated the discovery process into two phases"); *see also id.* at 219 (discovery was bifurcated "to determine whether this case can be resolved by summary judgment or motion to dismiss prior to reaching the other merits of the claim," quoting LCvR 16); *Wadley  v. Aspillaga,* 163 F. Supp. 2d 1, 11 (D.D.C. 2001) (bifurcating discovery into two phases, with dispositive briefing to follow each).  The Supreme Court has explained that sequencing discovery is within the "broad discretion" of the trial judge, and may be used to "facilitate prompt and efficient resolution of [a] lawsuit," particularly when it will permit early resolution of summary judgment motions on "objective issues that are potentially dispositive . . .

---

[5] The defendants are unable to produce any of the documents created pursuant to their contracts with the U.S. Department of State ("DOS") unless and until they have received approval to do so by the DOS.  *See* the Declaration of Vincent J. Cheverini, Jr., Contracting Officer with DOS, filed by the defendants in the *Arias* case on November 6, 2002 (CM-ECF Doc. 20-5) (explaining that DOS must review and clear the release of all contract documents prior to their production in

.”  *Crawford-El v. Britton,* 523 U.S. 574, 598-99 (1998).  Such dispositive issues exist in the

*Arias* and *Quinteros* cases.

        a.      <u>Class Certification Discovery</u>

With respect to the defendants' first recommended area of Phase I discovery, Fed. R. Civ.

P. 23 makes clear that class certification, and the discovery necessary to determine whether it

should occur, are to be addressed early:

> When a person sues . . . as a representative of a class, the court
> must – at an early practicable time – determine by order whether to
> certify the action as a class action.

Fed. R. Civ. P. 23(c)(1)(A).  "Certifying the class 'as soon as practicable' under Rule 23(c)(1) is

not a minor formality, but is necessary to give the action a clear definition."  *Navarro-Ayala v.*

*Hernandez-Colon*, 951 F.2d 1325, 1334 (1st Cir. 1991).  This Court's local rules also highlight

the need for expedition by requiring a motion for certification within 90 days of filing a class-

action complaint.  LCvR 23.1(b) (providing that this period may be extended by the Court

"pending discovery or other preliminary proceedings").  And Fed. R. Civ. P. 23 of course

prescribes exactly what must be found before a putative class will be certified, s*ee* Rule 23(a)

and (b), which necessarily guides the pre-certification discovery that will be pursued.

Moreover, although the plaintiffs propose that the *Arias* class discovery proceed at the

same time as discovery for the *Quinteros* "test plaintiffs," this makes no sense if the *Arias* class

is certified because most of the 1630 *Quinteros* plaintiffs who allegedly live or lived in the

Sucumbios Province of Ecuador will become eligible to be class members of the *Arias* class.

There are only 27 individual *Quinteros* plaintiffs who claim to live in another province of

Ecuador.  *See* Appendix A to the Consolidated Complaint filed in *Quinteros* on August 29, 2007

---

this litigation and must likewise approve any proposed deposition or trial testimony by any DOS
official).

(CM-ECF Document No. 13-2).  The defendants' proposal for "*Lone Pine*" submissions from the individual *Quinteros* plaintiffs and limited discovery into the defendants' government contractor defense is a compromise that does not freeze all other discovery while the *Arias* class discovery proceeds, but neither does it open the flood-gate of general discovery until the Court determines whether an *Arias* class will be certified.

                    b.      <u>*Lone Pine* Submissions</u>

As courts around the country have done in similar cases, defendants request that this Court issue a *Lone Pine* order requiring the individual plaintiffs to provide foundational information establishing the *prima facie* bases of their claims prior to proceeding with full-blown discovery.  The content of the *Lone Pine* submissions sought by defendants is attached as Exhibit A to the Defendants Proposed Scheduling Order filed with this joint report.

*Lone Pine* submissions are particularly necessary in this case because of the large number of named plaintiffs, the complexities created by the fact that the individual plaintiffs are Ecuadorian farmers with likely limited understanding of the United States judicial process (including the requirements of Rule 11), the vagaries of claims involving alleged "drift" of herbicides over a seven-year period across a 500 km border between Colombia and Ecuador, and the dubious nature of plaintiffs' allegations, which run directly contrary to numerous United States governmental findings.  *See* n.12 *infra*.  As plaintiffs' counsel in *Arias* can attest, determining the *bona fides* of individual Ecuadorian plaintiff claims in this type of litigation can be difficult even in cases involving only a handful of named plaintiffs.  *See Gonzales v. Texaco, Inc.*, No. C 06-02820, 2007 WL 3036093 (N.D. Cal. Oct. 16, 2007) (sanctioning counsel to Ecuadorian nationals who failed to reasonably investigate whether plaintiffs actually had cancer before filing suit alleging that the defendant's activities in Ecuador caused the cancer).

*Lone Pine* submissions are also essential here if the Court is to proceed in a reasoned way with a sequencing of individual plaintiff trials – if this case survives defendants' dispositive motions. Absent foundational information regarding the individual plaintiffs, the Court and the parties will have no ability to select or consider possible test cases that will be fairly representative and thus maximally informative of the merits of all or most plaintiffs' claims.

(i)    Lone Pine Submissions Facilitate Case Management in Mass Tort Cases.

Since first being used in the seminal case of *Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Nov. 18, 1986), *Lone Pine* orders have been used across the country as an essential tool in complex tort litigation to ensure the proper use of judicial and parties' resources and to maintain judicial control and efficiency in mass tort actions.[6]  Courts that have considered such orders have focused on a variety of factors that weigh in favor of *Lone Pine* submissions, including:  (1) the number of parties in the suit; (2) whether EPA or or other government studies contradict the plaintiffs' claims, (3) whether plaintiffs have adequately described the substance of their allegations, (4) the expense and complexity of the litigation, and (5) the possible lack of good faith in pressing the claim (*i.e.*, are the defendants being intimidated to settle).  *Lore*, 1986 WL 637507 at **2-4.  As demonstrated below, each of these factors weighs in favor of a *Lone Pine* order in the *Quinteros* case.

