**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Venancio Aguasanta Arias, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case Number: 1:01cv01908 (RWR) |
| v. ) | |
| ) | |
| DynCorp, *et al.* ) | |
| Defendants. ) | |
| ) | |
| ) | |
| Nestor Ermogenes Arroyo Quinteros, *et al.*, ) | Case Number: 1:07cv01042 (RWR) |
| ) | |
| Plaintiffs, ) | (Cases Consolidated for Case |
| v. ) | Management and Discovery) |
| ) | |
| DynCorp, *et al.* ) | |
| Defendants. ) | |

**DEFENDANTS' REPLY MEMORANDUM IN
SUPPORT OF THEIR MOTION TO COMPEL**

Filed: August 19, 2008

Joe G. Hollingsworth (D.C. Bar # 203273)
Eric G. Lasker (D.C. Bar # 430180)
Rosemary Stewart (D.C. Bar # 204438)
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW
Washington, D.C. 20005
Phone: (202) 898-5800
Fax: (202) 682-1639

Counsel to the Defendants

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    INTRODUCTION ...............................................................................................2

II.   THE DEFENDANTS' MOTION TO COMPEL SHOULD BE GRANTED .....................3

     A.    The individual plaintiffs are seeking to avoid compliance with the Court's directive to provide detailed disclosures establishing the bases of their claims......3

          1.    Plaintiffs' "meet and confer" argument is a frivolous diversion from the fact that plaintiffs have not complied with the Court's directives. ........6

          2.    Plaintiffs are refusing to provide dates and locations of their alleged exposures and instead wish to base their claims on discovery from the defendants. ...............................................................................................13

          3.    Plaintiffs are refusing to provide medical and employment records or any other external information to support their bare allegations of injury. ..............................................................................................................17

          4.    Plaintiffs are seeking Court permission to rely on rumors or hearsay instead of admissible evidence and fact to support their allegations. ........18

          5.    Plaintiffs are continuing to avoid their obligation to provide Initial Disclosures and Questionnaire Responses *in English.* .............................20

          6.    Plaintiffs are refusing to provide computations of damages as required by Fed. R. Civ. P. 26(a) .............................................................................21

     B.    Case Management will be enhanced by granting the defendants' motion to compel................................................................................................................22

III.  CONCLUSION.................................................................................................23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Venancio Aguasanta Arias, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case Number: 1:01cv01908 (RWR) |
| v. | ) |
| | ) |
| DynCorp, *et al.* | ) |
| Defendants. | ) |
| | ) |
| Nestor Ermogenes Arroyo Quinteros, *et al.*, | ) Case Number: 1:07cv01042 (RWR) |
| | ) |
| Plaintiffs, | ) (Cases Consolidated for Case |
| v. | ) Management and Discovery) |
| | ) |
| DynCorp, *et al.* | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY MEMORANDUM IN
SUPPORT OF THEIR MOTION TO COMPEL**

The defendants filed their Motion to Compel because the individual *Arias* and *Quinteros* plaintiffs have disregarded the specific directions of the Court about the Initial Disclosures that must be made by each of the individual plaintiffs in this case, and because those same plaintiffs have served wholly inadequate Questionnaire responses for the initial 800 (of the approximately 3300) individual plaintiffs.[1]  In their opposition, the plaintiffs announce that they cannot and will not provide the disclosures directed by the Court over eight months ago.[2]  This revelation follows

---

[1] Defendants' Motion to Compel the Individual Plaintiffs to Satisfy the Plaintiffs' Obligations under 26(a) (Initial Disclosures) and Rule 33 (Interrogatories) and to Provide Verified, Factual and Complete Responses *in English* to the Plaintiffs' Questionnaire (hereafter "Defs. Mot.") was filed separately in both the *Arias* and *Quinteros* dockets on August 1, 2008.

[2] Plaintiffs' Opposition to Defendants' Motion to Compel Discovery at 13-18 (hereafter referenced as the "Pls. Opp.")

the wholly false allegation that defendants did not meet and confer in good faith prior to filing their motion to compel, Pls. Opp. 3-12, which is an obvious smoke-screen designed to deflect attention from the individual plaintiffs' inability or unwillingness to the make disclosures that provide the bases for their claims as the Court directed them to do.

## I.    <u>INTRODUCTION</u>

When the Court first stated its intent to require disclosure of "the basis for each plaintiff's belief that the defendants' conduct caused the claimed injuries" in these cases, which the Court described as "essential in moving the case[s] forward," the plaintiffs were asked whether they saw any difficulties in making such disclosures. Plaintiffs' counsel replied that this "would be very doable." Defs. Mot. Ex. A.-11/27/07 Tr. at 11-12. When the Court then listed the specific kinds of disclosures that would be necessary to carry out its directive to identify the bases for each plaintiff's claim, *id.* at 13-14, not one of the plaintiffs' counsel (from four separate law firms) offered any objection to the specific disclosures so identified.

Nearly nine months later, after securing numerous extensions and other accommodations from the defendants by promising that such disclosures would be coming (*and promising that they would be coming in English*), the plaintiffs' opposition brief now announces that the individual plaintiffs cannot and will not provide the most essential of such disclosures. Pls. Opp. at 15-18. The surprising reason for the plaintiffs' refusal is that they cannot remember the dates, locations and other particulars of their alleged exposures, and will first need discovery from defendants about where and when the aerial spraying took place – with the hope that such discovery will form the bases for the plaintiffs' claims. *Id.* As discussed herein at pp. 13-15, this is not the law and it clearly runs afoul of Rule 11.

Throughout the Pls. Opp., no substantive rebuttal is offered whatsoever to the defendants' recitation of the numerous deficiencies in the plaintiffs' Initial Disclosures, Defs. Mot. at 8-10,

2

and in the first 800 Plaintiffs' Questionnaire Responses. Defs. Mot. at 12-15. The plaintiffs also do not dispute that they have failed to provide Initial Disclosures and Questionnaire responses in English. And they tacitly acknowledge their failure to provide medical and employment records and other documents required by the agreed-upon Questionnaire in support of an alleged link between the Plan Colombia spraying and their injuries. The Plaintiffs do seek to justify their stated reliance on rumors or hearsay to provide their "verified" disclosures, which is addressed in this Reply Memorandum at pp. 18-19 and they also seek to avoid their obligation to provide "computations of damages" as required by Fed. R. Civ. P. 26(a). This is addressed *infra* at pp. 21-22.

Lacking any firm support for their refusals to make disclosures, the plaintiffs devote most of their opposition to the fabricated claim that defendants failed to properly meet and confer with defendants prior to filing the motion to compel. As set out at pp. 6-12 herein, the defendants have fully satisfied their meet and confer obligations since January 2008, when the plaintiffs first provided their inadequate and untranslated Initial Disclosures, and the defendants carried out the conference requirement yet again prior to filing their motion to compel on August 1, 2008.

Plaintiffs have made it abundantly clear that they will not provide the disclosures and Questionnaire responses that comply with the Court's directive and that satisfy their burden under the federal rules. This reply memorandum will demonstrate that plaintiffs should now be compelled to do so by the Court.

## II.    **THE DEFENDANTS' MOTION TO COMPEL SHOULD BE GRANTED**

### A.    **The individual plaintiffs are seeking to avoid compliance with the Court's directive to provide detailed disclosures establishing the bases of their claims.**

The plaintiffs' allegations in the case stand on a shaky premise. Plaintiffs contend that the DynCorp defendants have unlawfully sprayed herbicide used in the "Plan Colombia" aerial

3

eradication of coca and poppy plants in Colombia, over the border into Ecuador, thereby causing alleged personal injuries to humans and the deaths of farm animals.[3]  These allegations have been squarely repudiated by an independent scientific commission appointed by the Organization of American States specifically to examine the alleged health and environmental effects of the Plan Colombia spraying.  After an extensive 81-page published analysis, the OAS scientific commission concluded:

> The database of glyphosate effects is large and its risks to humans and the environment have been extensively reviewed and assessed in a number of national and international jurisdictions as well as in the open scientific literature.  In all cases, glyphosate poses little risk . . . .  For the environment, direct risks from the use of glyphosate . . . were judged to be negligible.

