IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Venancio Aguasanta Arias, *et al*., | ) |
| | ) |
| Plaintiffs, | ) Case Number: 1:01cv01908 (RWR-DAR) |
| v. | ) |
| | ) |
| DynCorp, *et al*. | ) |
| Defendants. | ) |
| | ) |
| Nestor Ermogenes Arroyo Quinteros, *et al*., | ) Case Number: 1:07cv01042 (RWR-DAR) |
| | ) |
| Plaintiffs, | ) (Cases Consolidated for Case |
| v. | ) Management and Discovery) |
| | ) |
| DynCorp, *et al*. | ) |
| Defendants. | ) |

**DEFENDANTS' MOTION FOR SANCTIONS AGAINST
THE *ARIAS/QUINTEROS* PLAINTIFFS FOR VIOLATIONS
OF DISCOVERY ORDERS, WITH STATEMENT OF
<u>SUPPORTING POINTS AND AUTHORITIES INCLUDED HEREIN</u>**

Filed:  January 26, 2010

Joe G. Hollingsworth (D.C. Bar # 203273)
Eric G. Lasker (D.C. Bar # 430180)
Rosemary Stewart (D.C. Bar # 204438)
  HOLLINGSWORTH LLP
  1350 I Street, NW
  Washington, D.C. 20005
  Phone: (202) 898-5800
  Fax: (202) 682-1639

Counsel for the Defendants

TABLE OF CONTENTS

Page

I.   BACKGROUND FACTS ...................................................................................3

     A.   The Court's Prolonged Effort To Secure *Prima Facie* Disclosures from the
          Individual Plaintiffs. .......................................................................................3

     B.   Plaintiffs' Most Recent Violation of the Court's Order to Provide
          Individualized Causation Statements. .............................................................9

     C.   The Deposition Testimony of the 20 Test Plaintiffs Establishes Numerous
          Further Violations of The Court's Orders.....................................................11

          1.   The Calero Family ...............................................................................13

          2.   The Salas Family...................................................................................15

          3.   The Quevedo Family..............................................................................18

          4.   The Mestanza Family.............................................................................20

          5.   The Sandoval Family .............................................................................24

          6.   Elvia Alvarez .......................................................................................26

          7.   Edgar Balcazar .....................................................................................27

     D.   The Test Plaintiffs' History of Changing Stories Regarding Their Alleged
          Exposures Began Long Before This Litigation. ..............................................28

II.  THE TEST PLAINTIFFS SHOULD BE SANCTIONED FOR THEIR FALSE AND
     FRAUDULENT DISCOVERY RESPONSES AND REPEATED VIOLATIONS OF
     COURT ORDERS .........................................................................................32

     A.   Dismissal Is Warranted As Sanction For The Test Plaintiffs' Submission Of
          False and/or Fraudulent Discovery Responses. .............................................32

          1.   The Test Plaintiffs' Failure to Provide Accurate Information
               Regarding The Alleged Factual Bases Of Their Claims Has
               Significantly Prejudiced Defendants........................................................34

          2.   The Test Plaintiffs' Failure to Provide Accurate Information
               Regarding The Alleged Factual Bases Of Their Claims Has
               Significantly Prejudiced The Judicial Process. ........................................37

3.      The Test Plaintiffs Have Shown Disrespect to the Court and
Dismissal Is Necessary to Deter Such Misconduct By These and
Other Litigants. ........................................................................................38

B.      In the Alternative, Defendants Request That The Test Plaintiffs Be Precluded
From Defending Their False Questionnaire Responses and That The Jury Be
Instructed Regarding the Test Plaintiffs' Misconduct. ..........................................39

III.    THE REMAINING 2,001 INDIVIDUAL PLAINTIFFS SHOULD BE BROUGHT
INTO COMPLIANCE WITH THE COURT'S PRIOR DISCOVERY ORDERS. ..........40

IV.     THE COURT SHOULD ORDER PLAINTIFFS' COUNSEL TO PAY THE
DEFENDANTS THEIR EXPENSES AND FEES IN BRINGING THIS MOTION. .......44

CONCLUSION..........................................................................................................................45

In October and November 2009, the DynCorp defendants took the depositions of the 20 test plaintiffs (from seven plaintiff families) who were selected by the plaintiffs to serve as their first phase trial group.  During these depositions, each of the test plaintiffs repeatedly departed from their earlier sworn Questionnaire responses regarding the purported factual bases for their claims (*i.e.*, the who, what, when, and where of their alleged exposures and injuries) and relied instead on *new* allegations of *different* purported exposures and damages.  The test plaintiffs' disavowals of the most basic elements of their prior sworn disclosures – as detailed herein – makes clear that the test plaintiffs have willfully and repeatedly violated Court Orders over the past two years in which the Court required "verified, factual and complete" disclosures, with the explicit warning of dismissal for noncompliance.[1]  Equally troubling, given that each of the 20 test plaintiffs disavowed a significant portion of the predicate facts that they had provided in response to the Plaintiffs' Questionnaire, neither the defendants nor the Court can have any confidence in the accuracy of the Questionnaire responses of the 2,001 *other* individual plaintiffs who remain as plaintiffs in these cases.[2]  Indeed, some of the test plaintiffs' testimony makes clear that Questionnaire responses provided by other non-test-plaintiff family members are entirely fraudulent.

By Orders of the Magistrate Judge and the District Judge dated November 27, 2007, October 21, 2008, December 1, 2008, May 5, 2009, July 7, 2009, and July 17, 2009, the Court set forth clear directions to the individual plaintiffs requiring them to provide both (1) their best

---

[1] Oct. 21, 2008 Order (Ex. A); *see also* the Nov. 27, 2007 Hr'g Tr. at 11-14 (Ex. B); the Nov. 25, 2008 Hr'g Tr. at 21-22, 52 (Ex. C); the Dec 1, 2008 Order; the May 5, 2009 Order; the July 17, 2009 Hr'g Tr. at 13-15, 50 (Ex. D); and the Sept. 19, 2009 order.  (All discussed in detail below.)

[2] Following the Court's dismissal of 681 plaintiffs in its Order of September 16, 2009 and its dismissal of 590 plaintiffs in its Order of January 12, 2010, there are 2021 remaining individual plaintiffs in the *Arias* and *Quinteros* cases.

information as to the dates and circumstances of their alleged exposures to Plan Colombia

spraying and the specific nature of their alleged personal injuries and property damages, and (2)

individualized scientific causation statements by qualified experts linking each plaintiff's alleged

exposures to his or her alleged personal injuries and property damages.  Plaintiffs' repeated

failures to provide the ordered information required defendants to engage in extensive motions

practice and required the Court to conduct five separate motions hearings, each of which resulted

in Court findings that plaintiffs had violated the Court's prior Orders.  Despite this extraordinary

expenditure of time and resources, defendants and the Court find themselves today in the same

place now as they were when this case first began: with no credible information from any

individual plaintiff setting forth a plausible factual basis for his or her claim.[3]

The question now before the Court is what – if anything – can be done to bring the

individual plaintiffs into compliance with the Court's long-standing discovery Orders and move

this case on to a meaningful path towards trial.  The DynCorp defendants submit that the 20 test

plaintiffs' unambiguous violations of the Court's Orders – and the resulting hopelessly-muddled

nature of their factual allegations – require that each of the test plaintiffs' claims be dismissed

with prejudice.  In the alternative, defendants request that if the test plaintiffs are allowed to

proceed to trial, they be precluded from offering any argument to explain away their misconduct

and that the jury be instructed by the Court that the plaintiff provided false answers under oath in

their 2008 Questionnaire responses.

The DynCorp defendants also submit that the claims of the remaining 2,001 individual

plaintiffs should not be allowed to proceed until each of those plaintiffs have provided

---

[3] *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

meaningful assurance that they have provided accurate factual disclosures in their Questionnaire responses and that each plaintiff be required, as previously ordered, to provide individualized expert causation statements in support of their claims.  Further, in light of numerous test plaintiffs' testimony that their children had been put forward as plaintiffs without their knowledge, approval or authorization, defendants request that plaintiffs be required to provide a parental authorization for each minor plaintiff within the group of remaining individual plaintiffs.  Defendants also seek recovery of their reasonable attorneys' fees and costs in preparing this motion.  A proposed Order including these requested remedies is being filed simultaneously with this motion.[4]

## I.   BACKGROUND FACTS

### A.   The Court's Prolonged Effort To Secure *Prima Facie* Disclosures from the Individual Plaintiffs.

This case involves 2,021 individual plaintiffs in Ecuador who – notwithstanding the repeated findings of the safety of the Plan Colombia spraying operations by the U.S. Department of State, the U.S. Environmental Protection Agency, the U.S. Department of Agriculture, and an expert panel assembled by the Organization of American States[5] – allege physical harm and property damage stemming from the defendants' contract with the United States government to spray herbicides in order to eradicate Colombian cocaine and heroin farms.  At the initial

---

[4] The DynCorp defendants certify that before filing this motion, they conferred in good faith with the *Arias/Quinteros* plaintiffs about the relief to be sought in this motion but were not able to reach agreement (or to narrow the areas of disagreement) about the subjects and requests for relief set out herein.  Plaintiffs' counsel have indicated that they will oppose this motion.

[5] *See, e.g.*, Keith R. Solomon, *et al.*, *Human Health and Environmental Risks from the Use of Glyphosate Formulations to Control the Production of Coca in Colombia:  Overview and Conclusions*, 72 J. Toxicology and Envtl. Health, Part A, 914-920 (2009) (Ex. E); United States Department of State, *Memorandum of Justification Concerning the Secretary of State's 2007 Certification of Conditions Related to the Aerial Eradication of Illicit Coca in Colombia* (submitted to Congress on Aug. 10, 2007) (Ex. F).

scheduling conference on November 27, 2007, the Court recognized that the science behind

plaintiffs' claims was "skimpy" and thus required each of the individual plaintiffs to provide the

*prima facie* "who, what, when, and where" of their alleged individual exposures and injuries.[6]

The Court explained:

> There ought to be the kind of detail that would be useful by way of
> identification of dates or times, if that's possible, airplanes,
> descriptions, what they saw, colors of fumes, any kind of details
> like that, and added into temporal connections.  Plus, if they did
> have any doctors that they visited after the onset, assuming the
> onset was temporally connected in some way, what the doctors
> might have told them. . . .   [T]o move the case forward to get some
> of these issues teed up, it would be *required* to put in some basis of
> that type.

(11/27/07 Hr'g. Tr. at 13:9-14:5 (emphasis added) (Ex. B)).[7]  Plaintiffs' counsel agreed that these

facts were of the type that should be gathered before the filing of a lawsuit and assured the Court

that providing this information for each individual plaintiff "would be very doable." (*id*. at

12:10).

Over the next 18 months, however, it became increasingly clear that what counsel had

represented was "very doable" was not, in fact, getting done.  What followed instead was a series

of delays, obfuscations, and violations of multiple Court Orders:

•    Plaintiffs' first attempt to provide the ordered disclosures by the Court's January

28, 2008 deadline was so grossly deficient that plaintiffs did not even seek to defend it.  Instead,

---

[6] *See* 11/25/08 Hr'g Tr. 60:1-4 (Court discussion of bases for its earlier November 2007 ruling)
(Ex. C).

