UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VENANCIO AGUASANTA ARIAS, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DYNCORP, et al., | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 01-1908 (RWR)

Consolidated with Civil Action No. 07-1042 (RWR) for case management and discovery purposes

### MEMORANDUM OPINION

The Ecuadorian provinces of Sucumbios, Carchi, and Esmeraldas (collectively "provincial plaintiffs") and approximately 3,200 individual plaintiffs brought this action against the defendants, asserting violations of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and international and domestic common law stemming from the defendants' contract with the U.S. government to spray pesticides over cocaine and heroin farms in Colombia. The defendants have moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or, in the alternative, for summary judgment under Rule 56(c). They seek to dismiss the claims of the provincial plaintiffs on the grounds that the provincial plaintiffs lack standing to sue because their claims are too remote, the doctrine of *parens patriae* does not apply here to give the provincial plaintiffs standing, and they do not have the legal capacity to sue in U.S. courts. Because the provincial plaintiffs do not have Article III or *parens*

*patriae* standing, the defendants' motion, treated as a jurisdictional motion under Rule 12(b)(1), will be granted and the provincial plaintiffs' claims will be dismissed.

BACKGROUND

In the late 1990s, the United States government entered into a contract with the government of the Republic of Colombia, under a plan called "Plan Colombia," to eradicate drug production and exportation from Colombia. (First Am. Consol. Compl. ("Consol. Compl.") ¶ 12.) The U.S. government then contracted with the defendants to conduct aerial spraying to eradicate Colombian coca and heroin poppy crops. (Id. ¶ 13.) The plaintiffs allege that during the course of the defendants' spraying, "[h]eavy clouds of liquid spray dropped from the planes, shifted with the wind, and repeatedly fell on the homes and lands of [p]laintiffs." (Id. ¶ 38.) The chemicals from the spraying allegedly went "beyond their intended Colombian targets," entered into Ecuador, and injured humans, livestock, vegetation, and water. (Id. ¶¶ 18, 20.)

As a result of the alleged harm caused by the spraying, the individual and provincial plaintiffs brought this action asserting violations of the ATCA and various international and domestic common law torts. The provincial plaintiffs bring suit "in their own right and in their parens patriae capacity on behalf of their citizens and residents." (Id. ¶ 7.) The

provinces allege that they "have suffered damage to their natural resources and have expended, and will be required to expend in the future, funds to remediate the situation and to address their citizens' health, security, and property." (Id. ¶ 1.) The defendants move to dismiss the claims brought by the provincial plaintiffs, arguing that they lack both standing and the capacity to sue. The provincial plaintiffs oppose the dismissal.

## DISCUSSION

"Before a court may address the merits of a complaint, it must assure that it has jurisdiction to entertain the claims." Marshall v. Honeywell Tech. Solutions, Inc., 675 F. Supp. 2d 22, 24 (D.D.C. 2009) (internal quotation marks omitted). "Lack of standing is a defect in subject matter jurisdiction." Teva Pharm. USA, Inc. v. Sebelius, 638 F. Supp. 2d 42, 54 (D.D.C. 2009) (reversed on other grounds) (citing Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Because the defendants challenge the provincial plaintiffs' standing, the defendants' motion will be treated as one to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

"In considering whether a plaintiff has standing, a court accepts as true all of the factual allegations contained in the complaint." Unity08 v. Fed. Election Comm'n, 583 F. Supp. 2d 50, 56 (D.D.C. 2008) (reversed on other grounds) (citing Artis v. Greenspan, 158 F.3d 1301, 1306 (D.C. Cir. 1998)); see also

Chavous v. D.C. Fin. Responsibility and Mgmt. Assistance Auth.,
154 F. Supp. 2d 40, 44 (D.D.C. 2001) ("When reviewing a standing
challenge . . . trial courts must accept as true all material
allegations of the complaint[.]" (internal quotation marks
omitted)).  "Although the District Court may in appropriate cases
dispose of a motion to dismiss for lack of subject matter
jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint
standing alone, where necessary, the court may consider the
complaint supplemented by undisputed facts evidenced in the
record[.]" Coal. for Underground Expansion v. Mineta, 333 F.3d
193, 198 (D.C. Cir. 2003) (internal quotation marks omitted).