In the *Lone Pine* case, the plaintiffs claimed personal injuries and property damage from an allegedly contaminated landfill.  Previous EPA studies had concluded that contamination at the site was confined to the landfill itself and had not been transported by air or water.  But the

---

[6] Plaintiffs assert that *Lone Pine* orders have not been used by this Court, which is impossible to know because case management orders are not catalogued in a way that allows a researcher to pull all such orders from any federal district court (or any state court).  References to *Lone Pine* orders typically appear in published decisions only if a significant dispute or appeal about such an order was involved.  However, the defendants' research did not find any references to motions

plaintiffs lived as far as 20 miles away and did not substantiate their personal injury claims. *Id.* at **2-3. The Court ordered each plaintiff to provide the facts about his/her alleged exposure to the toxic substances, reports from treating physicians and medical or other experts supporting each plaintiff's claim of injury and causation by the substances, and for the property damage claims, the address of the property and reports of real estate or other experts supporting the claims of diminished value. *Id.* at **1-2. So called "*Lone Pine* orders" subsequently have been entered across the country in cases raising similar issues, as identified and discussed *infra*.[7] They are certainly *not* "rare" or approved only by the Fifth Circuit as asserted by the plaintiffs, and their use is well within the authority of any federal count to creatively manage its caseload.[8]

---

for *Lone Pine* orders being denied by this Court or by any other Courts except as specifically mentioned herein.

[7] In addition to the numerous cases discussed in this section, *see also Eggar v. Burlington Northern R. R.*, 1991 WL 315487 (D. Mont. Dec. 18, 1991), *aff'd sub nom. Claar v. Burlington N.R.R.,* 29 F.3d 499, 500 (9th Cir. 1994) (noting that the district court's order required affidavits from physicians listing each plaintiff's specific injuries, the particular chemical(s) that the physician believed to have caused injury, and the scientific basis for such conclusions); *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp.2d 567, 570 (S.D.N.Y. 2006) (court issued a *Lone Pine* order requiring plaintiffs to provide an expert report with regard to medical records and on causation); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL 1014, 1997 WL 303239, at *1 (E.D. Pa. Feb. 13, 1997) (requiring that "each plaintiff identify and provide [case-specific] expert discovery with respect to at least one duly-qualified, medical expert on the issues of injury and causation"); *Atwood v. Electric Brake & Clutch Co., Inc.*, 605 N.E.2d 1032, 1036 (Ill. App. 1992) (affirming trial court's decision to bar personal injury claims where plaintiffs failed to comply with case management order requiring them to certify, *inter* alia, that "each plaintiff has identified all of his or her medical, or personal injury, claims causally related to this case by way of the expert reports"), *appealed denied*, 612 N.E.2d 510 (Ill. 1993); *In re Love Canal Actions*, 547 N.Y.S.2d 174, 178-79 (Sup. Ct. 1989) (requiring plaintiffs to produce "reports of treating physicians and medical or other experts, supporting each individual plaintiff's claim of injury and causation" or face dismissal), *aff'd*, 555 N.Y.S.2d 519 (App. Dept. 1990); *Schelske v. Creative Nail Design*, 933 P.2d 799 (Mont. 1997) (affirming the dismissal of plaintiff's case after she failed to comply with the *Lone Pine* case management order requiring full disclosure of the alleged exposure to toxic substances and a physician's opinion about the causal connection between her alleged exposure and her alleged injury); *Able Supply Co. v. Moye*, 898 S.W.2d 766, 770 (Tex. 1995) ("Each defendant is entitled to discover whether there has been a medical determination that an illness was caused by the defendant's product," and doing so will "streamline costs" and "conserve judicial resources").

[8] Fed. R. Civ. P. 16(c) provides federal courts with broad authority and discretion to fashion case management orders to handle complex issues and potential burdens on the defendants and on the Court in this kind of case. Indeed, three separate subsections of Rule 16 support the use of case

Indeed, just two months ago, a federal district court issued a *Lone Pine* order in a case which –
like the cases here – involved allegations that herbicide drift had caused property damage to a
number of plaintiff farmers.  *Burns v. Universal Crop Protection*, No. 07CV00535, 2007 WL
2811533 (E.D. Ark. Sept. 25, 2007).  Notably, that case involved only eighty-two named
plaintiffs, alleged property damage in the United States, relatively (as compared to here) discrete
allegations of herbicide drift, and claims that did not run counter to years of governmental
findings.  Given the appropriateness of a *Lone Pine* order under the facts in *Burns*, there can be
no question of the need for such an order here.[9]

The principal virtue of the *Lone Pine* submissions is to focus on the critical issue of each
plaintiff's alleged exposure to a toxic substance and the alleged causation between that substance
and the plaintiff's alleged injuries or property damages.  They permit the parties and the Court to
determine if a *prime facie* case can be established against a defendant – thus separating the
plaintiffs with possibly meritorious claims from those that filed unfounded claims.  The Fifth
Circuit has held that this kind of information is essentially "what plaintiffs should have had

---

management tools such as *Lone Pine* orders:  "[T]he court may take appropriate action, with
respect to: . . . (6) the control and scheduling of discovery, including orders affecting disclosures
and discovery pursuant to Rule 26 . . . (12) the need for adopting special procedures for
managing potentially difficult or protracted actions that may involve complex issues [or]
multiple parties . . . [and] (16) such other matters as may facilitate the just, speedy, and
inexpensive disposition of the action."  The Fifth Circuit cited the same Rule in concluding that
"*Lone Pine* orders are designed to handle the complex issues and potential burdens on defendants
and the court in mass tort litigation."  *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir.
2000).

[9] In *Burns*, the cotton farmer plaintiffs sued herbicide manufacturers for damage to their crops
from the herbicide sprayed on the rice crops in another county, which the plaintiffs claimed to
have drifted in the wind to their cotton fields.  The Court issued a *Lone Pine* order requiring
affidavits from fact or expert witnesses, identifying, *inter alia,* the date, location and amount of
each product application, the location and acreage of each cotton field claimed to have been
injured, and the preliminary facts, data and other grounds relied upon by each expert who would
attest to the cause of the damage.  *Id.*  The trial court rejected plaintiffs' protestations that it was
premature to require the causation affidavits, finding that a preliminary showing on causation
was necessary for efficient case management.

before filing their claims," pointing out that Rule 11 requires that the plaintiffs' allegations and other factual contentions have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *Acuna*, 200 F.3d at 340.  The discovery order in the *Lone Pine* case was based on the same conclusion.  *See Lore*, 1986 WL 637507 at *4 ("[I]t is time that[,] prior to the institution of such a cause of action, attorneys for plaintiffs must be prepared to substantiate, to a reasonable degree, the allegations of personal injury, property damage and proximate cause.").  *See also Burns*, Order dated Sept. 25, 2007 (emphasis added) ("Arkansas law requires a plaintiff asserting any theory of product liability to show a causal link between the alleged product defect and alleged injuries . . . [and] a *preliminary showing on causation is necessary for efficient case management*.").