Keith R. Solomon *et al., Coca and Poppy Eradication in Colombia*:  *Environmental and Human Health Assessment of Aerially Applied Glyphosate*, 190 Rev. Environ. Contam. Toxicol. 43, 106, 111 (2007).  With regard to the allegations of unlawful spraying or spray drift, the OAS commission noted that the Colombian and United States governments closely monitor the spraying operations as to the "field locations, flight paths of the spray planes, and areas where spray is released," and the OAS commission further noted that "[e]xperience with spray equipment of the type used in Colombia suggests that spray drift will be minimal."  *Id*. at 52, 58.  These findings mirror those of the U.S. Department of State and the U.S. Environmental Protection Agency, which have concluded that the herbicide poses no significant risks to human

---

[3] In each of the Answers filed in response to the *Arias* and *Quinteros* complaints (the originals and amended versions), the DynCorp defendants have denied spraying herbicide in Ecuador and have denied that the herbicide used in Plan Colombia could or did cause the kinds of injuries claimed.  Further, most of the individual plaintiffs in these cases live in parts of Ecuador that suffer from unsanitary living conditions, poor nutrition, depleted farm lands and many kinds of illness and disease – any one of which could have caused the injuries claimed by the plaintiffs here.

health or the environment and that "best practices" are being used to minimize drift.[4]

In light of this same shaky premise, at the November 27, 2007 conference, the Court made clear that plaintiffs were required to provide defendants – as part of their January 28, 2008 Initial Disclosures – with detailed information providing "the basis for each plaintiff's belief that the defendants' conduct caused the claimed injuries," including *inter alia*, the dates of the alleged exposures (and time, if possible), the descriptions of what they saw, details establishing a temporal connection between the exposures and the alleged injuries, and any statements by doctors associating the alleged injuries with the spraying. Defs. Mot. Ex. A – 11/27/07 Tr. at 11-13.

While the plaintiffs' advised the Court just prior to the 11/27/07 conference that they would "provide the Court and DynCorp with . . . the precise injuries and damages alleged by the Plaintiffs," Defs. Mot. at 5, n.4, and while, as noted above, the plaintiffs' counsel offered no protest whatever to the Court's recitation of the *additional* categories of disclosures that must be made, the plaintiffs have done neither. Instead, in the last nine months, the plaintiffs have pursued a variety of tactics to avoid their obligations and prevent defendants from obtaining the

---

[4] *See e.g.*, U.S. Dept. of State, Bureau for International Narcotics and Law Enforcement Affairs, International Narcotics Strategy Report, Vol. I, Drug and Chemical Control at 118 (March 2007), http://www.state.gov/documents/organization/82201.pdf ("Biennial verification missions continue to show that aerial eradication causes no significant damage to the environment or human health."); Bureau of International Narcotics and Law Enforcement Affairs, Information Package on the Certification of the Aerial Eradication of Illicit Coca and Opium Poppy in Colombia (Aug. 22, 2006), http://www.state.gov/p/inl/rls/rpt/aeicc/70974.htm (quoting the 2004 EPA report on human health concerns, which stated: "Despite an aggressive search for cases, there does not appear to be any evidence that glyphosate aerial spraying has resulted in any adverse health effects among the [Colombian] population where this spraying takes place."); U.S. Environmental Protection Agency, Office of Pesticide Programs, Details of the 2003 Consultation for the Department of State, Use of Pesticide for Coca and Poppy Eradication Program in Colombia, Executive Summary at ii (June 9, 2003), *available at*

*Continued...*

information to which they are entitled.  These tactics were addressed in defendants' opening brief *and each has now been confirmed in the plaintiffs' opposition brief.*  Each of plaintiffs' tactics, excuses and arguments is addressed, in turn, below.

> **1.     Plaintiffs' "meet and confer" argument is a frivolous diversion from the fact that plaintiffs have not complied with the Court's directives.**

The plaintiffs contend that defendants failed to meet and confer in good faith because defendants' motion was filed when the parties were "in the midst of a negotiation" about how much time it would take the defendants to resolve a technical glitch in their computer programs in order to complete their preparation of Questionnaire responses, and because defendants unreasonably stated a take-it-or-leave-it position as to the form of relief that would avoid the filing of the defendants' motion.  Pls. Opp. 3-4, 4-11.

As the record of communications between the parties makes clear, the defendants' motion had (and has) nothing to do with the computer glitch that plaintiffs now claims to be the reason for their tardy delivery of Questionnaire responses.  Indeed, the defendants did not file their motion based on the plaintiffs' admitted tardiness in submitting the responses or based on any dispute about the schedule for delivering them.  The motion was instead based on *numerous substantive problems* with the responses, including their failure to follow the Court's explicit directives and the fact that they were in Spanish, among other specific objections.

To be clear, plaintiffs' assertion that there is "no dispute" about whether the plaintiffs "would provide the information required by the [Q]uestionnaires," with the "sole issue" being "when this could occur" (Pls. Opp. 3) is absolutely untrue.  Also untrue are all other similar statements such as "there is a scheduling issue, not a substantive disagreement" (Pls. Opp. 5)

---

http://www.state.gov/documents/organization/27516.pdf (finding best management practices to minimize drift).

made throughout the plaintiffs' opposition brief.  Because the only thing plaintiffs' counsel

wished to negotiate was a schedule for delivering even more *inadequate* Questionnaire

responses, there was no viable negotiation underway.  Indeed, as demonstrated below, during the

meet and confer process, the defendants made clear that they were not willing to provide yet

another extension of time to plaintiffs unless it was accompanied by a commitment to comply

with each discovery obligation imposed on plaintiffs by the Court and by the Rules – which

plaintiffs rejected (and still reject throughout the Pls. Opp.).

**The meaning of "Meet and Confer"**

      The plaintiffs cite two decisions about the need to "meet and confer" pursuant to Fed. R.

Civ. P. 37(a) and D.D.C. LCvR 7(m).  Pls. Opp at 3-4, 8-10.  Neither decision helps the plaintiffs

here.  In *United States ex rel Pogue v. Diabetes Treatment Centers of America, Inc.,* 235 F.R.D.

521, 529 (D.D.C. 2006), the Court found that defendants had not satisfied the conference

requirement before filing their motion to compel because three years had passed since the last

time they had communicated with the plaintiffs about their failure to respond to the

interrogatories and document requests at issue, and no new communication had been made

before the defendant's motion was filed.  In *Campbell v. Microsoft Corp.,* No. 04-2060, 2006

WL 463263 at *1 (D.D.C. Feb. 24, 2006), the Court agreed that the Magistrate had properly

found a lack of compliance with the conference requirement when the plaintiffs' attorney who

filed the motion "in fact never spoke with defendant's counsel about the dispute."  In addition,

the Court found that the *Campbell* plaintiff had made no effort to confer with the defendant after

defense counsel served revised discovery responses on plaintiffs, *id* at **1, 3, and had never

responded to two separate letters sent by defense counsel, which "offered to discuss a solution to

the dispute," *id*. at *3.

Of course, the foregoing decisions found a failure to comply with the meet and confer requirements. But other caselaw from this Court is more helpful in the present context. *See Footbridge Ltd. Trust v. Zhang,* No. 04-347 (CKK), 2007 WL 1794106, at *2 (D.D.C. June 19, 2007) (upholding the magistrate judge's finding that Rule 37 was satisfied where plaintiff filed its motion to compel "after [p]laintiff notified [d]efendant of the perceived inadequacy of [d]efendant's discovery responses" and noting that *"[t]he Court does not understand [Rule 37(a)(2)(B)] to require a party to confer repeatedly regarding the same discovery dispute despite numerous failed attempts to elicit . . . satisfactory responses"* (emphasis added)). *See also In re ULLICO Inc. Litig.,* 237 F.R.D. 314, 316 (D.D.C. 2006) (finding Local Rule 7(m) satisfied where "counsel not only discussed the . . . issue with [opposing] counsel on the telephone and in multiple letters, but also attempted to resolve the disagreement and expressly stated their intent to file this Motion").[5]

**The Earlier "Meet and Confer" Communications in this Case**

The "meet and confer" process actually started here when the individual *Quinteros* plaintiffs served their wholly inadequate Spanish-language Initial Disclosure forms in January 2008. Defendants' counsel wrote immediately to ask that the disclosures be translated into English and to identify other deficiencies in the plaintiffs' disclosures, including their failure to include a damage calculation for each plaintiff. Defs. Mot. Ex. B. Defense counsel wrote again

---

[5] *See also Doe v. District of Columbia,* 231 F.R.D. 27, 30 (D.D.C. 2005) (finding compliance with Rule 37(a)(2)(B), despite defendant's demand for discovery on the eve of a holiday weekend close to the discovery deadline, where defendant had twice previously placed plaintiff on notice that it believed he had not completely responded to its discovery requests); *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency,* 456 F. Supp. 2d 46, 52 (D.D.C. 2006) (LCvR 7(m) "contemplates that counsel will speak to one another" and one way to take "real steps to confer" is to contact opposing counsel by telephone), *aff'd,* 530 F.3d 980 (D.C. Cir. 2008).

to the plaintiffs counsel on February 26, 2008 to identify additional concerns in the Initial

Disclosure forms and to ask that they be supplemented as soon as possible to comply with Fed.