[7]  At the same hearing, the Court clarified that the disclosures about when the alleged exposures
occurred and what the plaintiffs saw would be required in addition to eight categories of
information promised by the plaintiffs, including: "(1) name; (2) address; (3) exposure address
(if different than current address … (6) claimed physical injuries (if any); (7) claimed property
damages (if any) …" *Id.* at 11 (referencing plaintiffs' promise to produce all such data in the
Joint Rule 16.3 Statement (ECF No. 62 in *Arias*, ECF No. 19 in *Quinteros*, Nov. 19, 2007) at
16).

following a meet-and-confer with defendants, the individual plaintiffs agreed to provide the

ordered disclosures as part of their responses to the Plaintiffs' Questionnaire, the text of which

had been negotiated and agreed to in advance by their counsel and would by agreement of the

parties be treated as supplemental initial disclosures and interrogatory responses.  Because the

plaintiffs also represented that they would be unable to meet the Court's April 25, 2008 deadline

to submit the first 800 Plaintiffs' Questionnaire responses, defendants agreed to extend this first

Questionnaire "due-date" to June 25, 2008.  (Consent Notice (ECF No. 68 in *Arias*; ECF No. 25

in *Quinteros*), April 17, 2008 at 1).

> •      Plaintiffs' initial responses to the Plaintiffs' Questionnaires, however, were

equally deficient, requiring defendants to file a motion to compel with the Court.  On October

21, 2008, the Magistrate Judge granted defendants' motion in full, and ordered each of the

individual plaintiffs to "provide verified, factual and complete responses to the Plaintiffs'

Questionnaire, using the previously agreed-upon text of that Questionnaire."  Ex. A ¶1.  The

October 21, 2008 Order also listed specific requirements for completing the Questionnaire,

including:

> 1.      Providing the month, day and year of each alleged exposure to the "Plan Colombia" herbicide, and then responding to all follow-up questions with respect to each alleged exposure event;
>
> 2.      The marking of the maps appended to the Questionnaire to show where the plaintiffs, their affected farms, and/or their affected farm animals were located when each alleged exposure event occurred;
>
> 3.      The submission of medical records in accordance with the instructions in the Questionnaire by the plaintiffs who claim health injuries from their alleged exposure events …; and
>
> 4.      Providing responses to Section VII.A of the Plaintiffs' Questionnaire to provide each individual plaintiff's

> monetary computation of each category of damages
> claimed.

*Id.* The same Order required the parties to discuss the "voluntary dismissal of plaintiffs who have failed to provide adequate responses to the Questionnaire" and stated that "[a]ny resulting dismissals shall be with prejudice and the plaintiffs are not entitled to any further opportunity to supplement their Questionnaire responses in support of their responses to the defendants' motion to dismiss." *Id.* ¶ 6. Moreover, in light of plaintiffs' inability (or unwillingness) to provide the *prima facie* disclosures that had been ordered nearly a year earlier in November 2007, the Magistrate Judge further required that "[i]n addition, the Questionnaire responses provided by the individual plaintiff shall be accompanied by sworn statements by qualified medical or scientific witnesses that specifically link each plaintiff's alleged personal injuries or property damages to the effects of the 'Plan Colombia' spraying." *Id.* ¶ 5.

The plaintiffs filed Objections to the October 21, 2008 Order, accusing the Magistrate Judge of "cultural bias and lack of complete sensitivity to the reality of these Plaintiffs' lives."[8] Plaintiffs acknowledged their obligation "to provide information within their knowledge to the best of their recollection" but represented that "[t]hey have done this, and this is all they can do." *Id.* at 6. The District Judge rejected plaintiffs' objections and affirmed the October 21, 2008 Order in full. The Court did provide plaintiffs a further extension of time to produce "all of the completed questionnaires and supplements to make them complete" until January 21, 2009 and an extension of time until March 23, 2009 to submit the individualized causation statements by qualified medical or scientific witnesses. *See* 11/25/08 Hr'g Tr. (Ex. C) at 24; Minute Entry entered on Nov. 28, 2008 in the *Arias* and *Quinteros* dockets; and the Court's Dec. 1, 2008 Order

---

[8] Plaintiffs Objections to Magistrate Judge's Oct. 21, 2008 Order on Defs.' Mot. to Compel Disc., ECF No. 77 in *Arias*; ECF No. 40 in *Quinteros*, Nov. 3, 2008, at 2.

(ECF No. 84 in *Arias*; ECF No. 47 in *Quinteros*).

In response to plaintiffs' counsel's claimed confusion as to the causation statement requirement, the Court explained that plaintiffs were required to produce for each individual plaintiff an expert causation statement that "at minimum, … mak[es] some connection based upon some scientific assessment between the allegation that spraying happened and that spraying caused these symptoms."  11/25/08 Hr'g. Tr. (Ex. C) at 60; *see also id.* at 53 ("each one of the 2500 or so questionnaires that's returned will have to have appended to it a separate sworn statement from some expert opining about causation with regard to that individual").

•      Despite being provided yet another opportunity to make sure that they had really done their best to truthfully answer the Questionnaire, plaintiffs again failed to provide defendants with the "verified, factual and complete responses" explicitly required by the Court's Orders.  To the contrary, the individual plaintiffs made no changes whatsoever to their previous Questionnaire responses.[9]  When confronted with this fact in defendants' subsequent motion to dismiss, plaintiffs' counsel again assured the Court that "all 2,463 Plaintiffs who submitted a completed Questionnaire responded as fully as they could based on personal knowledge," and argued that the plaintiffs could not be required to produce information that they did not have. Joint Mot. to Dismiss Nonresponsive Plts. and Plts. Without Claims, ECF No. 86 in *Arias*, ECF No. 48 in *Quinteros*, Feb. 19, 2009, at 10.  Based upon this representation, the District Court granted in part and denied in part the defendants' motion to dismiss but allowed the majority of individual plaintiffs who had completed the Questionnaire to proceed with their claims.  7/17/09

---

[9] This is precisely what the Court lamented in its January 12, 2010 Memorandum Opinion dismissing 590 plaintiffs with prejudice:  "Multiple orders have directed the plaintiffs to respond in full to the questionnaires, and the plaintiffs received three extensions of time in which to do so," and yet, "[d]espite the plaintiffs' ample opportunity to fill in the information gaps," they did not do so.  1/12/10 Mem. Op., at 5-6.

Hr'g Tr. (Ex. D) at 13-15 .  In a subsequent dismissal order addressing two categories of

disclosure failures, however, the Court made clear that individual plaintiffs who failed "to

plainly state data to which they have access" or who had "produce[d] discovery responses only

selectively" would be dismissed with prejudice.  1/12/10 Mem. Op., ECF No. 173 in *Arias* , ECF

No. 133 in *Quinteros*, at 4, 7; *see also* 7/17/09 Hr'g Tr. (Ex. D) at 15 (explaining reasoning for

dismissal categories).

 In response to a separate defendants' motion relating to the causation statements, the

Court held that the plaintiffs' submission of aggregate general causation statements (one for

personal injuries and one for property damages) violated the Court's order that they submit

individualized causation assessments.  In granting the defendants' request for sanctions, the

Magistrate Judge explained:

> The Court finds that there is nothing in this Court's order, or in the
> order of the assigned District Judge, which permits the plaintiffs to
> substitute "an aggregate review" for the paragraph 5 requirement
> . . . of this Court's October 21, 2008 order, . . .  that the plaintiffs
> provide a sworn statement of a qualified medical or scientific
> witness regarding "each plaintiff's alleged personal injuries or
> property damages."  The plaintiffs simply have not done so.  The
> plaintiffs concede they haven't done so, and there's nothing
> ambiguous about the order directing that they do so.

5/5/09 Hr'g Tr. (Ex. G) at 43:16-44:5; *see also* the Court's May 5, 2009 Minute Order.  After

rejecting plaintiffs' subsequent objections to the Magistrate Judge's ruling, the District Court

ordered plaintiffs to produce the "individualized assessments with regard to each individual

plaintiff and each individual plaintiff's complaints about harm or damage" by October 2, 2009.

7/17/09 Hr'g Tr. (Ex. D) at 39; *see also id*. at 50 ("the [submitted] reports . . .  that had been

provided did not comply with what I had asked for from the beginning.  The Magistrate Judge

was quite right that they didn't and that the reports did not comply, and I find no error in their

conclusion that the individualized expert assessments are required."); *see also* 7/22/09 Minute

Order entered in the *Arias* and *Quinteros* without ECF numbers and the Court's amended scheduling Order (ECF No. 147 in *Arias*; ECF No. 109 in *Quinteros*, Sept. 17, 2009).

> **B.**     **Plaintiffs' Most Recent Violation of the Court's Order to Provide Individualized Causation Statements.**

Despite the explicit and repeated direction from both the Magistrate Judge and the District Judge, the individual plaintiffs on October 2, 2009, again failed to provide individualized expert assessments supporting their claims. Instead, plaintiffs simply repackaged the general causation statements previously rejected by the Court by merging them into a single causation statement that they then produced to defendants over 2,000 times (one for each individual plaintiff). The only change in the language of the previous aggregate causation statements was the addition of a single paragraph in each statement that summarizes each individual plaintiff's alleged personal injuries and property damages (taken directly from his/her Plaintiffs' Questionnaire response), followed by an identical statement, repeated for each of the 2,000-plus plaintiffs that the injuries "could have been caused by Plan Colombia spraying." *See* the sample Campaña causation statement attached at Ex. H ¶ 16.

This boilerplate paragraph does not make the required connection "based upon some scientific assessment between the allegation that spraying happened and that spraying caused these symptoms" in any of the plaintiffs. 11/25/08 Hr'g Tr. (Ex. C) at 60:18-21 (the District Judge's description of what was expected). Campaña's paragraph 16 provides no information whatsoever as to the dates, times and frequencies of the individual plaintiffs' alleged exposures, the location of each plaintiff in proximity to contemporaneous Plan Colombia spraying, or the amount of the herbicide as to which each plaintiff purportedly could have been exposed. The paragraph also provides no scientific data linking the Plan Colombia herbicide spray to the specific types of illnesses alleged, no test data showing even the presence of the herbicide in any

of the plaintiffs' blood, and no explanation why the symptoms alleged by the plaintiffs should be linked to Plan Colombia spraying as opposed to the widespread health problems endemic to the impoverished communities in which the plaintiffs live.[10]   Instead, paragraph 16, like the rest of the aggregate causation statement, makes clear that plaintiffs' expert simply assumed that any and all ailments in the region – as asserted in any one of the plaintiffs' Questionnaire responses – might be attributed to the spraying, no matter how outlandish the claim might be.  See, *e.g.*, Campaña Decl. (Ex. H) ¶19 (recounting a Sucumbios resident's claim that "since the fumigations [my son] no longer gets good grades in school"); *id.* ¶20(b) (stating that the affected population generally attribute infectious diseases like influenza, bronchitis, and pneumonia to Plan Colombia spraying); *id.* ¶20(d) (stating that "women think" that the number of miscarriages in the region must be associated with the spraying despite admission from the Provincial health authorities that they cannot make such a link); *id.* ¶¶ 29-34 (identifying mosquito-borne diseases like malaria and dengue fever as possible results of the spraying).