I.   ARTICLE III STANDING

    Article III standing requires "(1) injury in fact,
(2) causation, and (3) redressability." Fund for Animals, Inc.
v. Norton, 322 F.3d 728, 732-33 (D.C. Cir. 2003) (citing Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  A
plaintiff's alleged injury must be "concrete and particularized"
and "actual or imminent" and fairly traceable to the defendant's
action.  Lujan, 504 U.S. at 560.  "[T]he injury in fact test
requires more than an injury to a cognizable interest.  It
requires that the party seeking review be himself among the
injured." Wilderness Soc'y v. Norton, 434 F.3d 584, 590 (D.C.
Cir. 2006) (internal quotation marks omitted).  In order to meet
the Lujan standard, plaintiffs must establish standing as to each

of its claims, id. at 589, and "[i]n reviewing the standing question, [a court] must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." Amador County, Cal. v. Kempthorne, 592 F. Supp. 2d 101, 104 (D.D.C. 2009) (internal quotation marks omitted).

The provincial plaintiffs bring suit, in part, on their own behalf, stating that they "have been damaged in their economies, provincial lands, waters and budgets[,] . . . [that] [t]hey have suffered increased housing costs, education costs, costs associated with the housing and feeding of refugees[,] . . . [and that,] as the political subdivisions responsible for protecting the environment, [they] face remediation costs." (Consol. Compl. ¶ 32.) The defendants argue that the provinces' injuries derive from the individual plaintiffs' injuries and are too remote to establish standing. For support, the defendants rely primarily on cases that examine the question of whether a plaintiff had pled an injury that is sufficiently direct to survive a motion to dismiss for failure to state claim. (See Defs.' Reply Brief in Supp. of Their Mot. to Dismiss the Three Provincial Pls. at 7-8.) For example, in In re Tobacco/Governmental Health Care Costs Litig., 83 F. Supp. 2d 125 (D.D.C. 1999), the Republic of Guatemala brought tort and negligence claims against several tobacco companies seeking to

recover health care costs it incurred in treating its citizens'
smoking-related injuries.  Id. at 127.  The district court
dismissed Guatemala's claims because "all of Guatemala's alleged
injuries [were] too remote to have been proximately caused by
defendants' misconduct."  Id. at 128.  While this analysis could
address a motion asserting that a complaint fails to state a
traditional tort claim, a "defect in the merits of a party's
claim is not the basis upon which to determine standing."
Wilderness Soc'y, 434 F.3d at 595.

The defendants also rely on cases where courts have used the
proximate cause standard to determine whether a plaintiff's
injuries were too remote to confer standing.  (See Defs.' Revised
Reply Brief in Supp. of Their Mot. to Dismiss the Three
Provincial Pls. at 9-10.)  In Ganim v. Smith and Wesson Corp.,
780 A.2d 98 (Conn. 2001), for example, the City of Bridgeport,
Connecticut and its Mayor sued gun manufacturers, trade
associations and gun retailers, alleging that as a result of the
defendants' failure to design handguns to prevent unauthorized
and unintended gun use, screen the distributors's and retailers's
background and business practices, and adequately warn users of
gun danger, the city suffered increased police, court and prison
costs and had to impose increased tax burdens on taxpayers.  Id.
at 101-02, 118.  The plaintiffs also claimed loss of investment,
economic development and tax revenues due to lost productivity,

and victimization of their citizens.  Id. at 118.  The court held
that the plaintiffs lacked standing to assert their claims
because the link connecting the defendants' alleged misconduct to
the plaintiffs' alleged harm involved an attenuated connection
between gun manufacturers, distributors, wholesalers, retailers,
and unauthorized buyers and users.  Id. at 123, 129.  Similarly,
in Penelas v. Arms Tech., Inc., No. 99-1941 CA-06, 1999 WL
1204353 (Fla. Cir. Ct. Dec. 13, 1999), the Mayor of Miami-Dade
County brought an action against gun manufacturers, a gun
distributor, and three trade associations, asserting various
negligence claims and seeking to recover the costs incurred in
providing police, fire, emergency, court, prison and other
related services as a result of various homicidal, suicidal and
accidental shootings in the county.  Id. at *1.  The court held
that the county lacked standing because the damages were purely
derivative of damages suffered by third parties and too remote to
be recoverable.  Id. at *2; see also Camden County Bd. of Chosen
Freeholders v. Beretta U.S.A. Corp., 123 F. Supp. 2d 245, 257-58
(D.N.J. 2000) (holding that county lacked constitutional standing
to assert against gun manufacturers negligence claims seeking
compensation for manufacturers' alleged reckless and negligent
handgun marketing and distribution because its theory of
causation involved "a great number of links in the causal chain"
and county would have been required to show that causation was

not severed by distributor, retailer, or purchaser illegal
conduct, or gun theft); <u>District of Columbia v. Beretta U.S.A.</u>
<u>Corp.</u>, No. Civ. A. 0428-00, 2002 WL 31811717, at *27 (D.C. Super.
Dec. 16, 2002) (reversed in part on other grounds) (dismissing
District of Columbia's claims against gun manufacturers seeking
monetary damages and injunctive relief for economic impact of gun
violence in the District because claims were too remote to confer
standing).