In another recent decision, the Fifth Circuit characterized *Lone Pine* orders as "pre-discovery orders designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation by requiring plaintiffs to produce some evidence to support a credible claim."  *Steering Comm. v. Exxon Mobil Corp.,* 461 F.3d 598, 604 n.2 (5th Cir. 2006). In that case, the *Lone Pine* order issued by the M.D. La. had required individual plaintiffs to produce "an affidavit from a qualified real estate appraiser or other real estate expert" attesting to the claimed injuries and their cause.  *Id.*  Although the principal holding of *Steering Committee* was to affirm the denial of class certification for a case in which hundreds of people claimed injuries (of various kinds) from drifting smoke after an ExxonMobil facility caught fire, *id.* at 601-05, one reason the Fifth Circuit deferred to the district court's Rule 23(b) determinations was that "the district court has been careful to manage the litigation efficiently through the judicious use of . . . tools such as *Lone Pine* orders."  *Id.* at 604.

31

By requiring *Lone Pine* submissions, the Court and counsel will be able to focus judicial and party resources on plaintiffs who *are* willing and able to support the allegations made in their complaint – and to consider the dismissal of plaintiffs who cannot provide the necessary foundational evidence in support of their claims. *See Baker v. Chevron, USA, Inc.,* No. 1:05-CV-277, 2007 WL 315346 (S.D. Ohio Jan. 30, 2007) ("The basic purpose of a *Lone Pine* order is to identify and cull potentially meritless claims and streamline litigation in complex cases involving numerous claimants . . . .") In *Baker,* the numerous plaintiffs who did not comply at all with the *Lone Pine* order were dismissed with prejudice, while those who complied with a modified *Lone Pine* order were permitted to proceed. 2007 WL 315346 at **3-4. The same result occurred in *Schwan v. CNH America LLC*, No. 4:04 CV3384, 2007 WL 1345193 (D. Neb. Apr. 11, 2007) (dropping the cases of 135 plaintiffs "who failed to make evidentiary disclosures as required by the *Lone Pine* case management order") and in *Bell v. ExxonMobil Corp.*, No. 01-04-00191-CV, 2005 WL 497295, (Tex. App.-Houston, Mar. 3, 2005) (unpublished opinion) (reviewing the ample Texas precedent in support of *Lone Pine* orders and affirming the trial court's dismissal of half of the plaintiffs who ignored the *Lone Pine* order's requirement). And in *Acuna*, the Fifth Circuit affirmed the dismissal of all of the plaintiffs' claims because none submitted the required information. 200 F.3d at 340.[10]

*Lone Pine* orders can also serve a most useful function in cases brought by foreign nationals who may not understand the significance of claiming that an American corporation *caused* their illnesses. In *Gonzales v. Texaco, Inc.*, the complaint alleged that each plaintiff

---

[10] The plaintiffs accuse defendants of seeking to dismiss individual *Quinteros* plaintiffs as part of the *Lone Pine* process before they have conducted discovery. *Supra* at 15, 18-19. But there is no automatic enforcement mechanism in a *Lone Pine* order. Motions to dismiss or for summary judgment are necessarily addressed later based on the results of the *Lone Pine* submissions and the law governing such motions. Moreover, defendants' proposal does permit discovery from

suffered from cancer due to exposure to toxic oil waste products, but when several plaintiffs

were deposed by defense counsel, they admitted they did not have cancer. The Court's sanctions

decision acknowledged that the Ecuadorian nationals may not have realized the significance of

the filing of the Complaint and/or may not have realized the nature of the suit filed on their

behalf, either possibility of which raised Rule 11 concerns.[11] *Gonzales*, 2007 WL 3036093 at

10-12.

This Court has also fashioned unique means to deal with discovery in cases brought by

foreign nationals where the interests of other countries are involved. *See, e.g.*, *Doe v. Exxon*

*Mobil Corp.*, 393 F. Supp.2d 20, 29 (D.D.C. 2005) (discovery in a case alleging claims under the

Alien Tort Statute "should be conducted in a manner so as to avoid intrusion into Indonesian

sovereignty. To this end, there will be firm control over any discovery conducted by plaintiffs.")

The appeal of this decision was dismissed by the D.C. Circuit, which noted with favor that the

district court had previously "limited discovery" to deal with the foreign policy concerns raised

by the action. *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 356 (D.C. Cir. 2007).

ii.    *Lone Pine* Submissions are Particularly Needed in the *Quinteros* Case.

As noted above, *Quinteros* involves a number of complexities that make it particularly

suited for a *Lone Pine* order. First, plaintiffs' claims are in direct contradiction to repeated

---

the defendants into a key subject matter that will be addresses in a dispositive motion, as
discussed herein.

[11] Of course, this Court has addressed Rule 11's obligation to reasonably investigate a plaintiff's
claims. *See e.g., Sherman Treaters Ltd. v. Ahlbrandt,* 115 F.R.D. 519, (D.D.C. 1987)
(addressing the affirmative duty of each attorney to conduct a reasonable inquiry into the
viability of claims before they are filed); *Danik, Inc. v. Hartmarx Corp.,* 120 F.R.D. 439 (D.D.C.
1988) (sanctioning plaintiff and its counsel for failing to make reasonable inquiries prior to
filing), *aff'd,* 875 F.2d 890 (D.C. Cir. 1989), *aff'd in pertinent part, sub nom. Cooter & Gell v.
Hartmarx Corp.,* 496 U.S. 384 (1990). But the point here is that *Lone Pine* submissions are a far
better way to ensure that plaintiffs do have viable claims before being allowed to proceed with
their claims.

findings of both the United States and international governmental organizations that have

analyzed whether the Plan Colombia aerial eradication operations are causing any adverse health

or environmental effects.[12]  The existence of such contrary government findings – and the

implications of such findings on the *prima facie* merits of plaintiffs' claims – is a frequent factor

that courts have considered in determining that *Lone Pine* orders are necessary.