R. Civ. P. 26(a) and with the "express direction of the Court at the Nov. 27, 2007 scheduling

conference." Defs. Mot. Ex. B. pp. 3-5 (identifying the same specific concerns set out in the

Defs. Mot. at 8-10). This letter concluded by stating the defendants' "intention to move the Court

for an order compelling adequate Initial Disclosures by the individual *Quinteros* and *Arias*

plaintiffs." *Id. See also* defendants' Exhibit N at ¶¶ 1-3 which is the Declaration of Michael A.

Shallcross identifying numerous deficiencies in the *Quinteros* and *Arias* plaintiffs' Initial

Disclosure forms, which were obvious without translating their text to English.

     Following a February 29, 2008 "meet and confer" held in the defendants' office in

Washington D.C., the parties reached an interim agreement and avoided the defendants'

anticipated motion to compel when the *Quinteros* plaintiffs agreed that their Initial Disclosures

*would* be translated into English, Defs. Mot. Ex. D., and when all parties agreed that the

plaintiffs could supplement their deficient Initial Disclosures with the plaintiffs' responses to the

Plaintiffs' Questionnaire, which by this time had already been drafted and was in the process of

being negotiated. Defs. Mot. at 10-11.[6]

**The "Meet and Confer" Prior to the Pending Motion**

     When the first 800 Plaintiffs' Questionnaire responses were delivered to the defendants

on June 27, 2008, the defendants immediately wrote the plaintiffs to identify the *very same*

---

[6] Although this interim resolution necessarily delayed the date that the defendants would receive
the plaintiffs' Initial Disclosures, it appeared to be a fair and effective resolution because the
Plaintiffs' Questionnaire was designed to ask each of the specific questions directed by the Court
on 11/27/07, as well as asking for, *inter alia*, each plaintiff's claimed damage calculations and
each plaintiff's factual observations and claimed injuries for each instance of alleged exposure.

*Continued…*

*concerns* previously identified in January and February 2008 – including the lack of English translations, the failure to follow the Court's directions, the failure to provide the particulars about each plaintiff's alleged exposure and injuries for each alleged instance of exposure, and the lack of Rule 26(a) damage calculations – in addition to identifying new concerns based on plaintiffs' not responding to several parts of the Questionnaire. Defs. Mot. Ex. J.[7] *See also* Ex. N, Shallcross Decl. at ¶ 5 (summarizing the numerous deficiencies in the first 800 Plaintiffs' Questionnaire responses, which, again, were obvious without translations into English).

The plaintiffs' response to defense counsel's letter stated "We have no problem now providing you with translations to English . . . using our in-house employees or contractors." Defs. Mot. Ex. K. (Defendants wrote back immediately to accept the plaintiffs' proffered "in-house translations," Defs. Mot. Ex. L, however, this has still not occurred.) The remainder of plaintiffs' Ex. K response contained legal disagreements about the substantive concerns raised by the defendants.[8] Notwithstanding this clear statement that the plaintiffs disagreed with the

---

Moreover, the forms of all these questions would be – and subsequently were – approved by all of the parties. Defs. Mot. at 11.

[7] The new concerns identified in defendants' Ex. J 6/30/08 letter included the "Initial Declaration" in each Questionnaire response stating that each entire response could be based on rumors or hearsay, the apparent changes to the form of the Questionnaire that eliminated key instructions, and the failure to provide maps, medical records and employment records, all of which were part of the agreed-upon Questionnaire. Defs. Mot. at 12-15.

[8] In particular, Plaintiffs' counsel Collingsworth argued that the qualification in the Questionnaire responses as to hearsay was proper, that the plaintiffs should not be expected to provide details about location or timing of their injuries because "best estimates" were acceptable, and that "it is improper for a defendant to ask a plaintiff for a specific dollar amount of her damages." Defs. Mot. Ex. K. Mr. Collingsworth's letter did state that there had been "a technical glitch in converting computer files," which might make it appear incorrectly that questions had been changed, but when defense counsel wrote back to request evidence of exactly what transpired with the claimed computer glitch, Defs. Mot. Ex. L at 2, plaintiffs did not respond. Clearly the alleged "glitch" is *not* one of the defendants' substantive concerns expressed about the plaintiffs' disclosures to date.

substantive concerns of the defendants, defense counsel wrote again to ask that plaintiffs schedule a "meet and confer" telephone conference within the week.  *See* Defs. Mot. Ex. L.  This July 10, 2008 letter also explained why the defendants continued to believe that the individual plaintiffs' disclosures were inadequate and stated that it was the defendants' intention to file a motion to compel if such disclosures were not made.  *Id.*

The two letters sent by defense counsel on June 30 and July 10, 2008, Defs. Mot. Ex.'s J and L, were clearly part of the prefiling "meet and confer."  And they soundly refute the plaintiffs' assertions that the defendants' proposed Consent Order sent to plaintiffs (just two weeks after the July 10th letter) came with "no explanation, legal or otherwise, for the positions taken in the consent order," Pls. Opp. at 9, and contained "onerous provisions that were never discussed by the parties."  *Id.*.  Every provision in that Consent Order (attached to the Pls. Opp. as Ex. 1) flowed from the specific concerns set out in the Ex.'s J, K, and L correspondence exchanged by the parties.

**The July 18, 2008 Conference Call**

During the follow-up July 18, 2008 telephone call, the same issues set out in defendants prior letters were discussed by counsel, and as Mr. Collingsworth now concedes in his Declaration filed as part of the Pls. Opp., (hereafter "Coll. Decl.") the parties discussed but did not agree about whether the Questionnaire responses could be based on hearsay or about plaintiffs' obligation to provide damage calculations.  Coll. Decl. ¶ 3 (also pointing out that plaintiffs' counsel did agree to provide in-house translations of the Questionnaire responses but without agreement as to *when* this would occur).

During the July 18th telephone conference, Mr. Collingsworth did ask for more time to complete the process of addressing the alleged "computer glitch" and providing any corrected

11

Questionnaire responses that might result from correcting that computer problem.  *Id.* at ¶ 2.  But his Declaration omits to note that defense counsel made it very clear during the July 18th conversation that *a time extension alone would not be a sufficient resolution* of the numerous issues laid out in the prior correspondence and during the July 18th conference.  And it is factually incorrect that the July 18th call ended with a simple agreement to see if the defendants would agree to the time extensions requested by plaintiffs' counsel.  Coll. Decl. at ¶ 3 (last sentence).  The meeting, in fact, ended with defendants' agreement to draft a Consent Order that would set out specific time extensions *and all other forms of relief necessary to prevent a defense motion to compel*.  This is precisely what defense counsel then sent to Mr. Collingsworth on July 25, 2008.  *See* Coll. Decl. Ex. 1 (defense counsel Stewart wrote: "To follow-up our "meet and confer" telephone conference, attached please find a copy of a proposed Consent Order.  Your agreement to this Order would avoid the defendants' filing of a motion to compel at this time").

Accordingly, when Mr. Collingsworth next advised the defendants that he would be meeting with his team about the timing of the next Questionnaire delivery date (*at no time did defendants agree that he should go to Ecuador to do this and did not even know he had gone to Ecuador until some time later*), and that he would later send a "counterproposal" as to timing, this was clearly not acceptable to the defendants because it did not address any of the substantive concerns raised in defendants' letters of June 30 and July 10 and during the July 18th telephone conference.  In fact, the timing of plaintiffs' delivery of even more substantively inadequate Questionnaire responses has never been the issue here, and it could not possibly form the basis for a resolution of the issues discussed at the "meet and confer."  This is precisely what defense counsel told Mr. Collingsworth in the correspondence attached as Exhibits 4 and 6 to his

12

Declaration.  Clearly, the numerous open issues between the parties did not reflect "a dispute that could have been resolved by the parties themselves." *Diabetes Treatment Ctr.*, 235 F.R.D. at 529 (explaining why the meet and confer requirement exists).

Finally, in the Exhibit 6 letter (defense counsel Stewart's August 1, 2008 letter to Mr. Collingsworth), defendants stated that they "remain willing to discuss and consider a consent resolution of the matters set out in DynCorp's motion to compel [filed that same day]," but noted that a resolution would need to address "the Court's previous directions and Rules 26(a) and 33." As Mr. Collingsworth's Declaration makes clear, no agreement has ever been reached on these substantive issues and the parties have no reason to believe that an agreement will ever be reached.  The "meet and confer" was fully carried out and properly concluded relative to the issues in the defendants' motion to compel.