Moreover, Campaña's paragraph 16 largely ignores the separate requirement in the Court's Order that the individual plaintiffs provide "sworn statements by qualified … scientific witnesses that specifically link each plaintiff's alleged … *property damages* to the effects of the

---

[10] For example, published epidemiologic studies in communities in Northern Ecuador identified alarmingly high rates of bacterial and insect-born diseases of the eyes, skin, and gastrointestinal tract.  *See, e.g.*, Simonetta Gatti., *et al.*, *Amebic Infections Due To The Entamoeba Histolytica-Entmoeba Dispar Complex:  A Study of the Incidence in a Remote Rural Area of Ecuador*, 67(1) Am. J. Trop. Med. Hyg. 123, 125-26 (2002) (176 of 178 individuals in study population (98.9%) tested positive for intestinal parasites; "This high detection rate is clearly related to poor sanitation, nutrition [and] use of contaminated water …"); Rodrigo X. Armijos, *et al.*, *The Epidemiology of Cutaneous Leishmaniasis in Subtropical Ecuador*, 2(2) Tropical Med. and Int'l Health 140-152 (1997) (14% of study population tested positive for active parasitic skin disease, leishmaniasis, and 33% had evidence of prior disease); P.J. Cooper, *et al.*, *Onchocerciasis in Ecuador: Ocular Findings in Onchocerca Volvulus Infected Individuals*, 79 Brit. J. of Opthalmology 157-162 (1995) (insect-born disease; Onchocercal ocular lesions identified in over 33% of the study population).  Copies of these studies were attached as Exhibit H to the defendants' April 3, 2009 motion for sanctions at ECF No. 91 in *Arias*; ECF No. 53 in *Quinteros*, April 3, 2009.

Plan Colombia spraying." 10/21/08 Order (Ex. A) ¶ 5 (emphasis added). Other than passing parenthetical references to the alleged impacts of the spraying on each plaintiff's crops and animals – also taken directly from each Plaintiffs' Questionnaire response – plaintiffs' expert simply combines these allegations with the plaintiffs' alleged personal injuries and concludes – for all plaintiffs – that the alleged property damages "could have been caused by Plan Colombia spraying." Ex. H ¶ 16. Again, the statements contain nothing in the way of an individualized scientific assessment: no scientific studies linking the alleged exposure scenarios to the types of crop and animal losses alleged; no soil, air, or water testing detecting even the presence of the herbicide on the plaintiffs' farms; and no discussion of potential alternative causes. Plaintiffs' expert's scant references to property damages are not surprising because the expert, as a medical doctor with purported specialties in the areas of mental health and public health, does not even claim to have the expertise or experience in animal toxicology or agricultural science that he would need to address causation for the plaintiffs' property damage claims.[11]

C.    **The Deposition Testimony of the 20 Test Plaintiffs Establishes Numerous Further Violations of The Court's Orders.**

In its July 17, 2009 ruling, the Court granted plaintiffs' request that they be allowed to select 20 test plaintiffs who plaintiffs believed could best advance their claims as a first phase trial group. Plaintiffs had previously represented to the Court that they would be selecting in this initial group, "people who had the most information [about the alleged facts of their claims] so that we could in the first trial be in a position to really prove what happened in detail." 11/25/08

---

[11] At the November 25, 2008 hearing, the Court specifically addressed the fact that plaintiffs would need to have an expert who could address each individual plaintiff's claims of crop or animal damage. *See* 11/25/08 Hr'g Tr. (Ex. C) at 20:13-17 ("Do you at this point … have any expert or experts lined up, scientific or medical, who have either examined the plaintiffs or examined their medical records *or evidence of crop or animal damage so far*?"). (Emphasis added.)

Hr'g Tr. (Ex. C) at 11:14-12:1.[12]  During the depositions of these test plaintiffs in October and November 2009, however, these self-selected test plaintiffs repeatedly demonstrated that they had not or could not provide any accurate account of the basic facts underlying their legal claims. To the contrary, all of the test plaintiffs repeatedly changed their stories as to their previously-disclosed dates and circumstances of alleged exposures and as to the personal injuries and property damages purportedly arising therefrom.  Thus, either the sworn Questionnaire responses – and expert causation statements derived solely from those responses – or the deposition testimony provided by each of the test plaintiffs, or both, are materially false with respect to the basic factual underpinnings of the test plaintiffs' claims.  Because the test plaintiffs have not produced any independent documentary evidence supporting their claims (*e.g.*, medical records relating to the injuries allegedly caused by the Plan Colombia spraying, business or tax records relating to the alleged property losses), the defendants have no meaningful way to choose among the plaintiffs' varying representations and can only guess at what story these same plaintiffs will present at trial.  Further, with this clear showing of the meaningless of the Plaintiffs' Questionnaire responses and causation statements of the plaintiffs' "best" individual cases, the defendants and the Court can have no confidence whatsoever in the information provided to date by the remaining 2,001 individual plaintiffs.

The changing stories of each of the 20 test plaintiffs, as grouped by plaintiff family,[13] are discussed below:

---

[12] In their written proposal about how to select the test plaintiffs, plaintiffs' counsel likewise promised that they would "select plaintiff cases that provide the parties with the most useful information." Pls.' Proposal for Selection of 20 Sample Test Plaintiffs, ECF No. 88 in *Arias*, ECF No. 50 in *Quinteros*, March 23, 2009, at 8.

[13] Each test plaintiff family has multiple other family members who are also plaintiffs in the litigation but who are not serving as test plaintiffs.

1.     **The Calero Family**

Four of the test plaintiffs are members of the Calero family, as follows:

- Santos Calero (husband of Calixta; father of Betty; grandfather of Yuli)
- Calixta Pineda (wife of Santos; mother of Betty; grandmother of Yuli)
- Betty Calero Pineda (daughter of Santos and Calixta; mother of Yuli)
- Yuli Calero Pineda (11-year-old daughter of Betty; granddaughter of Santos and Calixta)

In their Questionnaire responses, the Calero plaintiffs provided general and inconsistent representations that their alleged exposures to Plan Colombia herbicide occurred sometime in 2001 (Yuli), sometime in 2002 (Betty), sometime in 2002 or 2003 (Calixta), or sometime in 2001, 2002, 2003, 2004, 2005, and/or 2006 (Santos).  (App. 1, 5, 24, 37, 55.)[14]  At their depositions, however, each of the Calero plaintiffs told a different story.  The adult Caleros (Santos, Calixta, and Betty) now each testified that they were exposed only on a single occasion in August 2003, and while Santos and Calixta did not identify the number of helicopters they saw in their Questionnaire responses, and Betty said that she saw 3 helicopters in her Questionnaire response, at deposition they each testified to having seen 2 helicopters at the time of the alleged exposure.  (App. 2, 11-13, 24, 32, 39-40, 45-47.)  On the other hand, Yuli Calero, who in her Questionnaire response provided specific details of her recollection of an alleged spraying event in 2001 (*e.g.*, that she saw two white spray planes and a green helicopter on a clear morning at 9 am, that she saw a white cloud sprayed from the plane and both smelled the herbicide and felt it on her body) (App. 56-57), admitted in her deposition that she had no recollection of seeing (or smelling) any spraying event whatsoever.  (App. 61, 62-63.)

---

[14] In response to the Questionnaire inquiry: "When were you or your property exposed to herbicide?"  Santos Calero responded: "2001."  However, in response to the question: "What was the date and time of the day that your crops were exposed to the Plan Colombia herbicide? Santos Calero responded: "2001, 2002, 2003, 2004, 2005, 2006."  (App. 1, 5.)  All of the citations to the test plaintiffs' sworn Questionnaire responses and deposition transcripts have been compiled in an Appendix filed as the last exhibit to this motion.

Defendants also learned that the maps provided by the Caleros with their Questionnaire responses were wildly inaccurate in identifying the alleged location of their exposures.  (App. 10, 30, 44-B, 60.)

Further, the Caleros presented a notably different account at deposition of their alleged personal injuries from the purported spraying event.  In their Questionnaire responses, both Calixta and Betty Calero alleged that they had incurred medical expenses of $5,000 in connection with their alleged exposures, which they had paid in cash.  (App. 28-29, 44-45.)  At their depositions, however, both women admitted that they had incurred no such expenses: Calixta acknowledged that she did not even have access to that amount of money (App. 35-36), and Betty testified that her medical expenses were in fact only 5,000 sucres or less than $20 (a sucre is an Ecuadorian currency that was discontinued in 1999 – four years before Betty's alleged exposure – when Ecuador adopted the U.S. dollar as its currency).  (App. 53.)  The Caleros also changed their stories as to the nature of their alleged personal injuries:  Santos Calero testified about bone and kidney pains that were nowhere mentioned in his Questionnaire response (App. 3-4, 5, 17), and Betty Calero testified about previously-unmentioned mental problems, stroke, pain in the kidneys, and pain in the legs (App. 39, 41-43, 48, 49, 51).[15]  Not surprisingly, because they were prepared solely from the Questionnaire responses, the causation statements submitted for these two plaintiffs say nothing about these newly alleged health claims. (App. 23, 54.)   Moreover, Betty Calero's claim of medical injuries arising from Plan Colombia spraying completely fell apart when it was pointed out at deposition that the medical

---

[15] While Calixta Pineda's testimony as to her alleged personal injuries from the spraying was generally consistent with her Questionnaire response, she separately admitted that the medical history in her Questionnaire – in which she represented that she had suffered from chagas, respiratory illness, migraine headaches, bacterial and fungal infections, and anemia or other blood disorders – was entirely incorrect because she suffered from none of these ailments.  (App. 25-27, 33, 34.)

record she had produced only days earlier as evidence of her injuries was dated March 2003, some seven months prior to her alleged exposure.  (App. 50, 51.)  Betty Calero's only explanation for this obvious and fatal inconsistency was that the medical record must have been inaccurately dated.  (App. 52.)

While Santos Calero claimed in his Questionnaire response that the family had crop losses of nearly $15,000 (App. 8-9), at his deposition, he admitted that he had not in fact calculated any monetary losses for his purportedly damaged crops and did not know most of his crops' market value because he used them only for personal consumption.  (App.18-20, 21-22.) Mr. Calero also repeatedly reversed himself during his deposition on the question whether he had planted crops in the years following the alleged crop damage from Plan Colombia spraying, initially testifying that he did not plant crops for the following four years, then (after being shown his Questionnaire response claiming damage to crops planted in 2004) testifying that he could not remember whether he had planted any crops between 2003 and 2007, and then testifying that "of course we planted because with the crops we continued to live.  That's what we live off of."  (App. 5, 14-16.)