The provincial plaintiffs allege three category of harms,
including (1) direct monetary damages flowing from reduced
revenues, increased costs, or a combination of the two; (2)
environmental damage; and (3) remediation and relocation costs.
(Pls.' Revised Opp'n to Defs.' Mot. to Dismiss the Three
Provincial Pls. on the Pleadings or, in the Alternative, for
Summ. J. ("Pls.' Revised Opp'n"), Ex. B ¶ 8.)  Monetary damages
may constitute an injury-in-fact to satisfy the first prong of
the standing analysis.  <u>See</u>, <u>e.g.</u>, <u>Info. Sciences Corp. v. United</u>
<u>States</u>, 85 Fed. Cl. 195, 199 (Fed. Cl. 2008) (noting that
plaintiff's alleged monetary damages establish injury-in-fact
where plaintiff challenged government's award of government
contract to another company after plaintiff spent $1.625 million
in preparing for bid procurement, submitting initial and revised
proposals, and participating in procurement activities).  The
provincial plaintiffs assert monetary damages reflected here in

budget deficits that were "quantified by examining the budgets for the Plaintiffs and for the other Ecuadorian Provinces from 1990-2007." (Pls.' Revised Opp'n, Ex. B ¶ 22.) The provincial plaintiffs rely on an expert report prepared by Dr. Henry H. Fishkind (the "Fishkind report") which states that while the provinces typically enjoy balanced budgets, they have experienced significantly higher expenses since Plan Colombia that have resulted in budget deficits. (Id.)

The provincial plaintiffs, however, fail to present facts to support the conclusion that Plan Colombia caused the direct monetary damages of budget deficits complained of here. In fact, the Fishkind report acknowledges that the current budget data for Sucumbios are affected by oil workers' strikes that have demanded additional spending and services. (Pls.' Revised Opp'n, Ex. B ¶ 26.) Also, other economic and environmental factors have contributed to other Ecuadorian provinces' budget deficits. The Fishkind report states that these provinces suffer from budget deficits due to a volcanic eruption and floods, and "difficulty enforcing . . . tax collections." (Pls.' Revised Opp'n, Ex. B ¶¶ 29, 30.) Thus, there is no factual basis for concluding that the budget deficits claimed here were caused directly by Plan Colombia. Because several unknown factors could have caused the "unexpected pressure on their current budgets" (Pls.' Revised Opp'n, Ex. B ¶ 31), the provincial plaintiffs' claims of direct

monetary injury do not satisfy the causation element of the
standing analysis.  See, e.g., Ganim, 780 A.2d at 124 (noting
that the fact that "there are numerous steps between the conduct
of the . . . defendants and the harms suffered by the plaintiffs"
is "strongly suggestive of remoteness").  The provincial
plaintiffs' claims of direct monetary damage causing provincial
budget deficits do not support Article III standing.

The provinces' environmental damage claims are broken into a
total of five sub-categories including: agricultural activities,
sustainable non-timber activities, sustainable timber activities,
environmental services, and cattle and small animal production.
(Pls.' Revised Opp'n, Ex. B ¶ 33, Table 4.)  These "damages
include estimates for the direct loss [of] agricultural
production as well as additional losses to forestry
production[,]" which are "based on market prices for the
agricultural and timber products[.]"  (Id. ¶ 34.)  In an effort
to define these sub-categories, the Fishkind report states that
the sustainable non-timber activities include "hunting and the
use, production and gathering of fruits, palms, fibers, and
medicinal plants" and that "the environmental services include
water recharge, recreational values, scenic beauty, genetic
resources and carbon sequestration."  (Id.)  Taking as true the
allegation that agricultural, forestry, and animal production
have suffered as a result of Plan Colombia, the provincial

plaintiffs fail to allege any possessory interest or title in the injured livestock, animals, crops and timber.  Similarly, taking as true the assertion that Plan Colombia has had a negative impact upon the agricultural and sustainable timber and non-timber activities, there are no allegations, for example, that these timber and agricultural activities are undertaken on the provinces' behalf or that the provincial governments earn direct revenue from these activities.  Although the complaint broadly alleges damage to provincial lands (see Consol. Compl. ¶ 32), it does not allege that the affected land in these provinces is land in which the provincial plaintiffs, rather than others, hold some custodial or possessory interest or title.