In the *Lone Pine* case itself, the EPA had issued a record of decision summarizing

multiple previous studies of the landfill at issue, which identified the precise area where

pollution had and had not been found.  1986 WL 637507 at **1-2.  Similarly, in *Cottle v.

Superior Court*, 5 Cal. Rptr. 2d 882, 890 (Ct. App. 1992), the Court ordered plaintiffs to identify

the dates of their alleged exposure on land previously used by an oil company, the method of

exposure, and affidavits from medical experts supporting plaintiffs' alleged causation, after

noting that the California Dept. of Health Services had previously issued a report concluding that

"the waste materials do not pose any significant threat to the health of the residents living in the

Dunes subdivision or the environment."[13]  The same reason for suspicion exists here.

_____

[12] *See e.g.*, U.S. Dept. of State, Bureau for International Narcotics and Law Enforcement Affairs,
International Narcotics Strategy Report, Vol. I, Drug and Chemical Control (March 2007) at 118,
http://www.state.gov/documents/organization/82201.pdf ("Biennial verification missions
continue to show that aerial eradication causes no significant damage to the environment or
human health."); Dr. Keith R. Solomon, *et al.*, A Report Prepared for the Inter-American Drug
Abuse Control Commission (CICAD) Section of the Organization of American States (OAS),
Environmental Human Health Assessment of the Aerial Spray Program for Coca and Poppy
Control in Colombia (Mar. 31, 2005), 90, http://www.cicad.oas.org/en/glifosatefinalreport.pdf
("[B]ased on all evidence and information presented above, the Panel concluded that the risks to
humans and human health from the use of glyphosate and Cosmo-Flux in the eradication of coca
and poppy in Colombia were minimal."); Bureau of International Narcotics and Law
Enforcement Affairs, Information Package on the Certification of the Aerial Eradication of Illicit
Coca and Opium Poppy in Colombia (Aug. 22, 2006), http://www.state.gov/p/inl/rls/rpt/aeicc/
70974.htm (quoting the 2004 EPA report on human health concerns, which stated: "Despite an
aggressive search for cases, there does not appear to be any evidence that glyphosate aerial
spraying has resulted in any adverse health effects among the population where this spraying
takes place.")

[13] The same reasoning was evident in *Morgan v. Ford Motor Co.*, No. 06-1080, 2007 WL
1456154 at *8 (D.N.J. May 17, 2007).  In that case, the Court denied defendants' request for a

Secondly, the *Quinteros* plaintiffs have provided no information in their complaint to indicate when and how the approximately 1660 individual plaintiffs allege they were exposed to herbicide drift or spraying into Ecuador, any indication of the alleged frequency and duration (*i.e.*, dose) of the alleged exposure, the timing of their alleged injuries and property damage as compared to the timing of the alleged exposures, or any basis for their allegation that said exposure *caused* their damages.   This lack of basic factual information about plaintiffs' allegations, which are essential elements of any Rule 11 investigation, is a signature characteristic of cases that need a *Lone Pine* order.  *See Acuna*, 200 F.3d at 340 (affirming the use of a *Lone Pine* order when pleadings failed to identify "how many instances of which diseases" and "which facilities were alleged to have caused those injuries," as well as any basis for believing the defendants caused those injuries).[14]

---

*Lone Pine* order after contrasting the facts in *Morgan* with the facts in *Lone Pine*, including the important distinction that the plaintiffs in *Morgan* were suing for the contamination at a landfill site that appeared on EPA's National Priorities List for clean-up and for which Ford Motor Company had already taken responsibility in a consent order.  In contrast, in *Lone Pine,* the EPA reports had indicated contamination only at the site itself with no contamination migrating to surrounding areas, yet a number of plaintiffs' properties were located many miles from the landfill site, making their claims initially suspect.  *Id.*  The facts here are even more compelling than in *Lone Pine* because the EPA has concluded no significant harm from the Plan Colombia herbicide – wherever it has been sprayed – fully justifying the *Lone Pine* submissions sought by the defendants here.

[14] For the first time in this Joint Statement, the plaintiffs allege that the "majority" of the individual *Quinteros* plaintiffs "have suffered long-term physical injuries, including chromosomal damage, as a result of being exposed to the Plan Columbia [*sic*] herbicide."  *Supra* at 20.  But when plaintiffs' counsel William Scherer described the chromosomal damage allegation to the U.S. District Court for the S.D. Fla. on April 20, 2007, his information was much more limited:

> There was a survey of forty-five Ecuadorian women with respect
> to – that had been subject to the overspray and drinking the water
> and eating the food there, and all of them, a hundred percent in this
> study, suffered genetic damages.  Seven of those women are
> plaintiffs in our case.

Transcript of 4/20/07 hearing (on defendants' motion to dismiss or to transfer the *Quinteros* case to this Court) at p. 32-33.  The "survey" or "study" referenced by Mr. Scherer has not been

At the Rule 26(f) conference of the parties held on October 30, 2007, the defendants distributed a recommended outline for the content of the *Lone Pine* submissions to be made by *Quinteros* plaintiffs.  In response to plaintiffs' objections, the outline was modified but still is unacceptable to plaintiffs.  A copy of defendants' revised outline is attached as Exhibit A to the Defendants' Proposed Scheduling Order submitted simultaneously with this Joint Report.  Instead of the requested *Lone Pine* submissions, plaintiffs' counsel offer to provide unverified fact statements (prepared by counsel) that would identify limited information about each plaintiff's claims.  According to *Quinteros* counsel at the 10/30/07 conference, such unverified submissions would identify only the most basic biographical information and a bare itemization of each plaintiff's alleged damages.

Plaintiffs' contention that defendants are seeking *Daubert*-ready expert reports as part of a *Lone Pine* order (s*upra* pp. 17-18) is without merit.  The facts sought here in the defendants' request for  *Lone Pine* submissions are not final expert reports; they are key foundational facts necessary for a *prima facie* case.  For example, during the 10/30/07 conference, plaintiffs' counsel represented that many of the plaintiffs never saw a doctor at the time they were allegedly exposed to Plan Colombia herbicides, but offered no suggestion as to how these plaintiffs could establish that they were in fact injured, let alone link such injury to herbicide exposure.  Likewise, plaintiffs' counsel incredibly stated at the Rule 26(f) meeting that some plaintiffs will not be able to identify *when* they were allegedly sprayed because many Ecuadorians do not have the same sense of dates and times as U.S. citizens.  But the *timing* of the alleged exposure will be key to the establishment of factual causation because the Plan Colombia spraying occurs only periodically each year in various parts of Colombia and because DynCorp-piloted aircraft are not

---

identified further but, if it exists, it may be useful to plaintiffs in responding to the *Lone Pine* order recommended by the defendants.

the only planes that have participated in herbicide spraying in Colombia over the last nine years.