     **2.**     **Plaintiffs are refusing to provide dates and locations of their alleged exposures and instead wish to base their claims on discovery from the defendants.**

The plaintiffs do not disagree with any part of the defendants' recitation of the directions issued by the Court on November 27, 2008.  Defs. Mot. at 5-8.  Instead, they now contend that plaintiffs can only provide what they remember and it is too much to expect them to recall events that go back a decade ago.  Pls. Opp. at 15-16 (noting that the *Arias* complaint was filed in 2001 and that some of the plaintiffs "live in the rain forest without the benefit of watches or even calendars").  Of course, only the *Arias* case (whose plaintiffs are 11 adults and their children) was filed in 2001.  The *Quinteros* cases (3265 individual plaintiffs) were filed in late 2006 and early 2007.

Clearly, it is a plaintiff's duty, wherever he/she lives, to allege the *prima facie* basis for his/her claims against any defendant.  If the plaintiffs here are unable to do this, their claims should be dismissed.  The plaintiffs miss this point when they argue that caselaw permits

13

interrogatories to be answered based on the information that is available to the party at that time he/she responds.  Pls. Opp. at 16-17.   The directions issued by the Court were not simple interrogatories; they were the initial threshold disclosures that the Court found "essential" to allow these cases to proceed.  Defs. Mot. Ex. A-11/27/07 Tr. at 11-14.  As to these specific inquiries, the plaintiffs clearly have a greater burden.

The plaintiffs also argue in defense of not making the specific disclosures about when, where, and how *each plaintiff* claims to have been injured, that DynCorp should first disclose the records of its flight plans and other data to show spraying *in Ecuador,* which would then allow plaintiffs "to pinpoint exactly when they were exposed to DynCorp's 'Plan Colombia herbicide.'"  Pls. Opp. at 17.  In the first place, DynCorp possesses no flight plans for spraying *in Ecuador*, and secondly, it is absurd to suggest that the disclosures of when Plan Colombia spraying occurred *near the border* between Colombia and Ecuador would miraculously cause the same plaintiffs who live in the rainforest without watches or calendars, to somehow recall exactly when they were exposed.  *Id.* at 17-18.  It is equally absurd to assert that such information is "within the exclusive knowledge of DynCorp."  *Id.* at 17.  If plaintiffs were actually doused with a herbicide mixture that caused serious health effects or killed their crops or farm animals, they would remember when (and how often) this occurred!  The inescapable conclusion is that plaintiffs' counsel want the defendants' near-border spraying records first so that the individual plaintiffs can then claim that they were exposed on the dates when near-border spraying did occur.  This is not how a plaintiff sets out a *prima facie* claim and it invites obvious abuses by the plaintiffs and their counsel, one of whom has already been sanctioned for making personal injury claims on behalf of Ecuadorian citizens, which later turned out not to be true.  *Gonzales v. Texaco, Inc.* No. C-06-02820, 2007 WL 3036093 (N.D. Cal. Oct. 16, 2007).

Moreover, it is clearly improper to file an action without sufficient basis in fact with the hope that later discovery will provide the necessary support. *Danik, Inc. v. Hartmarx Corp*, 120 F.R.D. 439, 443 (D.D.C. 1988) (noting that plaintiffs may not rely on "bare allegations coupled with the hope" that something will be developed later). The *Danik* Court held that it was "no answer to a motion seeking Rule 11 sanctions . . . to suggest that plaintiffs needed discovery to ascertain whether the claim was well founded." *Id*. at 443.[9] *See also Kreuzer v. Am. Acad. of Periodontology,* 735 F.2d 1479, 1496 (D.C. Cir. 1984) (affirming the granting of a summary judgment motion against a party who relied on "bare allegations coupled with the hope that something could be developed at trial to support those allegations"); *View Eng'g Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 985-86 (Fed. Cir. 2000) (affirming the lower Court's sanction award, which rejected the attorney's claim that he needed "an opportunity to complete at least preliminary discovery" before he would know if his counterclaim was supported in fact); *Butera & Andrews v. IBM Corp*., 456 F. Supp.2d 104, 114 (D.D.C. 2006) ("Fundamental fairness demands that '[c]ounsel should not be allowed to file a complaint first and thereafter endeavor to develop a cause of action." (internal citations omitted)); *King v. E.F. Hutton & Co.* 117 F.R.D. 2, 5 (D.D.C. 1987) (stating in the context of a motion to compel interrogatory responses, "Rule 11 is designed to ensure that allegations in a complaint . . . are supported by sufficient factual information at the time the claims are initially asserted. It is no answer for plaintiffs to assert that they will need discovery . . . ."); *Edwards v. Gordon & Co.*, 94 F.R.D. 584, 586 n.2 (D.D.C. 1982) ("Complaints should not be conceived merely as tokens, guaranteeing access to a world of

---

[9] The Rule 11 sanctions imposed in *Danik* were affirmed by the D.C. Circuit at 875 F.2d 890 (1989). The Supreme Court then affirmed all but the costs of appeal in the same sanction award, *sub nom, Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).

discovery.")  Clearly the plaintiffs' argument conflicts with this ample caselaw.

The plaintiffs next assert that it is enough to show that the plaintiffs suffered from physical injuries that are consistent with glyphosate exposure.  Pls. Opp. at 17 (citing to the unpublished 2001 junk-science report of Dr. Maldonado, which is rebutted by the sources cited above at pp. 4-5 and n.4, and also citing to the articles referenced in the Coll. Decl. ¶ 16, *not one of which* studied the "Plan Colombia" herbicide mixture as did the sources cited *supra* by the defendants).  Moreover, it is not clear what the plaintiffs believe such injuries are because many of the plaintiffs are now claiming only simple temporary ailments such as skin rashes and others have identified alleged injuries that occurred years later (*see* Ex. N. at ¶ 4(b)), which contentions are not consistent with the exposure claims made in the *Arias* and *Quinteros* complaints.

Because of this lack of information about the nature of the plaintiffs' alleged injuries coupled with plaintiffs' acknowledgement that they need the defendants' records first and do not otherwise have evidence to support the particulars of their claims, it is clear that plaintiffs cannot provide the kind of evidence that this Court described as "essential" to allow their claims to proceed.  For these reasons, the defendants' proposed Order seeks, in addition to verified and complete Questionnaire responses, the delivery of sworn statements by qualified medical or scientific witnesses that link each plaintiff's alleged personal injuries or property damage to the effects of the alleged Plan Colombia exposures.  *See* defendants' proposed Order at Para. 5.

Instead of responding that such a provision is unnecessary because they *will* provide the detailed bases for their claims as directed by the Court, the plaintiffs contend that the Court did not opt for such causation proof on November 27, 2007, and that it would be "extremely burdensome" to impose it on the plaintiffs.  Pls. Opp. at 10-11.  Of course it is now nearly 9 months after the November 27th hearing, and the plaintiffs have *not* made the disclosures they

assured the Court they could and would make.  It is therefore time to require an even more meaningful causation disclosure by the individual plaintiffs as set out in Para. 5 of the defendants' proposed Order.

**3.    Plaintiffs are refusing to provide medical and employment records or any other external information to support their bare allegations of injury.**

As set out in the Defs. Mot. at 14-15, the agreed-upon Plaintiffs' Questionnaire requested medical records from the responding plaintiffs to support their claims for personal injuries and employment records from any plaintiff claiming damages based on lost wages or earnings.  No such records were produced with the first 800 Plaintiffs' Questionnaires.  *See* Ex. N, Shallcross Decl. at ¶ 5(h).

The Plaintiffs' Opposition is silent on this point.  No excuse is given for failing to produce these records and no promise is made that they are coming.  In fact, in the strained explanation of the "computer glitch" that allegedly caused some Questionnaire answers to appear incorrectly on the response forms, plaintiffs' counsel states that no new information is being gathered from the first 800 plaintiffs.  Pls. Opp. at 7 (clarifying that plaintiffs counsel will not be interviewing the individual plaintiffs again, but are merely gathering together the data they already collected from such plaintiffs).  If no new information is being gathered, then the medical and employment records requirement is being deliberately disregarded by the plaintiffs, and the Court should now order that such records be gathered and produced by all responding plaintiffs who claim personal injury and/or damages due to lost income, in accordance with the agreed-upon text of the Plaintiffs' Questionnaire.