2.   **The Salas Family**

Three of the test plaintiffs are members of the Salas family:

- Jorge Salas (husband of Laura; father of John)
- Laura Sanchez (wife of Jorge; mother of John)
- John Salas (15-year-old son of Jorge and Laura)

In contrast to the Calero family, Jorge Salas provided very specific information in his Questionnaire response as to the date of his alleged exposure: October 4, 2002.  (App. 67.)  His wife, Laura Sanchez gave a consistent, though more general date of exposure of "since 2002" in

her Questionnaire Response.  (App. 101.)[16]  At deposition, however, the Salas's abandoned those

dates and testified to a hodgepodge of exposure dates that do not match up with either their

Questionnaire responses or with the testimony of the other family members who were purporting

to describe the same alleged exposures.  Jorge testified that the exposures occurred in December

2000, May 2001, and October 2003 (App. 76, 80-81, 85-86); Laura testified that the exposures

occurred in June 2002, January 2003, and October 2003 (App. 105, 106, 109); and their son John

admitted that he cannot remember when the exposures occurred, but that he believed he was

exposed on two occasions.  (App. 118-120.)  Defendants can only guess what dates of exposure

the Salas family might allege at trial.

       The Salas family's testimony as to what they saw during the alleged spraying events also

changed significantly, with the number of spray planes decreasing (from multiple planes to 1-2

planes for Jorge and from 5 planes to 2-3 planes for John) (App. 67, 77, 81, 86, 114, 118) and the

number of helicopters increasing (with Jorge and Laura now claiming to have seen a helicopter

after having not so claimed in their Questionnaire responses).  (App. 67, 77, 81, 86, 101, 105,

107, 110.)  The Salas family also changed their statements as to *where* they were allegedly

exposed, with John testifying that the exposure took place 2 kilometers from the border (rather

than the 300 meters from the border stated in his and his mother's Questionnaire responses and

causation statements (App. 101, 113, 114, 119, 123)), and Jorge testifying that the exposure was

3 kilometers from the border (up from the 2 kilometers response in his Questionnaire and in his

causation statement).  (App. 67, 75, 77, 82, 87, 98.)   As with the Caleros, the marked maps of

the location of the alleged exposures provided with the Salas family's Questionnaire responses

were inaccurate and thus do not provide any clarification.  (App. 74, 104, 117.)

---

[16] John Salas stated in his Questionnaire response that the exposure occurred in 2000 (App. 114),
but he would have only been six years old at the time.

The Salas family plaintiffs also testified to a whole host of alleged personal injuries that are at odds with the personal injuries identified in their Questionnaire responses.  Jorge Salas testified that the herbicide spray caused inflammation of the eyes and caused him to lose his vision whereas he had not mentioned any problems with his eyes in his Questionnaire response. (App. 68, 70-71, 97.)  Laura Sanchez, on the other hand, abandoned the claims of respiratory disease and stomach burning set forth in her Questionnaire response.  (App. 102, 108, 111.)[17] John Salas likewise abandoned his Questionnaire response alleging respiratory problems; at his deposition, John testified instead that the herbicide exposure caused previously-unidentified body pain, bone pain, sore throat and a strong headache.  (App. 115, 121.)  Thus, once again, the causation statements submitted for the Salas family test plaintiffs do not even correctly identify the personal injuries alleged by the plaintiffs at deposition.  (App. 98, 113, 123.)

The Salas family also changed their claims of injuries to farm animals.  In his Questionnaire response, Jorge Salas claimed monetary damages for the death of 40 chickens, 2 cows, and 2 pigs. (App. 72, 73.)  At his deposition, however, Mr. Salas testified that the cows were not his, but he added new damages claims for 2 horses, 2 dogs, and an additional 2 pigs.  (App. 87-A to 92.)  He produced no documentation whatsoever to support either set of numbers.  Jorge Salas also testified at deposition that the Salas family members are plaintiffs in a separate lawsuit alleging contamination by waste from an oil well 500 meters from their home.  (App. 93-96.)  In his Questionnaire response, Jorge had specifically denied being exposed to oil pollution and denied being involved in such litigation.  (App. 64-66.)[18]

---

[17] When confronted with this fact at her deposition, Laura responded that she had testified about her sore throat, which she considered to be a respiratory disease.  (App. at 112 to 112-A.)

[18] Test plaintiff John Salas testified that an oil spill near the family's home "is like black crude that comes down … and it flows along the edge of the road like water, and the spill reached the river … where we used to wash."  (App. 122.)

3.    **The Quevedo Family**

There are four test plaintiffs from the Quevedo family:

- Luciano Quevedo (husband of Rosa; father of Edith and Robinson)
- Rosa Altamirano Miranda (wife of Luciano; mother of Edith and Robinson)
- Edith Quevedo Altamirano (14-year-old daughter of Luciano and Rosa)
- Robinson Quevedo Altamirano (9-year-old son of Luciano and Rosa)

The deposition testimony of the Quevedos follows the same winding course as that of the other test plaintiffs.  Although Luciano Quevedo stated in his Questionnaire response that he was exposed to Plan Colombia herbicide "from 2002 til 2006," he testified during his deposition that he could only recall seeing a single spray plane on one occasion flying close to the San Miguel River (which is 3 km from his farm), and that he could not recall the date.  (App. 124, 129, 131-133.)  Luciano's wife Rosa had claimed exposure "from October 2002 on" in her Questionnaire response and stated further that she had seen 2 lead-colored planes and a green helicopter in 2002 (App. 157-158); at her deposition, however, Rosa testified that she had not seen a helicopter and had only had heard what she believed to be a spray plane.  (App. 162-163, 164-165, 166-167.)  Luciano and Rosa's daughter Edith claimed exposure in her Questionnaire response "since April 10, 2002" and claimed in the same response that she saw 2 spray planes, but Edith admitted during her deposition that she could not provide any date for the one time she allegedly saw a single spray plane.  (App. 173-174, 177, 178.)  The Quevedos did provide testimony consistent with their Questionnaire responses that their home was 4 km from the border, but at deposition, Edith testified that she was exposed at school, not at home as stated in her Questionnaire response.  (App. 173, 178.)

As to personal injuries, in his Questionnaire responses, Luciano Quevedo alleged that the spraying had caused him to suffer itchiness, headaches, aching bones and fever.  (App. 125.)  The individual causation statement submitted on his behalf listed these same alleged injuries (as

18

well as another ailment listed in the medical history section of Luciano's Questionnaire).  (App. 126-A, 154.)  At his deposition, however, Luciano initially abandoned his claims of headaches, aching bones, and fever and substituted in their place only a claim of vision problems.[19]  He then revised his testimony (after being shown a copy of his Questionnaire response) to once again allege that he had suffered all of the injuries.  (App. 139, 140.)  Finally, Luciano abandoned all of his personal injury claims, testifying that he was not seeking any damages at all in connection with any alleged personal injuries.  (App. 149.)  Meanwhile, Luciano's wife, Rosa, who had alleged "headache, fever, diarrhea, and spots" in her sworn Questionnaire response, came to deposition with different complaints of a rash, headaches, and kidney and bone pains.  (App. 159, 168-169.)

        The Quevedos' claims of property damages likewise changed.  In his Questionnaire response, Luciano had alleged damage to 1 hectare of plantains, 5 hectares of coffee, and 5 hectares pasture.  (App. 127, 128.)  At deposition he bumped those numbers up, adding another 5 hectares of pasture and 1 hectare of cacao beans.  (App. 130.)  Further despite having provided a dollar value for his lost crops in his Questionnaire response, Luciano initially testified at deposition that he had never placed a monetary value on his allegedly lost crops.  (App. 134.)  When confronted with his Questionnaire response, Luciano (again) changed his testimony and stated that he had calculated the stated dollar amounts for his crops.  (App. 145-148.)  But then, when the written response was taken away, Luciano conceded once more that he had not – and

---

[19] *See* App. 137-138 (Q:  Other than the itchiness on your skin and the eyesight problems, do you believe you have suffered any additional personal injuries from the spray?  A:  No, just that).

could not – quantify the value of his allegedly lost crops (App. 150-151), and he produced no farming records to assist in making such calculations.[20]

### 4.   The Mestanza Family

The Mestanza family provides 4 of the test plaintiffs in the first phase trial group:

- Victor Mestanza (husband of Ercilia; father of Edy; grandfather of Jennifer)
- Ercilia Bosquez (wife of Victor; mother of Edy; grandmother of Jennifer)
- Edy Mestanza (son of Victor and Ercilia; father of Jennifer)
- Jennifer Mestanza (14-year-old daughter of Edy; granddaughter of Victor and Ercilia)

Although the Mestanza family demonstrated problems with changing testimony similar to the other test plaintiffs, the misstatements in their Questionnaire responses raise even more serious concerns. The four Mestanza test plaintiffs family all stated in their Questionnaire responses that they were exposed to Plan Colombia herbicide at their "current home address" in Puerto Mestanza, a small community in the Sucumbíos province of Ecuador, right beside the river border with Colombia. Each plaintiff likewise submitted an individual causation statement asserting that he or she had lived in Puerto Mestanza for most of their lives (App. 179-180, 221, 225-226, 241, 242-243, 273, 275, 301.) At deposition, however, all four of the test plaintiffs admitted that their principal place of residence both now and on the date of their alleged exposures was not in Puerto Mestanza but in Guayaquil, which is 275 miles from the Ecuador-Colombia border (App. 189, 229-230, 247-248, 282-283). While Victor and Ercilia testified that they had spent the majority of their time at the family farm in Puerto Mestanza during 2000-2004 and that their granddaughter Jennifer had been with them at the farm when spraying allegedly

---

[20] Luciano likewise reversed course with regard to his alleged animal losses, first testifying that he did not know the value of the animals, then testifying that he had calculated the values in his Questionnaire response, and then, after the response was taken away, admitting again that he could not state how much the animals were worth. (App. 135-136, 141-144, 152-153.)

occurred between 2000 and 2002, no other members of their family were at the farm during the times that Victor and Ercilia allegedly saw spray planes. (App. 190-191, 231 to 231-A, 236-A, 293-295, 283-A to 283-B.)  Victor's grown son Edy acknowledged in direct contravention to his Questionnaire response that he was rarely in Puerto Mestanza and that he had never been exposed to any Plan Colombia spraying.  (App. 250-252, 256-257.)  In his Questionnaire response, Edy had falsely alleged exposure in 2002 and claimed personal injuries including headaches, dizziness, vomiting, skin irritation, and sore throat, all of which were likewise falsely attributed to Plan Colombia spraying in his individual causation statement.  (App. 244-245, 273-274.)[21]  Moreover, as addressed more fully in Defendants' Response to Plaintiffs Motion to Dismiss Three Individual Plaintiffs, ECF No. 172 in *Arias*, ECF No. 132 in *Quinteros* (Jan. 6, 2009) at 3-10, the deposition testimony of the Mestanza test plaintiffs made clear that Questionnaire responses of four other Mestanza family members in the larger individual plaintiff group of non-test-plaintiffs were completely fictitious.  Each of these plaintiffs (two of Victor's other grown children and two of Edy's minor children) live full time in Guayaquil and were not in Puerto Mestanza during any of the alleged spraying events.  (App. 190, 193, 236-236-A, 253-255, 262-264, 267, 269.)  Nonetheless, as set out in the defendants' Jan. 6th response brief at 3-10, each of these four Mestanza family members submitted sworn Questionnaire responses containing numerous false representations about, *e.g.*, having seen spray planes and helicopters overhead and having suffered a wide variety of personal injuries.  Moreover, this apparent fraud