The provincial plaintiffs' responses to the defendants' interrogatory requests support a finding that the provinces' environmental damage claims are derivative of the individual plaintiffs' claims.  For example, in support of the assertion that "'Plan Colombia' herbicide caused damaged to natural resources[,]" Sucumbios cites "testimon[y] of the public regarding the effects on their crops and the impossibility of getting the land to produce[.]"  (Pls.' Revised Opp'n, Ex. D at 7 (emphasis added).)  Further, Sucumbios' citizens and residents allege that they "have not only lost crops, but also the basic products and foods for their own subsistence, due to the fumigations over their lands."  (Id. at 11 (emphasis added).)

There are also allegations that Esmeraldas' "citizens have lost
their land in many cases due to the impossibility for the crops
to grow in fumigated zones[.]" (Pls.' Revised Opp'n, Ex. F at 13
(emphasis added).) Because these environmental injuries are
derivative of the injuries allegedly suffered by the individual
plaintiffs and there is no allegation that environmental damage
has affected lands in which the provincial plaintiffs possess a
protectable interest, the provincial plaintiffs' claims of
environmental damage are not sufficient to satisfy the injury-in-
fact element of the standing analysis.

Finally, the provincial plaintiffs allege damages in the
form of remediation and relocation costs associated with the
environmental damage to the communities. (Pls.' Revised Opp'n,
Ex. B ¶ 38.) The Fishkind report states that there are "ongoing
difficulties in crop and small animal production in the affected
areas" and that "[t]here is a significant risk that the
[environmental] damage may be long lasting." (Id.) The report
states further that "the environmental damages to the communities
[will] continue, unless there is remediation" and that a "more
practical solution . . . is the relocation of the residents in
the most affected area[.]" (Id. ¶¶ 39-40.) There are, however,
no factual allegations to support the provincial plaintiffs'
claim that they bear direct responsibility for any remediation
costs. The plaintiffs' consolidated complaint asserts broadly

that the provinces are responsible for "protecting the environment" (Consol. Compl. ¶ 32), but noticeably absent from the complaint and supporting documents are specific assertions that the provinces are financially responsible for cleaning up all lands and waters allegedly damaged by Plan Colombia. Governments can carry out a responsibility for protecting the environment in countless ways -- e.g., licensing, imposing use restrictions, requiring emission and discharge controls -- that impose no obligation on them to bear the cost of remedying environmental harm not caused by them especially to natural resources not owned by them. The provincial plaintiffs provide evidence that "some inhabitants from the rural area [in Carchi] . . . started reporting that river waters had a sour taste to it and that the concentration of the chemical in the Plan Colombia herbicide was evident in the rivers." (Pls.' Revised Opp'n, Ex. E at 9.) However, the provincial plaintiffs do not state that they are solely or even partially responsible for cleaning or purifying any bodies of water affected by Plan Colombia. They do not allege or establish that remediation costs are not amounts assumed by individual plaintiffs, the national government, the polluters or other third parties.

The provincial plaintiffs also claim damages associated with relocating, housing, educating, feeding, and providing medical care for the communities affected by Plan Colombia. However,

like the provincial plaintiffs' other claims, there is no factual
basis to support a conclusion that these costs will be borne by
the provinces as opposed to private parties, the national
government, or national or international relief organizations.
Moreover, many of these claims -- particularly the claims related
to the depleted health conditions of the citizens -- are exactly
the type of third-party, derivative claims that the Article III
standing inquiry was designed to avoid.  See Wilderness Soc'y,
434 F.3d at 590 ("[T]he party seeking review [must] be himself
among the injured.").  That Plan Colombia allegedly has affected
individual citizens' welfare -- by, for example, resulting in an
increase in respiratory and digestive problems, allergic
reactions, or even death (see Pls.' Revised Opp'n, Ex. D at 11;
Ex. E at 8) -- does not result in a direct or otherwise non-
attenuated injury to the provinces.  Rather, this is the type of
claim that an individual plaintiff is in the best position to
raise and pursue, and it is the very type of injury that the
individual plaintiffs have alleged here.  (See, e.g., Consol.
Compl. ¶¶ 61 ("Plaintiffs have been injured to their person[.]"),
65 ("Plaintiffs have suffered injuries to their persons[.]").)
The relocation and remediation damages, then, do not satisfy the
injury-in-fact prong of the constitutional standing analysis.[1]