Clearly, the timing of any alleged exposure will be a critical element to proving causation for any

individual plaintiff's claimed injuries – separate and apart from the need to also prove scientific

causation between the herbicide and the personal injuries alleged in the *Quinteros* complaint.  At

this time, the *Quinteros* complaint does not identify the nature of the personal physical injuries

allegedly suffered by each plaintiff, let alone how and when these injuries may have occurred.

All such facts are one critical to the question of whether there is even a *prima facie* basis for

plaintiffs' claims – let alone necessary to prove causation for a toxic tort.  *See, e.g., In re Paoli

R.R. Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir. 1994); *In re Consol. Parlodel Litig.*, 182 F.R.D.

441, 445 (D.N.J. 1998).

It is not unduly burdensome to the *Quinteros* plaintiffs to require them to produce

verified statements about when and how they were injured (personal injuries and/or property

injuries to farm animals, legal crops or land) and what basis they have to conclude that their

injuries were caused by exposure to the Plan Colombia herbicide.[15]  Nor is the *Lone Pine*

submission the only opportunity for the *Quinteros* plaintiffs to submit causation evidence.  It is

simply a plaintiff's *preliminary* evidence of injury and causation and only the plaintiffs who

ignore the *Lone Pine* order altogether will face the possibility of their cases being dismissed.  *See

also* n.10 *supra*.  Those who produce the *Lone Pine* information would then be free to further

develop their claims with expert witnesses who would be able to amend or supplement their

opinions based on information they later receive in discovery.  In *Gonzales v. Texaco, Inc.*, the

---

[15] The sample case management order for a mass tort case contained in the Manual for Complex
Litigation (4th ed. 2004) at § 40.52 requires all plaintiffs to complete plaintiff fact sheets (with
the assumption that the parties agreed or will agree the questions to be asked in the fact sheets),
which "must be verified under oath," and will be treated as both answers to interrogatories under
Fed. R. Civ. P. 33 and as production responses under Fed. R. Civ. P. 34.  The attorney-prepared
information proposed by the *Quinteros* plaintiffs falls far short of this guidance.

interrogatory responses of the plaintiffs, *prepared by counsel*, had perpetuated the falsehoods in the complaint, 2007 WL 3036093, at 7-8, and no *Lone Pine* submissions had been ordered in the case. The risk of such false claims occurring here will be lessened if the *Lone Pine* submissions are verified by each plaintiff.

        (iii)    <u>Test Cases cannot be Fairly Selected before the Receipt of all "*Lone Pine*"</u><br><u>Submissions</u>.

*Lone Pine* submissions will also be necessary if the *Quinteros* case subsequently proceeds with the selection of test cases or bellweather plaintiffs. The principal reason is because "test cases" are designed to be "representative" of all claims in a mass tort case. *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-20 (5th Cir. 1997). But there is no way to determine "representativeness" in *Quinteros* because the individual plaintiffs have not identified what kind of exposure or harm they claim to have suffered, except for vague allegations that some were harmed physically, some lost farm animals, and some lost "legal" crops. Accordingly, the defendants disagree strongly with plaintiffs' proposal to provide only sparse unverified information now while nonetheless allowing *the plaintiffs alone* to choose test cases, which cannot possibly be representative of all claims.

In particular, the *Quinteros* plaintiffs propose that 20 "test cases" be selected at this time from among the 1660 individual *Quinteros* plaintiffs as to which counsel would provide selective factual information. After this, full discovery and bellweather trials would proceed only as to the test case plaintiffs but fully as to the defendants *before* additional data is provided about all of the other *Quinteros* plaintiffs' individual claims. There are several deficiencies in this proposal, the first of which is that it would interfere with the class discovery in *Arias* to determine if that putative class can meet the requirements of Rule 23(a) and (b) to be certified as a class. This will create confusion and unnecessary time and expense for the defendants and the Court.

Secondly, test cases cannot be properly or fairly selected until the parties and the court understand the universe of plaintiffs and their claims, which is impossible at this time.  As noted above, the Fifth Circuit stated in *Chevron* that sample or test cases must be "representative" to maintain the parties' due process rights.  109 F.3d at 1021.  And the Manual for Complex Litigation § 22.315 (4th ed. 2004) states that "To obtain the most representative cases from the available pool, a judge should . . . limit the selection to cases that the parties agree are typical of the mix of cases."  Here, there is neither agreement by the parties nor any basis to determine representative cases.  The Manual makes a similar point abut "sampling" at § 22.81 ("whether the aim is discovery, settlement, or a test-case trial, any sample should be representative of the claims and claimants . . . .").

In the decision *In re Shell Oil Refinery,* 136 F.R.D. 588, 592 n.7 (E.D. La. 1991), addressing an explosion at a refinery in Louisiana, it was noted that only after the completion of 81-page proof of claim forms – which were much more onerous than the *Lone Pine* submissions sought by the defendants here – did the court undertake to identify 20 claimants to present evidence of their damages in phases.  The Court noted that such "claimants will be representative of the types of damages alleged to have been caused by the explosion."  *Id.* at 593-94 and n.8 (clarifying that the Court anticipated a process whereby categories of damages would be established by a Court-appointed statistician based on a review of the class members' completed proof of claim forms and then a statistically meaningful random selection).

In *In re Ampicillin Antitrust Litigation,* 88 F.R.D. 174, 179 (D.D.C. 1980), the Court ordered certain trials in related cases to proceed with bellwether plaintiffs, but stressed that they should be "truly representative" of the group of related plaintiffs and offered guidance about the kind of factual record that would support inclusion in the group of bellwethers in order to make

the "essential determination about what actually occurred . . . ." And in *Morgan*, the U.S.