A similar situation exists regarding the maps that were attached to the Questionnaire, as discussed in the Defs. Mot. at 14 – although this omission also relates to the plaintiffs' refusal to provide the particulars of which plaintiffs were exposed on which dates *and at which particular*

17

*locations*, as discussed above. But as to the maps specifically, only 60 of the first 800 plaintiffs submitted the required maps along with their Questionnaire responses. *See* Ex. N at ¶ 5(f), (g). The Plaintiffs' opposition offers no excuses or promises about this subject either, and the plaintiffs should now be ordered to comply with this and all other provisions of the Plaintiffs' Questionnaire, using its agreed-upon text.

    **4.**    **Plaintiffs are seeking Court permission to rely on rumors or hearsay instead of admissible evidence and fact to support their allegations.**

As set out in the Defs. Mot. at 12, the plaintiffs' "Initial Declaration" inserted in each of the first 800 Questionnaire responses, declares that each plaintiff's response may include rumors or hearsay or other forms of proof that may not be reliable or admissible as evidence. The qualification is not specific to any plaintiff or to any specific question or answer. And it runs counter to the ample caselaw cited in the Defs. Mot. at 15-16, 20 (holding, *inter alia,* that interrogatory responses must be provided in a manner admissible for use at trial, and must be "true, explicit, responsive, complete and candid answers").

The plaintiffs respond that it is sometimes acceptable to include hearsay or other inadmissible information in answering interrogatories, and that one of the questions in the Plaintiffs' Questionnaire actually invites hearsay by asking what other people might have told the plaintiff about Plan Colombia. Pls. Opp. at 13-15. This is only partially correct. If a party can answer an interrogatory (here a question in the Plaintiffs' Questionnaire) only with the use of hearsay, such party must disclose that fact as part of his/her answer to the specific interrogatory. *See Perkins v. Gen. Motors Corp.*, 129 F.R.D. 655, 662 (W.D. Mo. 1990) (Sanctions imposed against the plaintiff and her attorney for making factually unsupported allegations against her

employer in response to interrogatories *without disclosing that she was "just repeating a rumor"* (emphasis added)), *affd.*, 965 F.2d 597 (8th Cir. 1992).[10]

Moreover, plaintiffs' offer to remove this "general objection" and "instead simply assert specific objections to those interrogatories that are objectionable," Pls. Opp. at 14, doesn't work. In the first place, the language at issue was not an "objection" but a qualifying (and troubling) statement of fact *i.e.*, that rumors or hearsay may form the bases for any or all of the plaintiffs' responses. Secondly, Rule 33(b)(4) makes clear that objections must be stated with specificity for each interrogatory. The plaintiffs' general qualification about rumor or hearsay is not targeted to any particular interrogatories, and indeed, *it could not be* because 3300 individual plaintiffs would necessarily have varying degrees of knowledge and recollections about the different events relevant to their claims in these cases. But Rule 33(b)(2) requires "each interrogatory" to be answered "separately and fully in writing under oath" by each party to which the interrogatories (here the Plaintiffs' Questionnaires) were sent. Plaintiffs cannot have it both ways – each plaintiff must answer without general qualifications or objections that cannot be linked to specific interrogatories. If a particular response can only be provided based on rumor or hearsay, a plaintiff must clearly disclose which parts of the answer are based on rumor or hearsay, so that the remainder of his/her verified answer will be admissible evidence.

---

[10] The Questionnaire inquiry that is criticized by the plaintiffs' counsel at Pls. Opp. 13 is, in fact, the correct way to ask for hearsay because it requires the plaintiff to identify who told him/her about "Plan Colombia" and what that person said. Defs. Mot. Ex. F at ¶ V.A. on p. 13. The answer to this question will not confuse what the plaintiff knows and what someone else has told him/her with the latter information being reasonably calculated to lead to the identity of "persons who know any discoverable matters" under Fed. R. Civ. P. 26(b).

**5.     Plaintiffs are continuing to avoid their obligation to provide Initial Disclosures and Questionnaire Responses *in English.***

The legal basis for the defendants' position that the Initial Disclosure and the Questionnaire responses must be delivered in English is set out in the Defs. Mot at 21-22.  The Pls. Opp. does not disagree in any way with this authority, and, of course, it would be difficult to argue that foreign citizens who choose to file claims in the United States District Courts, should not comply with the English language expectations of those Courts.

Moreover, plaintiffs' counsel have repeatedly agreed to translate both the Initial Disclosures and the Questionnaire responses, but have not done so.  The Collingsworth Declaration at ¶ 14 misleadingly references a March 3, 2008 letter from another of the plaintiffs' counsel, Stephen Terrell, which argued that there was no point in translating all the Questionnaires at that time because test case plaintiffs had not yet been selected.  Mr. Collingsworth omits the fact that defense counsel wrote back to Mr. Terrell on March 13, 2008, explaining why all discovery responses must be provided in English.  *See* Ex. O attached hereto, which concluded "*If producing Questionnaire responses in English is not acceptable to plaintiffs, we shall move the Court to compel your translations . . . .*"  (Emphasis added.)  Mr. Terrell responded to this via an e-mail dated March 20, 2008 (Defs. Mot. Ex. H), agreeing to translate the Questionnaire responses without his prior qualification about test case plaintiffs.

At least three subsequent letters from the defendants also referenced the plaintiffs' agreement to translate, with defense counsel's letter of June 6, 2008 (attached as Exhibit P ) noting the "plaintiffs' agreed-to obligation to provide English translated responses to the 35-page Questionnaire for 800 plaintiffs by June 25, 2008, and for the remaining 2,400+ plaintiffs by August 25, 2008."  Ex. P at 2-3.  At no time did plaintiffs' counsel write back to say that defendants' understanding was incorrect as to the due dates for the translated Questionnaire

responses.  Accordingly, the plaintiffs have not only repudiated their own previous agreements to translate but they have repudiated the specific dates that such translations should have been delivered.  In response, the plaintiffs now brazenly suggest that the timing of the translations be referred by the Court back to the parties for another "meet and confer."  Pls. Opp. at 12, n. 4.

The plaintiffs' promises to translate can no longer be accepted and the parties have no more to discuss about this subject.  It is time for the Court to order the translation of both the January 28, 2008 Initial disclosures and the Plaintiffs' Questionnaire responses, and to clarify that until the English versions of these disclosures have been produced, the plaintiffs shall not have satisfied their obligation to deliver such documents to the defendants.  *See* defendants' proposed Order at ¶¶ 2, 3, 4.

### 6.    Plaintiffs are refusing to provide computations of damages as required by Fed. R. Civ. P. 26(a)

Instead of responding to the Defs. Mot. at 22-24, which pointed out that Fed. R. Civ. P. 26(a) and caselaw from this Court require "a computation of each category of damages" claimed by each plaintiff, the plaintiffs now state that they will provide "whatever factual evidence they have on damages."  Pls. Opp. at 18 (contending also that some components of damages will be the subject of expert testimony).

This isn't good enough under Rule 26(a), which requires "a *computation* of each category of damages."  Just as plaintiffs may not wait on discovery to fill in the bases of their claims against the defendants, they also may not wait on discovery to comply with Rule 26(a), which necessarily requires its specified Initial Disclosures before discovery begins.  *See* this Court's ruling in *King v. E. F. Hutton & Co.*, 117 F.R.D. at 5 ("It is no answer for plaintiffs to assert that they will need discovery or to consult with an expert to determine their losses.")

Finally, this issue about the Rule 26(a) computation of damages has nothing to do with medical causation or expert testimony as asserted in the Pls. Opp. at 18-19. The plain fact is that only 88 of the first 800 plaintiffs responding to the Plaintiffs' Questionnaire provided a dollar amount for their claimed damages as required by Rule 26(a). *See* Ex. N at ¶5(b). The plaintiffs should be ordered to provide this information without further delay.

**B.    Case Management will be enhanced by granting the defendants' motion to compel.**

The Defs. Mot. at 24-25 explained how the plaintiffs have already thwarted the Court's initial case management efforts. With absolutely no response to this discussion, the plaintiffs argue that even more time should be lost in this case while plaintiffs provide final responses to the Questionnaires before the defendants should be allowed to complain about the inadequacies in the content of the plaintiffs' responses. Pls. Opp. at 12, 18. But the Shallcross Declaration (Ex. N) reveals that the deficiencies noted to date in the plaintiffs' previous disclosures and Questionnaire response are not technical or minor – *they reveal pervasive and substantial deficiencies by most of the responding plaintiffs.* Plainly it is time to impose a new case management scheme beginning with an order that requires strict English-language compliance with the Court's directions and with Rules 26(a) and 33, *after which* remaining discovery and the selection of test plaintiffs can be scheduled.