---

[21] Edy Mestanza claimed at his deposition that his correct signature did not appear on the Questionnaire response provided for him, although he acknowledged that certain portions of the response were specific to him.  (App. 258.)  Edy also identified his own signature on other Questionnaire responses submitted for his two minor sons and for his daughter (test plaintiff Jennifer).  (App. 265, 266, 268-269, 270-272.)  Edy insisted, however, that he had not authorized his minor sons (9-year-old Victor Manuel and 5-year-old David) to serve as plaintiffs in this litigation and that he did not believe that they were plaintiffs.  (App. 264, 269 to 269-A.)

cannot be attributed solely (or even at all) to these other (non-test-plaintiff) Mestanza family members, as two of them are minors and one is mentally retarded.[22]

The testimony of the Mestanza test plaintiffs also includes the same changing stories that characterize the testimony of the other test plaintiffs. For example, in their Questionnaire responses, the four Mestanza test plaintiffs provide only broad and conflicting statements as to the dates of their alleged exposures to Plan Colombia herbicide, with Victor alleging exposure in 2002, Ercilia alleging exposure from 2000 until October 2002, Edy alleging exposure in 2002, and Jennifer alleging exposure in 2002-2006. (App. 181-182, 227, 244, 276.) At deposition, Edy admitted that he had not been exposed at all, as noted above. (App. 255-256, 257.) Victor and Ercilia, on the other hand, were now in agreement as to five specific dates of alleged exposure (December 2000, January 2002, September 2002, and October 7 and 10, 2002). (App. 192, 196, 201-203, 205, 232, 233, 235, 237-240.) Ercilia also changed her Questionnaire response stating that she had seen 3 planes and 1 helicopter during the alleged spraying events, testifying at deposition -- again now consistent with her husband Victor – that she in fact had seen 5 spray planes and 5 helicopters. (App. 227, 233-234.) Jennifer, meanwhile, changed her prior five-year potential exposure period to just two years, 2000 and 2002, and further admitted that she doesn't recall anything from 2000 and is relying solely on her grandfather Victor Mestanza's say-so as to her alleged exposure during that year. (App. 284, 285, 286, 288, 297.) After having provided a detailed Questionnaire response stating that she had seen 5 spray planes, multiple helicopters marked with the Colombian flag, a white cloud in the air and residue on the

---

[22] On December 23, 2009, without offering any explanation for the fraudulent Questionnaire responses, plaintiffs counsel moved to dismiss the claims of Victor Mestanza's two minor grandsons and the claim of his mentally-challenged daughter. The DynCorp defendants' January 6, 2009, response addresses in detail the misrepresentations made by each Mestanza non-test-plaintiff and by test plaintiff Edy Mestanza (ECF No. 172 in *Arias*, ECF No. 132 in *Quinteros*), to which plaintiffs' January 13, 2010 reply brief did not respond in any detail.

ground, Jennifer acknowledged at deposition that (other than claiming that she once saw a plane spraying in 2002), she could not recall anything else she had seen at the times of the alleged spraying events.  (App. 276-277, 284-285, 286-290.)

The Mestanza test plaintiffs also changed course repeatedly on their claims of personal injuries and property damages.  Edy Mestanza, whose Questionnaire response had alleged that exposures to Plan Colombia spraying had caused him to suffer from headaches, dizziness, vomiting, skin irritation, and a throat infection, conceded at deposition that he had not suffered any of these injuries (App. 245, 256-257), although he raised an entirely new claim that he had suffered emotional and psychological damages due to his alleged property losses and the alleged personal injuries of family members.  (App. 256-257.)  Edy's father, Victor Mestanza, backed away from the claims made in his Questionnaire response that his exposures had caused headaches, stomach aches, gastric problems and vomiting, stating at deposition that he wasn't sure what was causing those and other new medical problems he was experiencing.  (App. 183, 195, 197, 204, 206, 209-210.)  Jennifer Mestanza abandoned claims of headaches and stomach aches in her Questionnaire response and causation statement and further admitted that she had no basis for the $20,000 in paid medical expenses she had claimed in her Questionnaire response. (App. 278, 281, 290-291, 296, 301.)  On the flip side, however, Victor Mestanza expanded at deposition the already expansive claims of property damage set out in his Questionnaire response and causation statement, adding new allegations of damages to 10 hectares of sugar cane, tomatoes, green peppers, cassava and grasslands, and the alleged deaths of large numbers of sheep, ducks, pigs and chickens.  (App. 184, 187-188, 194, 198-200, 207, 208, 218, 221-222.)[23]

---

[23] Mr. Mestanza's allegation that all of his animals were dead as of the date of his last alleged exposure to Plan Colombia spraying in October 2002 (App. 214-215), is belied by a video he produced to defendants before his deposition, which Victor confirmed was taken at his property

Remarkably, despite contending in his Questionnaire response that his property damages exceeded $600,000, Victor Mestanza could produce no business or farming records to support his claims.  (App.186, 187, 188, 213-214, 217, 211-212, 214-216, 220.)  Edy Mestanza testified consistently with his Questionnaire response as to the hectares of crops and numbers of animals allegedly killed by the Plan Colombia spraying, but testified that he was relying solely on his father Victor for these numbers because he (Edy) had never even seen the crops or animals allegedly at issue, and Edy further completely disavowed the monetary values set forth in his Questionnaire response for the alleged losses.  (App. 252, 259-261.)

### 5.    __The Sandoval Family__[24]

Three members of the Sandoval family are serving as test plaintiffs:

- Dociteo Sandoval (father of Edgar and Wilber)
- Edgar Sandoval (25-year-old son of Dociteo; brother of Wilber)
- Wilber Sandoval (14-year-old son of Dociteo; brother of Edgar)

The Sandoval test plaintiffs present the same pattern of changing alleged dates of exposure, changing alleged personal injuries, and changing alleged property damages.  In their Questionnaire responses, the three Sandoval test plaintiffs disagreed as to the date of their

---

in Nov. 2002 (App. 207-208) and which is replete with pictures of lush green plants and apparently healthy farm animals. Excerpted photos from that video are attached hereto as Ex. I.

[24] Other children of Dociteo Sandoval are also named plaintiffs in this litigation, despite Mr. Sandoval's testimony that he did not want any of his children (except 25 year old Edgar) to be plaintiffs:

> Q:    I understand that you do not want Marcelo and Roque to be plaintiffs.  Do you want Wilber to be a Plaintiff?
>
> A:    . . . I don't want any of my children – I do not accept that they are plaintiffs. . . . I'm surprised.  I'm very surprised for having signed that document with that explanation.

(App. 322) (referring to his surprise at seeing his son Roque's Questionnaire response).

alleged exposure to Plan Colombia spraying, with Dociteo claiming that the exposure occurred at the end of 2003, Edgar claiming that the exposure occurred in 2006, and Wilber claiming that the exposure took place in 2004.  (App. 304-305, 325-326, 341-342.)  At deposition, however, Dociteo and Edgar were now in agreement that the exposure took place during three days at the end of 2003; Wilber also testified that the exposure took place on three separate days, but he could not recall the year in which this occurred.  (App. 313, 319-320, 321, 330-331, 334, 338, 351-352.)  Wilber's memory was far more detailed at deposition, however, as to what he saw during these purported spraying events:  while his Questionnaire response states that he didn't see anything (App. 326), at deposition, Wilber testified that he saw 5 spray planes and 2 helicopters on 3 separate occasions, all flying in a specific formation.  (App. 331-333, 335-339.) Dociteo and Edgar also provided new answers to these questions at deposition, with Dociteo and Edgar for the first time specifying that they had seen 2 helicopters and Edgar increasing the number of planes he had seen from 3 to 5.  (App. 305, 314, 342, 348.)  As a result, at deposition, the three Sandoval test plaintiffs were all suddenly testifying to the same story.  Moreover, whereas Edgar's Questionnaire response had claimed exposure 4 kms from the border, at deposition, Edgar testified (now consistent with his father) that he was exposed on the family farm adjacent to the river border.  (App. 312, 313, 342, 347.)  Wilber, meanwhile, who stated in his Questionnaire response that he was exposed at his home, testified at deposition that two of his alleged exposures occurred while he was at school.  (App. 326, 332, 336.)

As to personal injuries, Edgar and Wilber both abandoned in their depositions the claims in their Questionnaire responses that they had incurred specified out-of-pocket expenses for medical treatment ($20 and $300, respectively) (App. 329, 340, 346, 350 ), but Edgar and Dociteo added new personal injury allegations to those claimed in their Questionnaire responses

and causation statements, with Dociteo adding a new claim of vision loss (App. 306-307, 323, 324), and Edgar newly contending that his alleged exposure had caused him to suffer vomiting and diarrhea.  (App. 343-344, 349, 353-354.)  Dociteo likewise added to the family's claims for crop damage, testifying that in addition to the alleged crop damages set forth in his Questionnaire response and causation statement, the herbicide spray also had killed 10 coconut trees, as well as cassava, bananas and oritos.  (App. 308, 310-311, 315-318, 324.)

### 6.  Elvia Alvarez

Ms. Alvarez is the only member of her family who has been proffered as a test plaintiff. Her testimony is typical of the other test plaintiffs.  In her Questionnaire response, Ms. Alvarez stated that she was exposed to Plan Colombia spraying several times between 2002 and 2006. (App. 355-356.)  In her deposition, however, she testified that she witnessed only two spray events, in April 2001 and sometime around October 2001.  (App. 366, 378-379.)  Whereas her Questionnaire response did not answer the question about the number of helicopters that she had seen, Elvia testified at deposition that she saw 6 helicopters.  (App. 356, 366-367.)  The location of the alleged exposures also changed, from 3 km from the border in her Questionnaire response and causation statement, to 7 km from the border at her deposition.  (App. 356, 365, 396.)   Ms. Alvarez's testimony regarding her alleged exposure in April 2001 became particularly convoluted when she was confronted with the fact that her son Byron – who Ms. Alvarez had alleged was with her during the April 2001 exposure – had stated in his Questionnaire response (App. 401, 402) that he had *not* seen any spray planes.  Ms. Alvarez responded that Byron had not seen the planes because he was working on another part of the farm that was more mountainous, a fact she claimed to recall because she had recorded that information in a notebook along with the April 2001 date.  (App. 372-373, 402.)  When asked if she could

produce the notebook, however, Ms. Alvarez claimed to have thrown it away three years ago. (App. 373-374, 375-377.)

Ms. Alvarez also used her deposition testimony as an opportunity to expand upon the broad allegations of personal injury and property damage set forth in her Questionnaire response. As compared to her Questionnaire response and causation statement, Ms. Alvarez testified to new personal injuries (headache, dizziness, stomach ache, diarrhea), new alleged crop damages (2 additional hectares of pasture, 1 additional hectare of plantains, 1 hectare of peanuts and 30 assorted plants of guava, grape, and avocado), and new alleged animal deaths (2 additional cows, 1 additional horse, 1 additional dog, and 40 guinea pigs).  (App. 357-359, 361-364, 368-371, 386-387, 388.)  Like other test plaintiffs, Ms. Alvarez first tried to justify in her deposition the high values placed on her crops in her Questionniare response, *see e.g.*, App. 389-390, but her calculations quickly fell apart upon questioning.  (App. 390-393.)