---

[1] The provinces also claim that crime rates have increased
since Plan Colombia.  (See Pls.' Revised Opp'n, Ex D at 13; Ex. E
at 9).  However, much like the claims of the Mayor of Miami-Dade

II.  PARENS PATRIAE STANDING

The provincial plaintiffs also seek to proceed in a *parens patriae* capacity.  *Parens patriae* is a doctrine that is reserved for U.S. States.  It is a narrowly construed, judicially created exception to the "normal rules of standing applied to private citizens in recognition of the special role that a State plays in pursuing its quasi-sovereign interests in 'the well-being of its populace.'"  Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 335 (1st Cir. 2000) (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982)).  "In order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party."  Id. at 336. Specifically, "[t]he State must express a quasi-sovereign interest" such as in "the health and well-being - both physical and economic - of its residents in general . . . [or] in not being discriminatorily denied its rightful status within the federal system."  Id. (citing Alfred L. Snapp & Son, Inc., 458 U.S. at 607).  The rationale behind extending *parens patriae* standing is that "States have surrendered certain aspects of

---

County in Penelas, these claims are derivative of damages suffered by the crime victims and likely would involve a great number of links in the causal chain, and thus are too remote to confer standing.  See Penelas, 1999 WL 1204353, at *2; see also Camden County Bd. of Chosen Freeholders, 123 F. Supp. 2d at 257-58.

their sovereignty to the federal government and, in return, are given recourse to solve their problems with other States." Id. at 337.

The D.C. Circuit, however, has held that *parens patriae* "does not create a boundless opportunity for governments to seek recovery for alleged wrongs against them or their residents." Serv. Emps. Int'l Union Health and Welfare Fund v. Philip Morris Inc., 249 F.3d 1068, 1073 (D.C. Cir. 2001). In particular, the Circuit has precluded foreign nations from asserting *parens patriae* standing "unless there is a clear indication by the Supreme Court or one of the two coordinate branches of government to grant such standing[,]" id. at 1073, and "[t]he Supreme Court has never recognized parens patriae standing in a foreign nation where only quasi-sovereign interests are at stake." DeCoster, 229 F.3d at 336.

Notwithstanding this Circuit's precedent, the provincial plaintiffs argue that they may bring their claims in a *parens patriae* capacity because they are provinces, not foreign nations. This distinction is of little consequence, however. The federalism concerns implicated by the relationship between the U.S. States and the U.S. federal government do not exist between foreign provinces and the U.S. federal government. The provinces, as political subdivisions of Ecuador, do not claim and have not shown that they have conceded any of their sovereignty

to the U.S. government.  See, e.g., State of Sao Paulo of the
Federative Republic of Brazil v. Am. Tobacco Co., 919 A.2d 1116,
1122 (Del. 2007) (holding that the Republic of Panama and State
of Sao Paulo, Brazil did not have *parens patriae* standing to
bring suit on behalf of their citizens in part because they had
"retained the full array of sovereign rights that the American
States and Puerto Rico had ceded to the United States
government").  Moreover, "the theoretical underpinning of *parens
patriae* standing is to 'prevent[] . . . injury to those who
cannot protect themselves.'"  In re Tobacco/Governmental Health
Care Costs Litig., 83 F. Supp. 2d at 134 (alterations in
original) (quoting Alfred L. Snapp & Son, Inc., 458 U.S. at 600).
Here, the individual plaintiffs have counsel representing them,
pursuing and protecting their interests in this suit, and there
has been no need demonstrated for the provincial plaintiffs to
intercede on their behalf.  See, e.g., Late Corp. of the Church
of Jesus Christ of Latter-Day Saints v. United States, 136 U.S.
1, 57-58 (1890) (noting that it is often necessary for a state to
intercede in its *parens patriae* capacity to prevent injury to
infants, insane persons, and persons who "cannot act for
themselves" and "are often incapable of vindicating their
rights").  The provincial plaintiffs have not demonstrated *parens
patriae* standing to sue.

## CONCLUSION

Because the provincial plaintiffs' injuries are not sufficient to satisfy Article III standing and the provincial plaintiffs do not have standing under the doctrine of *parens patriae*, the defendants' motion, treated as one to dismiss under Rule 12(b)(1), will be granted and the provincial plaintiffs' claims will be dismissed. An appropriate Order accompanies this Memorandum Opinion.

SIGNED this 15th day of September, 2010.


                                   _____/s/_____

                                   RICHARD W. ROBERTS
                                   United States District Judge