District Court in New Jersey ordered the parties to choose bellwether plaintiffs *after* completion

of statements from "all Plaintiffs regarding the 'nature and extent of injuries suffered,' their

treating physicians, and medical authorizations . . . ." 2007 WL 1456154 at *9. Moreover, as

noted above, the *Morgan* Court required the plaintiff statements only after distinguishing the

facts in *Lone Pine* based on favorable vs. unfavorable EPA reports. *Id.* at *8. But, in opting to

use bellwether plaintiffs after the completion of the fact statements by all plaintiffs, the *Morgan*

Court also directed the parties to keep in mind "the Fifth Circuit's caution that the more

representative the bellwether plaintiffs, the more reliable the case management tool." *Id*. at *9.

Thirdly, initial discovery as to all *Quinteros* plaintiffs is essential before any bellweather

trial because the information provided through such discovery from all plaintiffs may lead to

relevant evidence on general causation, *i.e.,* whether the alleged drifting of herbicide into

Ecuador is in fact causing any adverse effects. The plain facts here are that the plaintiffs reside

in a poverty stricken region of northern Ecuador, where poor nutrition, limited health care, and

violent conditions have led to significant health and environmental impacts. The fact that

plaintiffs counsel may be able to find 20 individuals from this region with illnesses, sick farm

animals or damaged crops says nothing whatsoever about Plan Colombia spraying, and, if those

plaintiffs are allowed to present those claims in isolation, it would result in an exceedingly

misleading presentation of the relevant facts. Requiring the 1,660 *Quinteros* plaintiffs to provide

*prima facie Lone Pine* submissions will provide a necessary reality check against such plaintiff

cherry-picking.

The aggregated data from *Lone Pine* submissions offers other benefits as well. For

example, if most of the plaintiffs who allege injuries in a particular month of a particular year

turn out to report the same symptoms – and if the defendants' and the governments' records later prove that there was no Plan Colombia spraying in that same month – then it will be reasonable to conclude that something else caused the plaintiffs' symptoms.  Another example is the possibility that the *Lone Pine* submissions as a whole will reveal the same wide variety of alleged symptoms during a period of time when herbicide spraying *was* being performed in Colombia close to the Colombia-Ecuador border and when it was not, again raising the possibility that the plaintiffs' symptoms were caused by many different reasons (and by each individual's idiosyncratic reactions to common factors) found in rural Ecuador such as disease, hunger, unsanitary conditions or the chemicals used in processing coca into cocaine.

The Manual for Complex Litigation recognizes the usefulness of such aggregated information:

> In litigation with numerous plaintiffs, the judge may direct the parties or a special master to identify relevant characteristics of the parties affecting pretrial organization, discovery, settlement or trial.  For example, in litigation involving allegedly harmful products or substances, the parties might be directed to organize information such as (1) the circumstances of exposure to the toxic product (*e.g*., the place, time span, and amount of exposure . . . , (3) relevant and distinguishing characteristics of multiple products . . . , (4) the types of occupations of the . . . plaintiffs . . . . Emerging patterns may assist the Court in organizing and managing the litigation, whether by aggregated treatment or otherwise.

Manual for Complex Litigation, § 22.316 (4th ed. 2004).  Indeed, such information from all individual *Quinteros* plaintiffs could well constitute independent information that the expert witnesses for both parties should examine with respect to causation issues.

Finally, the plaintiffs point out that *Lone Pine* orders are not mentioned in the Manual for Complex Litigation, but they ignore the Manual's clear reference to plaintiff fact sheets (*cf.* n.15 *supra*) and its statement that if "test cases" are "to produce reliable information about other mass

tort cases, *the specific plaintiffs and their claims* should be *representative* of the range of cases," *id* at § 22.315 (emphasis added) as well as the above-quoted guidance that "sampling" should likewise be "representative of the claims and the claimants."  *Id* at § 22.81.  It is not possible to follow the Manual's guidance in the *Quinteros* case until and unless *Lone Pine* submissions or other verified fact sheets addressing causation are first produced for all individual plaintiffs.

      c.      <u>Discovery Should Be Had Initially as to the Threshold Issue of the Government Contractor Defense.</u>

Although it is premature to brief the defendants' entitlement to the government contractor defense set out in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), and implemented by federal courts around the country for the last two decades, *see, e.g., Haltiwanger v. Unisys Corp.,* 949 F. Supp. 898, 902-07 (D.D.C. 1996), it is important to note that the defendants' reliance on this defense has already been supported here by a sworn declaration from the U.S. Department of State:

> DynCorp International's activities under the Contract are taken pursuant to and in compliance with the Bureau's precise specifications.  In particular, all drug spraying operations, conducted in the Andean region by DynCorp International or with DynCorp International's support are (1) carried out pursuant to detailed flight plans and operational requirements approved by both the Government of Colombia and representatives of the Bureau and (2) use a herbicide selected, approved, and supplied to DynCorp International by the Bureau.  DynCorp International's activities are closely monitored by the Bureau, including a formal Award Fee process which has generally rated DynCorp International's performance as excellent.

Declaration of Rand Beers, former Assistant Secretary of State for the Bureau of International Narcotics and Law Enforcement Affairs, filed in the *Arias* case on January 7, 2002 (CM-ECF Document No. 7, Ex. B) at ¶ 26.  Further discovery into the government contractor defense will bring this information up to date and demonstrate that Mr. Beers' statements in 2002 have remained true and correct to the present date.  Such discovery will also demonstrate the fallacy

of the plaintiffs' factual contentions that DynCorp is responsible for purchasing, mixing or handling the herbicide used in Plan Colombia because those activities are *not* performed by the defendants.[16]

        d.    <u>Proposed Schedule</u>

The Defendants' Proposed Scheduling Order recommends that the first-phase discovery into the *Arias* class action claims be completed by June 30, 2008, with briefing on the *Arias* plaintiffs' motion to certify their class to follow immediately thereafter. The Defendants' Proposed Scheduling Order also recommends that the first-phase discovery into the government contractor's defense and *Lone Pine* submissions be ordered completed by August 29, 2008. DynCorp International's dispositive motion(s) on the government contractor defense (and on international law issues) would then be due by October 31, 2008, as would any briefing that may be required if the parties have disagreements regarding the sufficiency of specific *Lone Pine* submissions. Following the Court's resolution of these dispositive motion(s), if any claims remain, defendants propose that the Court would then convene another scheduling conference to set fact and expert discovery deadlines for issues such as causation and the remaining liability and damage issues as well as to set dates for *Daubert* and other dispositive motions. *See* Paragraph 5 of Defendant's Proposed Scheduling Order.