If the plaintiffs are permitted to submit the remainder of the 3,300 Questionnaire responses, in Spanish, without the previous directions of the court being followed, without following the express text of the agreed-upon Questionnaire, and without compliance with Rules 26(a) and 33, a time-consuming duplication of effort will result because these same issues will necessarily be addressed in yet another motion to compel. Moreover, if the plaintiffs are required to re-administer the Questionnaire in order to get it done correctly, as defendants suspect may be necessary, even more duplication of effort will result.

22

III.   **CONCLUSION**

For the reasons set forth herein and in the defendants' August 1, 2008 motion, the

defendants' motion to compel should be granted.

Respectfully submitted:


Dated: August 19, 2008                          /s/ Rosemary Stewart
                                                Joe G. Hollingsworth (D.C. Bar # 203273)
                                                Eric G. Lasker (D.C. Bar # 430180)
                                                Rosemary Stewart (D.C. Bar # 204438)
                                                SPRIGGS & HOLLINGSWORTH
                                                1350 I Street, NW
                                                Washington, D.C. 20005
                                                Phone: (202) 898-5800
                                                Fax: (202) 682-1639

                                                Counsel to the Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Venancio Aguasanta Arias, *et al.*, )<br><br>       Plaintiffs, )<br>v. )<br><br>DynCorp, *et al.* )<br>       Defendants. ) | Case Number: 1:01cv01908 (RWR) |
| Nestor Ermogenes Arroyo Quinteros, *et al.*, )<br><br>       Plaintiffs, )<br>v. )<br><br>DynCorp, *et al.* )<br>       Defendants. ) | Case Number: 1:07cv01042 (RWR)<br><br>(Cases Consolidated for Case<br>Management and Discovery) |

**ADDITIONAL EXHIBITS IN SUPPORT OF**
**DEFENDANTS' MOTION TO COMPEL, SUBMITTED**
**WITH THE DEFENDANTS' REPLY MEMORANDUM**

Filed: August 19, 2008

**INDEX TO THE ADDITIONAL EXHIBITS IN SUPPORT OF
DEFENDANTS' MOTION TO COMPEL, SUBMITTED
WITH THE DEFENDANTS' REPLY MEMORANDUM**

**Document**                                                                                        **Exhibit**

– Declaration of Michael Shallcross in Support of Defendants'
Motion to Compel ............................................................................................. N

– Defense counsel Rosemary Stewart's letter to plaintiffs' counsel dated
March 13, 2008 ................................................................................................. O

– Defense counsel Rosemary Stewart's letter to plaintiffs' counsel dated
June 6, 2008 ...................................................................................................... P

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Venancio Aguasanta Arias, *et al.*,<br>　　　　Plaintiffs,<br><br>v.<br><br>DynCorp, *et al.*,<br>　　　　Defendants. | Case No. 1:01CV01908 (RWR) |
| Nestor Ermogenes Arroyo Quinteros, *et al.*,<br>　　　　Plaintiffs,<br><br>v.<br><br>DynCorp, *et al.*,<br>　　　　Defendants. | Case No. 1:07CV01042 (RWR)<br><br>(Cases consolidated for case<br>management and discovery) |

## DECLARATION OF MICHAEL A. SHALLCROSS
## IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL DISCOVERY

I, MICHAEL A. SHALLCROSS, HEREBY DECLARE AS FOLLOWS:

1.　　　My name is Michael A. Shallcross and I am a paralegal at the law firm of Spriggs & Hollingsworth, the legal counsel for the DynCorp defendants in the above captioned cases. I am a member of the defense team working on the above-captioned cases.

2.　　　On January 28, 2008, we received from the individual *Quinteros* plaintiffs 978 Initial Disclosure forms in Spanish. I have carefully reviewed the 978 Initial Disclosure forms submitted by plaintiffs *without translating their text from Spanish to English*. My review has disclosed the following facts:

1

a.      859 Initial Disclosures were completed for more than one person, without

identifying which persons were exposed on which dates and which

injuries, if any, resulted to each of the persons identified.

b.      881 Initial Disclosures were completed with more than one exposure date

given, but the remaining disclosures on those 881 forms did not identify

what alleged injuries occurred from each such alleged exposure date.  Nor

did the disclosures identify how the other alleged observations, such as the

appearance of an aircraft or the "material being sprayed," coincided with

each such alleged exposure date.

c.      864 Initial Disclosures did not answer Question #1.

d.      20 Initial Disclosures did not answer Question #2.

e.      61 Initial Disclosures did not answer Question #3.

f.      35 Initial Disclosures did not answer Question #4.

g.      151 Initial Disclosures did not answer Question #5.

h.      97 Initial Disclosures did not answer Question #6.

i.      65 Initial Disclosures did not answer Question #7.

j.      34 Initial Disclosures did not answer Question #8

k.      38 Initial Disclosures did not answer Question #9.

l.      30 Initial Disclosures did not answer Question #10.

m.      95 Initial Disclosures did not answer Question #11.

n.      113 Initial Disclosures did not answer Question #12.

o.      130 Initial Disclosures did not answer Question #13.

p.      120 Initial Disclosures did not answer Question #14.

q.    127 Initial Disclosures did not answer Question #15.

r.    168 Initial Disclosures did not answer Question #16.

s.    132 Initial Disclosures did not answer Question #17.

t.    No Initial Disclosures gave an ID Number for any of the plaintiffs identified therein.

u.    24 Initial Disclosures did not indicate a town.

v.    955 Initial Disclosures did not indicate an address for the plaintiffs identified therein.

3.    On February 20, 2008, we received five Initial Disclosures from the *Arias* plaintiffs, which had been translated into English. These five Initial Disclosures were delivered for five of the six families represented by the *Arias* plaintiffs, with the sixth family not yet delivering an Initial Disclosure. I have carefully reviewed these five disclosures, and have noted the following facts:

a.    All five *Arias* Initial Disclosures were completed for more than one person, without identifying which persons were exposed on which dates and which injuries, if any, resulted to each of the persons identified.

b.    Four of the five Initial Disclosures were completed with more than one exposure date given, but the remaining disclosures on those four forms did not identify what alleged injuries occurred from each such alleged exposure date. Nor did the disclosures identify how the other alleged observations, such as the appearance of an aircraft or the "material being sprayed," coincided with each such alleged exposure date.

3

4.      On April 14, 2008, pursuant to the *Quinteros* counsel's agreement to translate their Initial

Disclosures, we received 184 of the *Quinteros* plaintiffs' Initial Disclosures, which had been

translated from Spanish to English.  This represented about 20% of the total number of *Quinteros*

Initial Disclosures delivered to us in January 2008.  I carefully reviewed these English language

Disclosure forms, and I attach a sample of them to demonstrate the following facts relative to the

content of many such translated disclosures:[1]

   a.      Although the Disclosures had been translated, they had not been

            completed any more than before.  Therefore, they still suffered from the

            same lack of information as their Spanish counterparts.  Many were

            missing responses to specific questions, none gave an ID Number for the

            responding plaintiff(s), and most Disclosures indicated multiple people

            and/or multiple dates of spray but were filled out without any

            identification of which person suffered which alleged injury on which

            alleged exposure date.

   b.      Many respondents who answered that they had gotten sick after the

            spraying (Question #8) also answered that they got sick months or years

            after the spraying occurred (Question #9).  For example, some Disclosures

---

[1] Along with the sample of translated Initial Disclosures attached hereto, I have included a copy
of the 17 Questions that were reportedly asked by plaintiffs' counsel in order to prepare the 17
Answers in the Initial Disclosure forms sent to us.  These questions were described in the
Defendants' Motion to Compel at 9, n.6.

indicated that the respondents got sick "2 years after the fumigation" or "After 4 years I have become ill."

    c.       Some Disclosure forms indicated that the respondents never saw any planes or spraying occurring (Question #4).

5.      On June 27, 2008, we received from the plaintiffs 800 Spanish language responses to the Plaintiffs' Questionnaire. I have reviewed the first 800 Questionnaire Responses -- *again without translating their text* -- and have noted the following facts:[2]

    a.       Only 507 of 800 Questionnaire responses provided any kind of date of alleged exposure in Section V(c). Many of them had multiple dates listed in Section V(c), but only 132 provided a month and year of exposure for at least one of the dates. Even fewer, 96, provided a month, day and year for at least one of the dates.

    b.       Only 88 of the Questionnaire responses provided a dollar amount for damages in Section VII(a), which is what the agreed-upon Questionnaire asked the plaintiffs to provide. 424 Questionnaire responses provided some information regarding the nature of the plaintiff's alleged damages in Section VII(a).