### 7.   Edgar Balcazar

Mr. Balcazar is the only test plaintiff from his family.[25]  Like the other test plaintiffs, his deposition was replete with new and different claims as to his alleged exposures and damages. In his Questionnaire response, Mr. Balcazar alleged that he had been exposed to Plan Colombia spray "in the year 2001 and 2002 until the year 2007," while at his deposition, Mr. Balcazar was unwilling even to guess at the years of his alleged exposure. (App. 403, 413, 414, 415.)  Whereas his Questionnaire stated that he had not seen a spray plane, at deposition he testified that he had, albeit at a distance.  (App. 403, 412, 413.)  While Mr. Balcazar repeated at deposition his claim in his Questionnaire responses to a variety of non-specific personal injuries, he admitted that he

---

[25] Like test plaintiffs Edy Mestanza and Dociteo Sandoval, Edgar Balcazar was surprised to learn at his deposition that his son is also a plaintiff, testifying that he did not "want [his] son Diego to be identified as a plaintiff in this litigation."  (App. 424.)

has no basis for and cannot confirm the representation in his Questionnaire response that he spent $3,000 out-of-pocket for medical expenses.  (App. 406, 416-417.)  Moreover, Mr. Balcazar's testimony in explaining why he initially forgot during his deposition to mention his claimed respiratory symptoms (symptoms for which, as with all of the medical symptoms claimed by all the test plaintiffs, there is no documentary evidence) raises obvious red flags as to the reliability of his testimony:  "You cannot be after every detail for what happened to you because time goes by and, but that's something we can recognize if it comes into your eyes and your nose why shouldn't your respiratory ways be affected as well?"  (App. 422-423.)

Finally, Mr. Balcazar's testimony as to his alleged crop damages bears virtually no resemblance to his identification of crop damages in his Questionnaire responses:  Some of the alleged crop damages decreased (6 hectares of cacao in his Questionnaire dropped to 2 hectares at deposition, 5 hectares of coffee dropped to 2-3 hectares, 35 hectares of pasture dropped to 20 hectares, and ½ hectare of allegedly damaged coconuts disappeared altogether), while others increased (1 hectare of rice became 3 hectares at deposition, ½ hectare of yucca increased to 1-1½ hectares, and 2 hectares of lost plantains and a variety of lost fruit trees, including avocado, lime, orange, and grapefruit were identified at deposition whereas such crops had not been identified in his Questionnaire).  (App. 407, 418-420.)  Further, at his deposition, Mr. Balcazar conceded that he did not even own the two farms at which he alleged that these damages occurred, as the title to one farm is held solely by his mother and title to the other is held by his wife, neither of whom are plaintiffs in this litigation.  (App. 408-409.)

### D.    The Test Plaintiffs' History of Changing Stories Regarding Their Alleged Exposures Began Long Before This Litigation.

In Section V.H. of the agreed-upon Plaintiffs' Questionnaire, each of the test plaintiffs was asked whether they had made any previous complaints about their alleged exposures to Plan

Colombia spraying to any other party.  In their responses, 19 of the 20 test plaintiffs either denied having made any such complaints or failed to respond to this question,[26] and the one plaintiff who answered "yes" failed to provide the requested information as to whom he had complained and what had been communicated.  (App. 246.)  These representations were not true.  Rather, as evidenced by documents produced by the test plaintiffs on the eve of their depositions, as well as an Ecuadorian judicial complaint located by the DynCorp defendants through their own investigation, at least six of the seven test plaintiff families had raised claims of alleged exposures and damages from Plan Colombia spraying in other forums.  While the test plaintiffs' failure to disclose these complaints in their Questionnaire responses is improper in its own right (and impeded the DynCorp defendants in their ability to effectively prepare for the test plaintiffs' depositions), the documents now available to defendants are particularly telling in that they demonstrate that the test plaintiffs' history of false and changing stories regarding alleged exposures to and injuries from Plan Colombia spraying began long before this litigation.

For example, in December 2002, various Ecuadorian plaintiffs sued the President of Ecuador and other government officials in an Ecuadorian court for failing to protect them from alleged personal injuries and property damages purportedly arising from exposure to the Republic of Colombia's spraying of herbicide during the period December 2000 through July 2002.  (App. 427 *et seq*.)  Test plaintiff Santos Calero signed this complaint despite his acknowledgment in this litigation that he was not exposed (even allegedly) to Plan Colombia spraying until August 2003, eight months after the Ecuadorian complaint was filed.  (App. 11,

---

[26] App. 6-7, 25, 41, 59, 69, 103, 116, 126, 160-161, 172, 175-176, 185, 228, 279-280, 309, 328, 345, 360, 405.

15, 443.)[27]   Similarly, in March 2002, test plaintiff Elvia Alvarez signed the same complaint

(App. 448) and also prepared two certifications with her brother, the President of her residential

commune Rivera Del Oriente, in support of her complaint that Plan Colombia spraying in

December 2000 and January 2001 had, *inter alia*, caused the death of her husband in February

2001.  (App. 380-385, 397-398, 399-400)  But in this litigation, Ms. Alvarez testified that she

was not exposed to Plan Colombia spraying until April 2001, two months after her husband's

death, and conceded that her husband's illness began in early 2000, well before even the dates of

alleged exposure asserted in the prior certification she prepared with her President-brother.

(App. 366, 382-383, 394-395A.)   (Ms. Alvarez is not claiming damages for the death of her

husband in this litigation.)

Further, the third party complaints by other test plaintiffs set forth litanies of alleged

personal injuries and property damages that are far different from those they claim in this case –

either in their 2008 sworn Questionnaire responses or in their 2009 deposition testimony.  In the

DynCorp defendants' prior briefing in response to plaintiffs' motion to dismiss three non-test

plaintiff Mestanza family members, defendants demonstrated that test plaintiff Victor Mestanza

had secured, for purposes of a separate litigation in Ecuador, a fraudulent medical certification

identifying alleged personal injuries to his grandson Victor Manuel, despite the now-

acknowledged fact that his grandson was not exposed to any spraying operations and was living

275 miles away in Guayaquil at the time of the alleged spraying events.  *See* Defendants'

Response to Plaintiffs' Motion to Dismiss Three Plaintiffs, ECF No. 172 in *Arias*, ECF No. 132

in *Quinteros*, at 9-10.  In addition to this, however, Victor Mestanza also secured medical

---

[27] A second test plaintiff, Rosa Altamirano, also signed on to the Ecuadorian complaint (App. 481), despite stating in her Questionnaire that her first exposure was not until October 2002, three months after the end of the exposure period alleged in that complaint.  (App. 163.)  She also failed to answer the Questionnaire section asking about other complaints. (App. 166-167.)

certifications on his own behalf and on behalf of his granddaughter, test plaintiff Jennifer

Mestanza, in which he claimed personal injuries that his and Jennifer's deposition testimony now

indicates did not occur.  (App. 223, 302.)  In particular, while the 2003 medical certification

Victor secured for his granddaughter Jennifer states that Plan Colombia spraying had caused her

to suffer both a 35% vision loss requiring eyeglasses and chronic gastritis, Jennifer testified at

her deposition in this case that she has never worn eyeglasses or had vision problems, and she

could not recall ever suffering from any stomach problems.  (App. 292, 298-300.)  The 2003

medical certification for Victor Mestanza is virtually identical to that prepared for his

granddaughter (and indeed virtually identical to the admittedly-fraudulent certification prepared

for his young grandson, Victor Manuel), similarly claiming that Plan Colombia spraying had

caused him to lose 35% of his vision and caused chronic gastritis.  Victor Mestanza notably

backed away from those claims at his deposition in November 2009.   (App. 209-210.)

    Test plaintiff Jorge Salas signed a December 2002 certification in which he alleged that

exposure to Plan Colombia spraying caused skin infections, acute sores, inflammation of the

throat and dry cough, fungus in the intestines, dizziness, and fevers – a laundry list of alleged

maladies that only marginally intersects with his claims of nose and eye irritation, throat

inflammation, and skin itching and infection at his deposition in this case.  (App. 78-79, 83-84,

99-100.)  Test plaintiff Rosa Altamirano assisted in preparing a March 2002 certification signed

by the president of her cooperative setting out Rosa's complaint that the Plan Colombia spraying

had caused her family (the Quevedos) to suffer respiratory problems – an allegation not made in

any of the Quevedo test plaintiffs' Questionnaire responses, causation statements, or deposition

testimony – as well as Rosa's complaints of crop damage to rice and cassava that likewise are

nowhere alleged in this litigation.  (App. 155-156, 170-171.)  Finally, test plaintiff Edgar

Balcazar prepared an alleged "report of damages and harms from Plan Colombia" in May 2002 in which he made no mention of the now-alleged loss of cacao, coffee, coconuts, sugarcane, rice and yucca, did not claim of the now alleged death of 2 or 3 horses and 30-50 hens, and alleged only 4 pigs dying as compared to the 10 now alleged in this case. (App. 407, 421, 425-426.)

The only consistent message that emerges from the test plaintiffs' third party complaints, the test plaintiffs' Questionnaire responses, and the test plaintiffs' deposition testimony, is that every time these test plaintiffs are asked about their alleged exposures to Plan Colombia spraying, they come forward with a different story – a pattern that defendants can only assume will continue if these cases ever get to trial.  While this record would surely provide defendants with a wealth of material for cross-examination, the test plaintiffs' repeated changes in their allegations dating back before this litigation was filed significantly prejudices defendants in their ability to prepare their defense (to exposures allegedly occurring when? occuring where? causing what alleged personal injuries and property damages?), and they demonstrate that the problems in the plaintiffs' Questionnaire responses and their violations of repeated Court orders cannot be blamed on technical glitches or misunderstandings.  The inherent unreliability of the test plaintiffs' factual claims cannot support the continued prosecution of their claims.

## II.   THE TEST PLAINTIFFS SHOULD BE SANCTIONED FOR THEIR FALSE AND FRAUDULENT DISCOVERY RESPONSES AND REPEATED VIOLATIONS OF COURT ORDERS

### A.   Dismissal Is Warranted As Sanction For The Test Plaintiffs' Submission Of False and/or Fraudulent Discovery Responses.

Although dismissal is "a severe sanction, and should be resorted to only to the extent necessary to induce future compliance and preserve the integrity of the system . . . the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases."  *Weisberg v. Webster*, 749 F.2d 864, 869-870 (D.C. Cir. 1984).  As

the Supreme Court has explained, the Rule 37 sanction of dismissal "must be available . . . not

merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter

those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey

League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). The availability of dismissal is

essential for effective case management. "[I]f district court judges are to discharge their heavy

case processing responsibilities effectively, their power to dismiss . . . must be more than

theoretical." *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167 (D.C. Cir. 1990) (internal

citations and quotation marks omitted). As this Court noted in its January 12, 2010 Opinion

dismissing the claims of 590 other plaintiffs in this litigation with prejudice for failure to submit

accurate Questionnaire responses, dismissal is particularly appropriate here, because lesser

sanctions have been imposed previously but without success. *See* 1/12/10 Mem. Op., at 3-4.