---

[16] The plaintiffs complain that "DynCorp wants to preclude plaintiffs from conducting discovery" into matters such as "the precise composition of the herbicide" and the manufacturers warnings or other health information "which DynCorp obtained when it purchased the herbicide." *Supra*, p. 15. But because DynCorp does not purchase the herbicide or mix it with the surfactant, plaintiffs will have to obtain discovery from third parties irrespective of the method of discovery ordered in this case.

Dated:  November 19, 2007                         Respectfully submitted:


                                                  /s/ Rosemary Stewart
                                                  Joe G. Hollingsworth (D.C. Bar # 203273)
                                                  Katharine R. Latimer (D.C. Bar # 405137)
                                                  Eric G. Lasker (D.C. Bar # 430180)
                                                  Rosemary Stewart (D.C. Bar # 204438)
                                                  SPRIGGS & HOLLINGSWORTH
                                                  1350 I Street, NW
                                                  Washington, D.C. 20005
                                                  Phone: (202) 898-5800
                                                  Fax: (202) 682-1639

                                                  Attorneys for the Defendants
                                                  DynCorp International, *et al*.



                                                  /s/ Rosemary Stewart  with permission
                                                  Terrence Collingsworth
                                                  INTERNATIONAL LABOR RIGHTS
                                                  FUND
                                                  2100 S Street NW
                                                  Suite 420
                                                  Washington, DC  20009
                                                  Phone: (202) 347-4100
                                                  Fax: (202) 347-4885

                                                  Attorneys for the *Arias* Plaintiffs



                                                  /s/ Rosemary Stewart  with permission
                                                  Michael J. Madigan
                                                  AKIN, GUMP, STRAUSS, HAUER &
                                                  FELD LLP
                                                  1333 New Hampshire Ave. NW
                                                  Washington, DC  20036
                                                  Phone: (202) 887-4000
                                                  Fax: (202) 887-4288

William R. Scherer
William R. Scherer III
Jeff L. Frazier
Gregory Barthelette
CONRAD & SCHERER, LLP
633 South Federal Highway
Fort Lauderdale, FL  33301
Phone: (954) 847-3374
Fax: (954) 463-9244

Walter J. Lack
Stephen R. Terrell
ENGSTROM, LIPSCOMB & LACK
10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA  90067
Phone: (310) 552-3800
Fax: (310) 552-9434

Thomas V. Girardi
J. Paul Sizemore
GIRARDI & KEESE
1126 Wilshire Blvd.
Los Angeles, CA  90017
Phone: (213) 977-0211
Fax: (213) 481-1554

Attorneys for the *Quinteros* Plaintiffs

503442v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| Venacio Aguasanta Arias, *et al*., ) | |
| ) | |
|         Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DynCorp, *et al*. ) | |
| ) | |
|         Defendants. ) | Case Number: 1:01CV01908 (RWR) |
| _____ ) | |
| ) | Consolidated for Case Management |
| Nestor Emogenes Arroyo ) | and Discovery with |
| Quinteros, *et al*., ) | *Quinteros*: 1:07CV01042 (RWR) |
| ) | |
|         Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DynCorp, *et al*. ) | |
| ) | |
|         Defendants. ) | |
| _____ ) | |

## PLAINTIFFS' PROPOSED SCHEDULING ORDER

**I.     INITIAL DISCLOSURES**

      The parties shall make initial disclosures pursuant to Fed. R. Civ. Proc. § 26(a)(1) within 60 days of entry of this order.

**II.    *ARIAS* CLASS DISCOVERY**

      **A.    Discovery**

      Discovery pertaining to class certification issues (as defined by Fed. R. Civ. Proc., § 23(a)) will be open upon entry of this order.

      Class certification discovery shall be completed by _____, 2008.

**B.    Motion for Class Certification**

Within 30 days of the close of class certification discovery, as identified in Section 11.A, *supra*, Plaintiffs shall file their motion for class certification.

Briefing shall be pursuant to L. Cv. R. § 7.  A hearing on the motion (if any) shall be set by the Court.

**III.    Stay of Provincial Discovery**

Aside from initial disclosures as set forth in Section I, *supra*, the Court herein stays all discovery with respect to the Provincial Plaintiffs.

Pursuant to Fed. R. Civ. Proc., § 16(c)(13) and L. Cv. R. § 16.3(c)(11), the Court herein finds that the claims of the individual Plaintiffs have preference over the claims of the Provincial Plaintiffs.  Therefore, the claims of the individual Plaintiffs shall be tried first and all discovery and other pre-trial procedures with respect to the Provincial Plaintiffs is stayed until further notice of the Court.

**IV.    *Quinteros* Questionnaires**

Within 60 days of entry of this order, Defendants shall provide to Plaintiffs counsel a proposed Plaintiff questionnaire and all proposed authorizations for release of medical, employment (as appropriate), and school (as appropriate) records to be executed by the Plaintiffs.  The questionnaire may include a request for production of documents from the Plaintiffs.

This questionnaire shall be in lieu of interrogatories and requests for production to be propounded on the individual Plaintiffs pursuant to Fed. R. Civ. Proc., §§ 33, 34.  The number of questions in the questionnaire are not limited by Fed. R. Civ. Proc., § 33(a).

Verified, completed, questionnaires shall be provided by Plaintiffs on a rolling basis. Plaintiffs shall produce to defendant _____ questionnaires per month.

All questionnaires shall be due to defendant no later than _____, 200___.

The Court will set an Order to Show Cause why individuals who failed to provide a questionnaire response by the date indicated above should not be dismissed.

**V.    Phase I - *Quinteros***

Within 90 days of entry of this order, Plaintiffs shall identify to Defendants and to the Court twenty (20) individual Plaintiffs to be the First Phase trial group in this case.

Upon designation, fact discovery will be open and limited to these 20 First Phase Plaintiffs. All discovery will be stayed as to all other Plaintiffs (aside from questionnaire responses as set forth in Section IV, *supra*) and the Provincial Plaintiffs.

All parties may engage in all fact discovery permissible by law.

Defendants have indicated that they intend to move for summary judgment based upon the government contractor defense and/or international law.  If Defendants intend to support either of their motions by expert testimony, Defendants shall so indicate to the Court and the Plaintiffs within 120 days of entry of this order.  If Defendants so elect, the Court will issue a subsequent Scheduling Order governing this expert discovery.

Fact discovery for the First Phase trial group shall be concluded by _____, 2008.