---

[2] We received the Questionnaires from the *Quinteros* plaintiffs in electronic (PDF) format. I was unable to open three Questionnaires and was instead given an "error message" saying that those three files were damaged. Therefore, the numbers included herewith are based on my review of only 797, not 800, Questionnaires.

c.    351 Questionnaire responses provided some information in the chart for

crop damages in Section VII(f), but only 317 of these Questionnaires

provided dollar amounts in the chart.

d.    354 Questionnaire responses provided some information in the chart for

animal damages in Section VII(g), but only 317 of the Questionnaires

provided dollar amounts in the chart.

e.    Some of the Plaintiffs' Questionnaire responses provided no more

information, or not much more information, than a plaintiff's name and

control number, without any responses to the remaining questions.

f.    Although the Plaintiffs' Questionnaire required each person to mark on the

map (attached thereto) the locations of alleged exposure to himself, his

crops and/or his farm animals, we received only 60 maps that correspond

to the 800 plaintiffs who submitted the Questionnaire response.  To be

clear, plaintiffs' counsel delivered 186 maps, 81 of which were completely

hand drawn.  Some of the maps had multiple control numbers, so it

appears that we received maps that had been filled out for 204 plaintiffs.

However, most of the plaintiff control numbers marked on either the

map's file name or the map itself do not correspond to the plaintiff control

numbers for the first 800 plaintiffs whose Questionnaires we received.

Again, I was only able to match 60 plaintiff control numbers indicated on the maps to the plaintiff control numbers indicated on the Questionnaire responses.

g.    Although most of the hand-drawn maps identify some recognized geographical markers like cities and/or rivers, they do not show any context. For example, they may show a city beside a river, but they do not show the city's proximity to the river, and they have no scale or legend to identify where such a city or river is actually located or how close it is to the plaintiff's home or other alleged exposure location.

h.    Not one of the Plaintiffs' Questionnaire responses were delivered to us with any employment and/or medical records, as requested by Section IX of the agreed upon Questionnaire.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 19, 2008

Michael A. Shallcross
Paralegal
Spriggs & Hollingsworth
1350 I. Street NW
Washington D.C. 20005
(202) 898-5800

569540v2

7

## <u>ATTACHMENT TO MICHAEL A. SHALLCROSS DECLARATION</u>

### <u>Samples of the Translated Quinteros Initial Disclosures Delivered to Defendants on April 14, 2008</u>

**Legal Process – Spraying Northern Border**          Form No.
**Privileged Attorney-Client communication**          Town:
                                                      **Coordinates XY:**

1. If you are not the Plaintiff, check every reason why the plaintiff can not complete this questionnaire:
   a. Disabled
   b. Death
   c. Minor
   d. Other (Specify)

2. When were you exposed to spraying?  (Please put the month and year of all times that you remember seeing spraying, seeing fogs of herbicide, or hearing that your village had been sprayed.)

3. Where were you when each spraying occurred?  (Were you at home, at school, visiting a friend or relative, working your farm, bathing in the river, etc.?)

4. Did you ever see an airplane spraying?

a. If yes, what did the airplane look like?

b. What did the material being sprayed look like?

5. What else did you see during the sprayings? (Was there a fog of chemicals, what did it look like?)

6. Did you see a fog or chemical cloud?

7. What did the spraying feel like?  What did it smell like?  What did it look like?

8. Did you get sick after the spraying?

9. When did you get sick?

10. How did you feel?

11. When did you get better?

12. Had you ever felt this way before?

13. Did you see a doctor?

14. What Doctor you saw and where?

15. What was the Doctor's diagnosis?

16. Did any crops or animals die after the spraying?

17. What did the dead crops look like? (Did they look black, shriveled?)   **Name of the Plaintiff**
                                                                            **(or person who completed the form)**
Write who and how many persons are affected in your house.                  **ID number:**

| No. | Nombre | Dirección |
|---|---|---|
| 65 | Castillo Carollos Luis Alfredo | Mataje |

**Personas Afectadas**: 3

| CUESTIONARIO |
|---|

| | |
|---|---|
| 2. | I was fumigated on while working on my farm 3 years ago |
| 3. | Working on the farm |
| 4. | No, white clouds that looks like oil |
| 5. | ??????? |
| 6. | Yes |
| 7. | |
| 8. | Yes |
| 9. | |
| 10. | |
| 11. | After 3 days |
| 12. | No |
| 13. | |
| 14. | Auxilary infirmary |
| 15. | Poisoning |
| 16. | 30 hens and 2 hectares of coconuts |
| 17. | Wilted and yellow |

| No. | Nombre | Dirección |
|-----|--------|-----------|
| 58 | Montaño Quintero Sugay | Mataje |

**Personas Afectadas**: 6

**CUESTIONARIO**

| | |
|---|---|
| 2. | First time 3 years ago, 2 times |
| 3. | At the river |
| 4. | Yes, a gray airplane and helicopters |
| 5. | |
| 6. | Yes |
| 7. | A putrid odor and a white cloud |
| 8. | Yes |
| 9. | 3 days after |
| 10. | Itchy and pimples on the skin |
| 11. | 1 month after |
| 12. | |
| 13. | Yes |
| 14. | Mataje medical center |
| 15. | Poisoning |
| 16. | 17 hens |
| 17. | _____?? |

| No. | Name | Address |
|-----|------|---------|
| 58 | Calero Celi Santos Eduviges | Cooperativa Río Verde. |

**Persons Affected: 4**

### QUESTIONNAIRE

2.  January 2001; October 2002; July 2003; December 2004; December 2005; January 2006
3.  Yes, working on the farm
4.  Yes
5.  A white chemical cloud that fell from the sky onto the plants
6.  Yes
7.  Smelled like herbecide, smelled asphixiating
8.  Yes
9.  2 years after the fumigation
10.  _____?  Allergy, infection
11.  The sickness continues
12.  No.
13.  Yes
14.  Pucayacu subcenter
15.  Swelling, infections, allergies
16.  2 cows, 1 hectare of coffee, 2 hectares of cacao
17.  Yellowish, wilted and dry

| No. | Name | Address |
|-----|------|---------|
| 48 | Calero Calero Pablo Policarpio | San Juan de Pasul, cerca de Chone 1. |

**Persons Affected: 4**

### QUESTIONNAIRE

2. January 2001; October 2002; July 2003; December 2004; December 2( 2005; January 2006
3. At home, at the river, working on the farm
4. Yes
5. Production lowered, the coffee, cacao, plaintains, yuca and grazelands were damaged
6. Yes
7. It stunk like toxic liquid, fumigated with glifocide
8. Yes
9. After 4 years I have become ill
10. Upset stomach and dry mouth
11. There is no cure
12. No.
13. Yes
14. At the Seguro de Dueno
15. Infection caused by the water
16. 10 dead turkeys, 12 hens, 15 pigs, 10 hectares of coffee, 10 hectares of graseland
17. They turned yellow and died from the heart and the plantains dried

| No. | Name | Address |
|-----|------|---------|
| 1642 | Alvarez Vargas Elvia | Recinto Comuna Rivera del Oriente, vía 10 de Agosto, La Condor. |

**Persons Affected: 5**

Claimant

My husband died 8 months after the fumigation, he swelled up

| | | |
|---|---|---|
| Dowga Fernando | son | 32 years old |
| Dowga Nelson | son | 15 years old |
| Dowga Mauro | son | 14 years ol |

## QUESTIONNAIRE

2. January 26, 2001, we heard the sound of the airplane
3. Working on the farm
4. No, heard the airplanes fumigating
5. Only noise
6. Si.
7. Big, dark and dense white
8. Yes
9. After 6 months
10. Pain all over the body, spitting blood, dizziness, headaches
11. After a year
12. No.
13. No.
14. Visited a naturalist, blood of drago
15.
16. 16 cows, 5 horses, 10 hens, 2 pigs, 3 dogs, 2 cats, 6 hectares of coffee, 1 of plantins, yuca & mora
17. Yellow, dried

| No. | Name | Address |
|-----|------|---------|
| 1635 | Alvarez Vargas Armando | Recinto Comuna Rivera del Oriente, vía a Colombia, |
| 1640 | Alvarez Vargas Livia | 10 de Agosto. |

**Persons Affected: 11**

Demandantes

Alvarez Elva

Alvarez John

Alvarez Vargas Armandiño, Alvarez Vargas Armando Mariano, Alvarez Vargas Diego,
Alvarez Vargas John, Alvarez Vargas Nelson.