The test plaintiffs' misconduct in this case in providing false evidence under oath strikes

at the core of the judicial process and cannot be countenanced. As the United States Supreme

Court has explained, "[f]alse testimony in a formal proceeding is intolerable. We must neither

reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary

proceedings." *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) (citations omitted).

Accordingly, numerous courts faced with discovery abuses of the type here at issue have

concluded that dismissal is the appropriate sanction. *See Chavez v. City of Albuquerque*, 402

F.3d 1039, 1046 (10th Cir. 2005) (affirming district court's dismissal of plaintiff's jury verdict

where plaintiff perjured himself during discovery); *Archibeque v. Atchison, Topeka and Santa Fe

Ry. Co.*, 70 F.3d 1172, 1175 (10th Cir. 1995) (affirming dismissal of case for plaintiff's

submission of false and misleading discovery responses); *Dotson v. Bravo*, 202 F.R.D. 559, 574

(N.D. Ill. 2001) ("Dismissal is an appropriate sanction for giving false interrogatory responses.")

(bold and italic typeface omitted); *In re Amtrak "Sunset Limited" Train Crash*, 136 F. Supp. 2d 1251, 1257, 1271 (S.D. Ala. 2001) (dismissing plaintiff's claim with prejudice for providing knowing false interrogatory answers).

The D.C. Circuit has set forth three basic justifications that support the use of dismissal as a sanction for misconduct:

- "First, the court may decide that the errant party's behavior has severely hampered the other party's ability to present his case – in other words, that the other party has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (internal quotations and citations omitted).

- "Second, the court may take account of the prejudice caused to the judicial system when the party's misconduct has put an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay." *Id.* (internal quotations and citations omitted).

- "And finally, the court may consider the need to sanction conduct that is disrespectful of the court and to deter similar misconduct in the future." *Id.* (internal quotations and citations omitted).

Any one of these justifications alone is sufficient grounds for dismissal. *Id.* In this case, all three justifications are present.

      **1.**      <u>The Test Plaintiffs' Failure to Provide Accurate Information<br>Regarding The Alleged Factual Bases Of Their Claims Has<br>Significantly Prejudiced Defendants.</u>

The test plaintiffs' submission under oath of the factual bases of their claims, which they have now acknowledged are false, has significantly prejudiced defendants at every stage of the pretrial process. As this Court noted in its January 12, 2010 Opinion, plaintiffs' failure to

provide accurate and complete Questionnaire responses, "impedes the defendants' ability to prepare their defense." 1/12/10 Mem. Op., at 6 ("Without the requested information, the defendants are hampered in knowing the full extent, nature and location of the plaintiffs' alleged damages.") (citing *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1234 (9th Cir. 2006).  This prejudice began with defendants' enormous expenditure of time and resources in repeatedly seeking judicial assistance over the course of five separate motions hearings in 2008 and 2009 in an (apparently futile) effort to secure accurate Plaintiff Questionnaire responses and with defendants' prodigious but wasted efforts in analyzing Questionnaire responses that have now been shown to be wholly unreliable.

The prejudice continued with the defendants' frustrated efforts to meaningfully prepare for the 20 test plaintiff depositions, conducted over a four-week period in Quito, Ecuador.  While defendants were able to expose during these depositions at least some of the falsehoods in the test plaintiffs' Questionnaire responses, defendants did not and could not question the test plaintiffs as to every response set forth in their Questionnaires and have no way to determine whether the other Questionnaire responses are equally false.  *See In re Amtrak*, 136 F. Supp. 2d at 1260 ("A party is entitled to rely on an opposing party's written responses to interrogatory questions; he/she/it is not required to ask a party deponent every question in his/her deposition that the party previously answered in the set of interrogatories.  Indeed, such a practice would render the interrogatories superfluous and unnecessarily increase the expense of a deposition.").  Moreover, because of the false information in the Questionnaire responses, defendants prepared their deposition questions to address now-abandoned factual allegations, and defendants were unable to adequately prepare question regarding the *new* factual allegations the test plaintiffs made for the first time at the depositions themselves.  In addition, as noted above with respect to

35

the test plaintiffs' false Questionnaire responses as to complaints to third parties, the test plaintiffs' misconduct also prevented defendants from pursuing potential fruitful areas of investigation in preparation for the depositions.

Looking forward, defendants will be significantly prejudiced in their ability to meaningfully prepare for trial.  Defendants plainly cannot rely on any of the information set forth in the test plaintiffs' Questionnaire responses.  Nor, given the ever changing nature of the plaintiffs' allegations, can defendants have any confidence that the test plaintiffs will stick to the stories told at deposition.  The prejudice to defendants is particularly significant given the central importance of the information at issue in the test plaintiffs' false Questionnaire responses.  For example, in preparing their expert case, it is essential that defendants have accurate information about, *e.g.*, the times and locations of the alleged exposures (to rebut plaintiffs' necessary showing that any herbicide spray in the vicinity could have reached the individual plaintiff or reached them at a sufficient dose to cause injury), the types of personal injuries allegedly caused by the spraying (as well as an accurate history of other medical or environmental conditions that might present alternative causes), and the types of crops and livestock allegedly impacted by the spray and the nature of these alleged impacts.  As it is, however, defendants can only proceed based upon guesswork and speculation, must sift through plaintiffs' varying and often mutually exclusive discovery responses, and must prepare for any variety of different allegations that might be made by the test plaintiffs at trial.  As this Court explained in its January 12, 2010 Opinion, "draw[ing] conclusions based on incomplete information … is not the defendant's duty."  1/12/10 Mem. Op. at 6.

More fundamentally, of course, defendants are prejudiced in having to respond at all to inherently unreliable and demonstrably false factual allegations.  The test plaintiffs have been

provided numerous opportunities to present a reliable factual predicate for their claims, and they have failed to do so. They should not be allowed to continue to impose upon defendants the significant costs of litigating their nebulous and shifting claims.

> **2.      The Test Plaintiffs' Failure to Provide Accurate Information Regarding The Alleged Factual Bases Of Their Claims Has Significantly Prejudiced The Judicial Process.**

The Court has since November 2007 devoted considerable time and resources in an effort to secure accurate factual disclosures from the individual plaintiffs. At each turn, when defendants were forced to file motions to compel, to seek sanctions for plaintiffs' noncompliance with prior orders, or to defend against plaintiffs' objections to the Magistrate Judge's orders, the Court has ruled in favor of the defendants. In so doing, the Court was required to wade through a total of 435 pages of briefing (plus over 1,150 pages of exhibits) and to partake in motions hearings totaling some 278 transcript pages. In an effort to resolve the Court's concerns, plaintiffs' counsel provides specific assurances that each of the individual plaintiffs had answered the Questionnaire "as fully as they could based upon personal knowledge." Jt. Mot. to Dismiss, ECF No. 86 in *Arias*, ECF No. 48 in *Quinteros*, Feb. 19, 2009, at 10. The Court accepted these assurances absent evidence to the contrary, but the Court made clear through its dismissal with prejudice of two categories of plaintiffs who failed to provide information that they clearly should have known that a plaintiff's knowing failure to provide accurate information in his or her Questionnaire response would not be tolerated. *See* 1/12/10 Mem. Op.

The testimony of the test plaintiffs demonstrates that the plaintiffs' counsel's representation that plaintiffs had provided full and accurate Questionnaire responses to the best of their knowledge was false and that all of the Court's efforts over the past two years have been for naught. Moreover, if the test plaintiffs are allowed to continue with their claims, the Court undoubtedly will be required to intervene again and again in the day-to-day pretrial process in an

effort to somehow mitigate the prejudice caused to the defendants by the test plaintiffs' misconduct.  The Court will also be required to preside over a trial where it will be "virtually impossible for the jury to determine the truth" behind the test plaintiffs' allegations.  *In re Amtrak*, 136 F. Supp. 2d at 1268.

As the D.C. Circuit explained in affirming a dismissal sanction in *Weisberg*, 749 F.2d at 193 (citation omitted), "if parties are allowed to flout their obligations [to respond to interrogatories], choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules."  The test plaintiffs have failed to abide by the Court's orders, they have repeatedly embroiled the Court in futile efforts to compel compliance, and they have through their false discovery responses subverted the judicial process.  Their claims should be dismissed.

### 3.   The Test Plaintiffs Have Shown Disrespect to the Court and Dismissal Is Necessary to Deter Such Misconduct By These and Other Litigants.

The history of the test plaintiffs' repeated violations of the Court's discovery orders leaves no question that the test plaintiffs have failed to provide the Court with the proper respect. Dismissal is necessary to sanction the test plaintiffs' disrespectful behavior and to deter other litigants from engaging in similar misconduct.  The need for a clear sanction in this case is particularly compelling because the Court's response to the test plaintiffs' misconduct likely will determine whether the Court will be able to maintain any control whatsoever with respect to the remaining 2,001 individual plaintiffs in this case, whose Questionnaire responses must be assumed to contain the same glaring problems as those of the 20 test plaintiffs.  Moreover, litigants in other proceedings may be tempted to resort to similar misconduct if they believe that the Court is unwilling to impose appropriate and meaningful sanctions to ensure compliance with

its orders.  *See Nat'l Hockey League*, 427 U.S. at 643 (stating that if the court of appeals'

reversal of the sanction of dismissal were to remain undisturbed, "other parties to other lawsuits

would feel freer than we think Rule 37 contemplates they should feel to flout other discovery

orders of other district courts").

The Court has shown ample patience in its dealings with the plaintiffs.  The Court has

repeatedly given the plaintiffs additional time to provide factual information they should have

had in hand before they even filed their claims, and it has repeatedly indulged plaintiff counsel's

now-disproved assurances that the information had been accurately provided.  The time for

patience is over.  If the Court's orders are to have any meaning, the 20 test plaintiffs' claims

must be dismissed.  Moreover, because the test plaintiffs' misconduct was willful and because

the test plaintiffs have now, in any event, conclusively demonstrated their inability to present any

reliable, consistent evidence that would state a cause of action for alleged harms from purported

Plan Colombia spray exposures, their dismissals should be with prejudice.  *See* 1/12/10 Mem.

Op.; *see also Norman v. United* States, 467 F.3d 773 (D.C. Cir. 2006) (affirming dismissal with

prejudice where evidence demonstrated that refiling of claim would be futile); *Handy v. Shaw,*

*Bransford, Veilleux & Roth*, No. 00-2336, 2006 WL 3791387, at *7 (D.D.C. Dec. 22, 2006)

(dismissal with prejudice appropriate as sanction for willful misconduct).

> **B.**      **In the Alternative, Defendants Request That The Test Plaintiffs Be**
> **Precluded From Defending Their False Questionnaire Responses and That**
> **The Jury Be Instructed Regarding the Test Plaintiffs' Misconduct.**

If the Court elects to allow the test plaintiffs to proceed with their claims, defendants

request that the Court issue an alternative sanctions order that provides defendants with at least

some measure of relief from the prejudice imposed upon them by the test plaintiffs' misconduct.