**VI.    Summary Judgments**

Upon close of fact discovery, Defendants may file their motion(s) for summary judgment based upon the government contractor defense and international law.

All motions shall conform with Fed. R. Civ. Proc., § 56 and L. Cv. R. 56.1.

**VII.    Phase II - *Quinteros***

The parties will simultaneously exchange expert witness designations and expert witness reports (pursuant to Rule 26) for all "general causation" expert witnesses.  Such witnesses shall include liability experts, standard of care experts, herbicide experts, epidemiologists, general toxicologists, economists, etc.

"General-Causation" experts shall not include experts who will be asked to opine whether a specific Plaintiffs' injuries were caused, or contributed to, by exposure to Defendant's spraying.  Experts may be double designated as "general" and "specific" causation, but any such experts re-designated shall have to submit a second expert witness report and be made available for a second expert witness deposition during the next phase.

Expert witness depositions shall occur pursuant to the Rules of Civil Procedure.

Designation shall be on _____, 2008.

This phase of expert discovery shall conclude on _____, 2008.

## VIII.    Phase III - *Quinteros*

The parties will simultaneously exchange expert witness designations and expert witness reports (pursuant to Rule 26) for all specific-causation expert witnesses.

Expert witness deposition shall occur pursuant to the Rule of Civil Procedure.

Designation shall be on _____, 2008.

This phase of expert discovery shall conclude on _____, 2008.

## IX.    Pre-Trial Conference

All motions for summary judgment not mentioned above and all motions *in limine* (including challenges to the admissibility of expert opinion testimony) shall be heard at the pre-trial conference.

The Pre-Trial conference is set for _____, 2008.

**X.    Trial**

Trial as to the First Phase 20 Plaintiffs is set for _____, 2009.

**XI.    Next Phase**

Upon completion of the first trial, the parties and the Court will develop a scheduling order for the second phase trial.

_____
Richard W. Roberts
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Venacio Aguasanta Arias, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DynCorp, *et al.* | ) |
| | ) |
| Defendants. | ) Case Number: 1:01CV01908 (RWR) |
| | ) |
| | ) Consolidated for Case Management |
| Nestor Emogenes Arroyo | ) and Discovery with |
| Quinteros, *et al*., | ) *Quinteros*: 1:07CV01042 (RWR) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DynCorp, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>DEFENDANTS' PROPOSED SCHEDULING ORDER</u>

1.      The parties shall exchange Initial Disclosures within 60 days after the Initial

Scheduling Conference.

2.      Discovery will commence immediately following the exchange of Initial

Disclosures into the following three subject matters:

      a.      Discovery pertinent to the *Arias* class action claims and certification

          proceeding;

      b.      The submission of verified fact statements (*i.e., "Lone Pine"* submissions)

          by the 1660 individual *Quinteros* plaintiffs to identify each plaintiff's

alleged exposure and resulting harm, with the form of the statements to contain at least the information set out in Exhibit A to this Scheduling Order; and

 c. Discovery from the DynCorp defendants (and relevant third parties) pertinent to the defendants' anticipated reliance on the government contractor defense in the defendants' anticipated dispositive motion on that subject.

3. Discovery pertinent to the *Arias* class action claims (Para. 2(a) above) shall be completed by June 30, 2008, with an interim due date for the collection of compete medical records by March 31, 2008, and briefing on the *Arias* motion for certification of its class shall follow the close of class-related discovery and shall be completed within 45 days after said discovery closes or after the filing of the motion for certification, whichever occurs later.

4. The *Lone Pine* submissions by the individual *Quinteros* plaintiffs (pursuant to Paragraph 2(b) above) shall be completed by August 29, 2008.  Fact and expert discovery into the subject matter set out in Paragraph 2(c) above shall be completed by August 29, 2008.

5. Expert reports on the government contractor issue (and on any remaining international law issues) shall be exchanged on May 30, 2008, and rebuttal expert reports shall be exchanged on June 30, 2008.  The defendants' dispositive motion(s) addressing the government contractor defense and/or the remaining alleged international law violations, shall be filed by October 31, 2008.

6. Following the Court's resolution of the dispositive motion(s) identified in the preceding paragraph, if any claims remain, the Court will convene another scheduling conference to set discovery deadlines and to establish other dates for at least the following subjects:

      a.        Fact and expert discovery regarding causation;

      b.        Fact and expert discovery regarding remaining liability and damages

                issues;

      c.        The consideration and disposition of *Daubert* and other dispositive

                motions; and

      d.        The setting of pretrial hearing and trial dates.

7.      The deadline for joining additional parties and for amending the pleadings shall be May 30, 2008.

_____
Richard W. Roberts
United States District Judge

<u>**Defendants' Suggested Content of "*Lone Pine*" Submissions to be Made**</u>
<u>**by Each Individual *Quinteros* Plaintiff**</u>

1.      **For each individual *Quinteros* plaintiff:**

     a.      Provide personal facts about yourself:

          -- Name

          -- Age

          -- Sex

          -- Address now

          -- Address when the injury or damage allegedly occurred

          -- Spouse's name

2.      **For each individual *Quinteros* plaintiff alleging personal injury**

     a.      Provide the facts related to your exposure to the Plan Colombia herbicide

          -- When did it happen?  How often?

          -- Where were you?

          -- What did you see?  If you saw an aircraft, what did it look like?

          -- What did you feel?  Smell?

          -- What did you do after you were exposed?

     b.      Identify the injuries or illnesses you believe resulted from the exposure (to yourself and to your minor children).

     c.      Attach report(s) of treating physicians, medical attendants or others who support your claim of injury or illness and who opine to a reasonable degree of medical or other probability that it was caused by your exposure to the Plan Colombia herbicide.

3.      **For each individual *Quinteros* plaintiff alleging property damage**:

    a.      Identify the property that was damaged.

        -- For real estate, provide the address (or a description of its geographic location) and submit proof that you owned it when the damage occurred

        -- For crops:

            ● Provide the address (or a description of the location) where your crops grew

            ● What kinds of crops were allegedly damaged on your property?

            ● How big was your field of crops?

        -- For farm animals, identify the type and number of each kind of animal and the nature of the injuries allegedly sustained by them

    b.      Identify the monetary loss you believe you suffered due to the injury or damage to your property (animals, crops, land) and explain how you determined this amount.

501831v1