**QUESTIONNAIRE**

1. Sickness
2. End of October 2006 I only heard it
3. Inside the school
4. No, I only heard it
5. Fogs, very white clouds
6. Yes
7. You could not smell anything, there were white clouds
8. Si.
9. 3 months after
10. Blisters on the body, pain all over, dizziness
11. It has not improved
12. No.
13. No.
14. Bartolo Shiwan - Shamanes.
15. Says we have typhoid produced by the fumigations
16. Livestock, dogs, pigs, hens, 1 hectare cacao and coffee
17. The leaves would wilt

# EXHIBIT O



Spriggs & Hollingsworth
1350 I Street, NW
Washington, DC 20005

tel. 202.898.5800
fax 202.682.1639
www.spriggs.com

Rosemary Stewart
202.898.5888
rstewart@spriggs.com

March 13, 2008

Stephen R. Terrell, Esq.
Engstrom, Lipscomb & Lack
16th Floor
10100 Santa Monica Boulevard
Los Angeles, CA  90067

Re: *Quinteros v. DynCorp*, No. 07-cv-1042 (RWR) and
*Arias v. DynCorp*, No. 01-cv-1908 (RWR) (D.D.C.)

Dear Stephen:

     This is in response to your letter dated March 3, 2008, which states that the plaintiffs will not produce English versions of (and will not share the cost of translating) the Plaintiffs' Questionnaire responses or the Spanish language medical and employment records to be produced in this case.  We write to ask that plaintiffs' counsel reconsider your stated position as to the Questionnaire responses to be provided by all individual plaintiffs.

     Plaintiffs are required to provide written discovery responses in English.  In this case, the responses to the Plaintiffs' Questionnaire will be verified and will serve as the equivalent of the plaintiffs' responses to interrogatories.  Indeed, your own portion of the Joint Rule 16.3 Statement filed with the Court on November 19, 2007, recommended the use of Questionnaires "[i]n lieu of interrogatories . . . ."  *See* p. 17 of the Jt. R.16.3 St.  And you advised the Court that one goal of the Questionnaires would be "to obtain one verification for discovery responses from these plaintiffs ...."  See Transcript of 11/27/07 Initial Scheduling Conf. at 25. [1]

---

[1] Because we recognize that some jurisdictions require parties that file document requests for preexisting records in another language (such as the Ecuadorian medical and employment records requested here) to bear the cost of translating those records, we have offered to share (50/50) the cost of translating both the responses to the Questionnaire and the Spanish-language records produced by the plaintiffs.  That offer remains open.

Spriggs 25 Hollingsworth
YEARS

Stephen R. Terrell, Esq.
March 13, 2008
Page 2

Translating the Questionnaire responses into English is particularly appropriate given the parties' recent agreement that such responses will serve as the individual plaintiffs' Rule 26(a)(1) Initial Disclosures (as supplemented). You will recall that plaintiffs' counsel previously agreed to translate your clients' Initial Disclosures into English. *See* Jeff Frazier's e-mail to me dated February 20, 2008.

If producing Questionnaire responses in English is not acceptable to plaintiffs, we shall move the Court to compel your translation of the Questionnaire responses with the costs to be borne solely by the plaintiffs. Please advise at your earliest opportunity whether you will oppose such a motion.

Sincerely,

Rosemary Stewart

Rosemary Stewart

Counsel to the DynCorp Defendants

RS/jes

cc:     All *Arias* and *Quinteros* Counsel

528371v1

# EXHIBIT P

**Spriggs 25 Hollingsworth**
YEARS

Spriggs & Hollingsworth
1350 I Street, NW
Washington, DC 20005

tel. 202.898.5800
fax 202.682.1639
www.spriggs.com

Rosemary Stewart
202.898.5888
rstewart@spriggs.com

June 6, 2008

Stephen R. Terrell, Esq.
Engstrom, Lipscomb & Lack
16th Floor
10100 Santa Monica Boulevard
Los Angeles, CA 90067

Re:  *Arias v. DynCorp*, No. 01-cv-1908 (RWR) and
     *Quinteros v. DynCorp*, No. 07-cv-1042 (RWR) (D.D.C.)

Dear Stephen:

I write in response to your e-mail of June 3, 2008. While that e-mail states that you "simply want to supplement" the discussion I had last week with Jeff Frazier, your e-mail instead departs significantly from what Mr. Frazier represented and from the parties' prior agreements regarding the format and timing of the submission of the Questionnaire to the individual plaintiffs.

To recap, at *plaintiffs'* suggestion over two months ago, defendants agreed to accept Questionnaire responses in a database format – with answers being entered directly into the database on laptops in the field at the time the Questionnaire was administered – and we have been proceeding in our internal preparations based upon that understanding. In my discussion with Mr. Frazier last week – which followed weeks of unanswered inquires on our part – we were advised for the first time that plaintiffs had run into difficulty transferring the Questionnaire to a database and were working with a new computer system. At no point, however, did Mr. Frazier state that plaintiffs were abandoning the database approach, and Mr. Frazier assured me, consistent with the parties' prior agreements, that plaintiffs would share their computer plans with us *before* administering the Questionnaire to the individual plaintiffs. Mr. Frazier also represented that, except for testing on a "pilot" basis, plaintiffs had not yet begun to administer the Questionnaires in the field. Indeed, because plaintiffs were still working on the database, the parties have yet to execute the medical and employment authorization forms, attached to the Questionnaires as Exhibits A and B, which must be provided to each of the individual plaintiffs

Spriggs 25 Hollingsworth
YEARS

Stephen R. Terrell, Esq.
June 6, 2008
Page 2

at the time the Questionnaire is administered.[1]  Absent these authorization forms, the plaintiffs cannot provide us with the medical and employment records that are an integral part of their Questionnaire responses.

While we are prepared to work with you now on your request to change course and provide "paper" responses to the Questionnaire, we are quite concerned about your statement that plaintiffs have already been administering the Questionnaire to individual plaintiffs.  Quite aside from the fact that this is contrary to your prior representations, because none of these Questionnaires included executed authorization forms, any such plaintiffs will need to be contacted again to complete their responses.  It also is not clear to us whether you have been gathering these Questionnaire responses in a database or in paper format and, if the former, how you intend to transfer the responses previously input into the database into the paper format that you now propose to use for the responses.  To the extent that individual plaintiffs' responses were recorded directly into a database, those electronic records and the database in which they were entered are the best evidence of such plaintiffs' responses and we are entitled to that electronic data.  Please take care not to destroy any such responses or the electronic media upon which they are maintained.

Your statement regarding the individual plaintiffs' Initial Disclosure forms also departs from our prior understanding and plaintiffs' counsel's prior representations.  While it is correct that defendants agreed to accept the Plaintiffs Questionnaire responses as "supplemental" disclosures in lieu of motions practice over the inadequacies in the individual plaintiffs' January 28, 2008 Initial Disclosures, that agreement was premised in part upon plaintiffs' representation that they promptly would provide English translations of those Initial Disclosures.[2]  The January 28 disclosures continue to be part of the individual plaintiffs' full disclosures (as supplemented by the Questionnaire responses) and we have been repeatedly advised over the past 3½ months that these English translations would be forthcoming.  But to date we have received translations for only about 20% of the Initial Disclosures.

Plaintiffs' repeated delays in providing English translations of the single-page January 28 disclosures is of particular concern given plaintiffs' agreed-to obligation to provide English

---

[1] Of course, we stand ready to sign those authorization forms when they are presented to us in the final form that you intend to ask the individual plaintiffs to sign.

[2] See Jeff Frazier's 2/20/08 e-mail to me, stating inter alia:  "We are translating the disclosure forms and will send them to you.  We are also transferring the information into Microsoft Access so that it is more manageable."  This responded to my letter of January 29, 2008, which pointed out that Rule 26 Initial Disclosures, like pleadings and filings with the Court, should be in English and requested English translations as soon as possible.

Spriggs 25 Hollingsworth
YEARS

Stephen R. Terrell, Esq.
June 6, 2008
Page 3


translated responses to the 35-page Questionnaire for 800 plaintiffs by June 25, 2008, and for the
remaining 2,400+ plaintiffs by August 25, 2008.  Your statement that you have been unable to
translate the Initial Disclosures because you have made the Questionnaire responses a priority is
not credible.  Clearly, the litigation support people who have been working on your database
issues are not the same people who would be handling the translations.  In any event, the January
28, 2008 Initial Disclosures continue to be part of plaintiffs' full disclosure requirement and
English translated versions of those disclosures must be provided prior to the Questionnaire
response deadlines as well.

We would appreciate a prompt response to the matters set forth in this letter.

Sincerely,

Rosemary Stewart

Rosemary Stewart

Counsel to the DynCorp Defendants


RS/jes

cc:    Other *Arias* and *Quinteros* Counsel


553332v2