First, defendants request that the test plaintiffs be precluded from presenting any evidence or

argument at trial to defend, explain, or mitigate the fact that they provided false statements under

oath in their Questionnaire responses.  As this Court has noted, such a preclusion order is an "unexceptional remedy that is contemplated in the federal rules" and it is plainly warranted here. *See Moore v. Napolitano*, No. 00-953 (RWR-DAR), 2009 WL 2450280, at *1-2, 9 (D.D.C. Aug. 7, 2009) (precluding defendant from introducing as evidence any information responsive to an interrogatory that was not produced in a timely manner); *see also Jung v. Neschis*, No. 01 Civ. 6993, 2009 WL 762835, at *24 (S.D.N.Y. Mar. 23, 2009) (adopting report and recommendation precluding the plaintiffs from using fraudulent evidence or amending reports to take it into account).  Second, defendants request that the Court instruct the jury at any future trials that the test plaintiffs provided false information under oath regarding the basic factual foundations of their alleged claims and that this conduct may be considered by the jury in assessing the test plaintiffs' credibility.  *See, e.g., Jung*, 2009 WL 762835, at *24 (adopting report recommending jury instruction that jurors should consider fabricated evidence and false statements in assessing the plaintiff's credibility on other matters); *Bernal v. All Am. Investment Realty, Inc.*, 479 F. Supp. 2d 1291, 1301 (S.D. Fla. 2007) (ordering jury instruction that jurors may take into account the defendant's false statements and conduct when considering his credibility); *Rybner v. Cannon Design, Inc.*, No. 95 Civ. 0279 (SS), 1996 WL 470668, at *6 (S.D.N.Y. Aug. 20, 1996) ("[D]efendants will be permitted to inform the jury of [plaintiff's] dishonesty and a jury charge will be given that any falsehood under oath should be considered seriously by jurors in assessing [plaintiff's] credibility.").

## III.    THE REMAINING 2,001 INDIVIDUAL PLAINTIFFS SHOULD BE BROUGHT INTO COMPLIANCE WITH THE COURT'S PRIOR DISCOVERY ORDERS.

In addition to establishing their own inexcusable misconduct, the test plaintiffs' depositions demonstrated without question:  (1) that defendants (and the Court) can have no confidence in the factual information provided to date by the remaining 2,001 individual

plaintiffs in this litigation and (2) that without further order from the Court to finally secure accurate and meaningful information from these plaintiffs, this litigation cannot meaningfully proceed.  Defendants accordingly request the Court to issue a detailed order providing the 2,001 individual plaintiffs with one last opportunity to provide what the Court has long required: verified, factual and complete responses to the Plaintiffs' Questionnaire and individualized expert causation statements based upon a meaningful scientific assessment that links each individual plaintiff's alleged exposure to his or her alleged personal injuries and/or property damages.  The Court's order should further provide that if plaintiffs fail to provide the ordered information and causation statements, their claims will be dismissed with prejudice.

With respect to the Plaintiffs' Questionnaire, defendants submit that the Court need not order the individual plaintiffs to prepare completely new Questionnaire responses.  Indeed, absent some showing that the individual plaintiffs would approach the Questionnaires differently, such an order would not provide any meaningful assurance that the plaintiffs' new responses would be any more accurate than their old ones.  Instead, defendants request that each individual plaintiff be required to provide a sworn certification that confirms the accuracy of his or her prior Questionnaire responses and/or provides corrected information to those questions that were answered inaccurately.  To ensure that the individual plaintiffs are providing accurate information, the proposed certification should contain a number of additional safeguards:

First, the certification should state that plaintiffs are being required to prepare the certificate because of the Court's concerns about the reliability of the previous Questionnaire responses.  Second, the certification should state that if the certification is shown to be knowingly inaccurate in any respect, the plaintiffs' claims will be dismissed and that the plaintiff (or his or her counsel) will be required to pay defendants' costs in seeking such dismissal.  Third,

plaintiffs should be required to certify that he or she has read both the certification and his or her prior Questionnaire responses in full (or, if the plaintiff is unable to do so, that the documents have been read to him or her). Fourth, the plaintiffs should be required to physically sign the certificate (as opposed to providing an electronic signature), have it witnessed, and have the original copy of the signed certificate maintained by plaintiffs' counsel in the United States and available for inspection by defendants upon reasonable demand. A proposed certification providing such assurances is attached to the proposed order being filed with this motion.

With respect to the previously-ordered causation statements, the DynCorp defendants submit that the only possible course of action is an order requiring plaintiffs to provide new statements. As set forth above, the aggregate causation statements provided by plaintiffs to date (with only a one-paragraph boilerplate recitation of the individual plaintiff's allegations) are directly contrary to the Court's repeated Orders that plaintiffs provide *individualized* causation statements that make "some connection based upon some scientific assessment between the allegation that spraying happened and that spraying caused these symptoms." 11/25/08 Hr'g Tr. (Ex. C) at 60:19-21; *see also* 7/17/09 Hr'g Tr. (Ex. D) at 39 ("I have made it clear that there's got to be some individualized assessments with regard to each individual plaintiff and each individual plaintiff's complaints about harm or damage.").

Moreover, because the prior causation statements are based solely on Questionnaire responses that have now been shown unreliable, the boilerplate paragraph 16 in each causation statement likely does not even address the individual plaintiffs' actual alleged exposures or harms. Further, the failure of the test plaintiffs after three years of litigation – and after defendants' production of hundreds of thousands of pages of Plan Colombia documents and nine years of electronic "spray line" data covering the entire Colombia-Ecuador border – to provide

any reliable and consistent information as to the factual predicates of their claims makes the need for meaningful causation statements all the more evident.  *See In re Vioxx Products Liability Litigation*, 557 F. Supp. 2d 741, 744 (E.D. La. 2008) (noting that while individual causation statements "may not have been appropriate at an earlier stage before any discovery had taken place … this case is no longer in its embryonic stage").

In light of plaintiffs' repeated – albeit baseless – claims that the Court's prior orders requiring causation statements were ambiguous, defendants request that the Court issue a detailed order that clearly specifies what the Court is requiring by way of a scientific assessment of each individual plaintiff's claims:  First, the causation statement must specifically address the individual plaintiff's allegations of exposure, including some scientific assessment of the proximity of the plaintiff to any alleged spraying events on the dates of alleged exposure and some scientific basis for a conclusion that the spray could have reached the plaintiff or their property at a dose level sufficient to cause injury or damage.  Second, the causation statement must specifically address the individual plaintiff's claims of personal injury and provide some scientific basis for a conclusion that his or her alleged exposure to Plan Colombia spray could have caused each of the specific types of injury alleged.  Third, the causation statement must specifically address the individual plaintiff's claims of property damage and provide some scientific basis for a conclusion that the alleged exposure to Plan Colombia spray could have caused each of the specific property damages alleged.

In addition, each of the foregoing assessments in the causation statements must be proffered by an expert who is specifically qualified to speak to the issue at question.  *See Acuna v. Brown & Root, Inc.*, No. SA-96-CA-543-OG, 1998 WL 35283824, at *5 (W.D. Tex. Sept. 30, 1998) (That the court's orders requiring "affidavits from qualified experts" did not "specif[y] the

particular type of expert required . . . does not excuse Plaintiffs from the requirement that the experts they offer actually be qualified in the subject matter area in which [they] testif[y]."), *aff'd*, 200 F.3d 335 (5th Cir. 2000).  Thus, for example, plaintiffs may not rely, as they have to date, solely on Dr. Campaña to prepare the causation statements because Dr. Campaña does not even purport to have the requisite expertise in exposure assessment, animal toxicology, or agronomy to speak to the plaintiff's exposure and property damage allegations.

Finally, in light of the testimony from three of the test plaintiff families that minor children have been put forward as plaintiffs in this litigation without their parents' knowledge, approval, or authorization, *see supra* nn. 21, 24, and 25, defendants request that the Court require signed parental authorizations on behalf of each of the minor plaintiffs in the remaining individual plaintiff group.  *See* Fed. R. Civ. P. 17(c) (addressing capacity of minors to bring suit); *Weinbaum v. City of Las Cruces, New Mexico*, 465 F. Supp. 2d 1164, 1166 n.1 (dismissing claim of minor plaintiff because she "lacks the legal capacity to sue on her own behalf"); *Woods v. Wills*, 400 F. Supp. 2d 1145, 1181 (E.D. Mo. 2005) ("To maintain a suit in federal court, a minor must be represented by a competent adult").

## IV.  THE COURT SHOULD ORDER PLAINTIFFS' COUNSEL TO PAY THE DEFENDANTS THEIR EXPENSES AND FEES IN BRINGING THIS MOTION.

Finally, the defendants request their reasonable expenses, including attorney's fees, in bringing this motion.  Rule 37 provides that when granting a motion for sanctions for failure to comply with a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C); *see also Kornagay v. AT&T*, No. 05-0001, 2008 WL 4482970, at *1 (D.D.C. Sept. 29, 2008) ("This section of Rule 37 is mandatory unless 'the

disobedient party' meets its burden to avoid expenses").  Plaintiffs' failures here are not justified

and no known circumstances make an award of fees unjust.  In light of defendants'

understanding that plaintiffs' counsel have agreed to cover all of plaintiffs' costs in this

litigation, defendants request that the Court specify in its order that the payment of defendants'

expenses be made by plaintiffs' counsel, as the Court did in its previous order sanctioning

plaintiffs in this case.  *See* 7/17/09 Hr'g Tr. at 50:12-51:1 (Ex. D).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that their motion for sanctions

be granted.

Dated:  January 26, 2010                                         Respectfully submitted:


                                                                /s/ Eric Lasker
                                                                Joe G. Hollingsworth (D.C. Bar # 203273)
                                                                Eric G. Lasker (D.C. Bar # 430180)
                                                                Rosemary Stewart (D.C. Bar # 204438)
                                                                    HOLLINGSWORTH LLP
                                                                    1350 I Street, NW
                                                                    Washington, D.C. 20005
                                                                    Phone: (202) 898-5800
                                                                    Fax: (202) 682-1639

                                                                Counsel for the Defendants
                                                                DynCorp International, et al.


658041v1

## EXHIBITS TO DEFENDANTS'
## MOTION FOR SANCTIONS

| Document | Exhibit No. |
|---|---|
| October 21, 2008 Order | A |
| Excerpts of Nov. 27, 2007 Hearing Transcript | B |
| Excerpts of Nov. 25, 2008 Hearing Transcript | C |
| Excerpts of July 17, 2009 Hearing Transcript | D |
| Soloman, K.R., Marshall E.I.P., Carrasquilla, G, *Human Health and Environmental Risks from the Use of the Glyphosate Formulations to Control the Production of Coca in Colombia: Overview and Conclusions,* 72 Journal Toxicology and Environmental Health, Part A, 914-920 (2009) | E |
| U.S. Dept. of State, Memorandum of Justification Concerning the *Secretary of State's 2007 Certification of Conditions Related to the Aerial Eradication of Illicit Coca Colombia* (submitted to Congress on Aug. 10, 2007) | F |
| Excerpts of May 5, 2009 Hearing Transcript | G |
| Sample of Dr. Campana Causation Statement | H |
| Photographs from 2002 Video produced by Test Plaintiff Victor Mestanza | I |
| Appendix Containing the Excerpts of All Cited References to the Test Plaintiffs' Questionnaire Responses, Deposition Transcripts, and Other Documents | "App." |